# EXHIBIT C

2011 WL 116138
Only the Westlaw citation is currently available.
United States District Court,
D. South Carolina.

UNITED STATES of America
v.
Chadrick E. FULKS.

CR No. 4:02–992–JFA.
|
Jan. 13, 2011.

**Attorneys and Law Firms**

C. Todd Hagins, SC Law Enforcement Division, Jimmie Ewing, Robert F. Daley, Jr., Jeffrey Mikell Johnson, Robert C. Jendron, Jr., U.S. Attorneys Office, Jonathan S. Gasser, Harris and Gasser Law Firm, Columbia, SC, John C. Duane, Motley Rice, Mt. Pleasant, SC, Rose Mary Parham, Parham Law Office, Florence, SC, J. Strom Thurmond, Jr., Smith Massey Brodie and Thurmond, Aiken, SC, for Plaintiff.

ORDER ON MOTION TO ALTER OR AMEND

JOSEPH F. ANDERSON, JR., District Judge.

INTRODUCTION

**\*1** This matter is before the court upon defendant's motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend this court's order denying defendant's motion to vacate his sentence under 28 U.S.C. § 2255. The Rule 59(e) motion was timely filed and has been fully briefed by the parties. Additionally, the court heard oral argument on December 8, 2010, during which the defendant was present via video satellite. On alternative grounds (one procedural and the other substantive), the court denies the motion.

BACKGROUND

The extensive history of this case is set forth more fully in the court's order denying relief under § 2255, a copy of which is incorporated herein by reference. Briefly, the defendant, Chadrick Evans Fulks ("Fulks"), was sentenced to death by a South Carolina federal jury for the 2002 carjacking and kidnapping resulting in the death of Alice Donovan. After an unsuccessful appeal to the United States Court of Appeals for the Fourth Circuit [1] and the United States Supreme Court, Fulks returned to this court with a § 2255 motion to vacate, set aside, or correct his federal death sentence.

Contending that his trial counsel were constitutionally ineffective in a variety of ways, and that other violations of his constitutional rights rendered his death sentence infirm, Fulks asserted thirty-three claims in his § 2255 petition, as amended. The court found no merit to any of the grounds of error asserted and denied the petition in its 175–page order of August 20,2010. [2] The court did, however, grant Fulks a certificate of appealability on all but three of his thirty-three claims.

The motion to alter or amend was filed by Fulks's newly-appointed counsel, Billy H. Nolas and Amy Gershenfeld Donnella, both of the Capital Habeas Unit of the Federal Community Defender for the Eastern District of Pennsylvania ("PCHU"). [3] Mr. Nolas was appointed on August 27, 2010, and Ms. Donella was admitted as co-counsel on December 2, 2010. They are the fifteenth and sixteenth lawyers, respectively, who have represented Fulks during the pendency of the criminal and civil litigation at issue. Because their late involvement in the case impacts this court's ruling to a minor degree, it is necessary to recite in some detail, the course of events which led to the PCHU being involved in this case.

Following Fulks's indictment, the Magistrate Judge for this District, after a statutorily required consultation with the South Carolina Federal Public Defender, appointed John H. Blume—an attorney with extensive capital litigation experience who also teaches at Cornell Law, along with William Nettles—a long-time Federal Public Defender serving in the District of South Carolina, to represent Fulks. Blume called to his assistance two other lawyers, Sheri Johnson and Keir Wyble, who both had capital litigation experience.

After Fulks's conviction was affirmed on appeal, this court appointed two attorneys to represent Fulks in his post-conviction relief efforts. After an initial skirmish with Blume, who suggested that the court appoint different counsel, the court appointed Greenville, South Carolina attorneys William J. Watkins, Jr. and Beattie B. Ashmore to represent Fulks. As detailed in previous orders of this court, both of these attorneys had extensive experience litigating in federal court.

Ashmore was primarily a criminal defense attorney with extensive courtroom experience, and Watkins, a former law clerk for the Fourth Circuit Court of Appeals, enjoyed a reputation as an excellent researcher and brief writer.

**\*2** Shortly after Fulks's § 2255 petition was filed, Watkins accepted an appointment to serve as an Assistant United States Attorney for the District of South Carolina, thereby requiring that this court issue an order to substitute counsel. As a replacement, the court chose Kirsten Small, an attorney with the South Carolina firm of Nexsen Pruett, who was also a former law clerk on the Fourth Circuit Court of Appeals with extensive brief writing and appellate advocacy skills. Ashmore and Smalls were then joined by six lawyers from the California firm of O'Melveny & Meyers (David P. Dalke, Kymberleigh Damron–Hsiao, Amy J. Laurendeau, Stephanie L. Noble, Danielle N. Oakley, and Amy J. Longo), who entered the case on a pro bono basis and actually funded some of the investigation used in developing the claims in the § 2255 petition.

One other procedural development warrants special mention. Fulks's initial § 2255 petition included an allegation that he had been sexually abused as a child, and that his trial counsel (Blume) was constitutionally ineffective for failing to fully explore this issue and develop it through testimony at trial. Then on September 8, 2009, Fulks filed a pro se motion with the court (ECF No. 1231) in which he referred to the "lies of sexual abuse and also the wrongful representation of counsel in this case." Later, in a status conference conducted on October 5, 2009, Fulks, who appeared at the conference via video satellite, informed the court that he did not want to go forward with the sexual abuse allegation and, further, that he was upset with his attorneys for having inserted this claim in the § 2255 petition without his consent. When the court inquired of Fulks's counsel, counsel responded that they had already determined that the sexual abuse allegation would be dropped and that a motion to that effect would be forthcoming. The court entered an order indicating that the sexual abuse claim was deemed abandoned.

After several postponements, including a lengthy delay occasioned by an appeal of a procedural ruling of this court to the United States Supreme Court, the matter was scheduled for an evidentiary hearing to commence on February 22, 2010. Ten days before the hearing, counsel for Fulks filed a motion to once again raise the sexual abuse claim. Counsel also sought a postponement of the evidentiary hearing and the authorization of additional expenditures for experts to further explore this issue.

Fulks's vacillation regarding whether the sexual abuse claim would be raised in this case mirrored his actions in other respects. Specifically, on three separate occasions while this § 2255 action was pending, Fulks filed a motion to withdraw his appeals and proceed with his execution. On each occasion, he subsequently recanted and asked that the case go forward. On this record, the court denied the motion to continue the evidentiary hearing and further exploration of the sexual abuse claim although, as will be seen, the court heard extensive testimony regarding the sexual abuse allegations in the evidentiary hearing that was eventually conducted.

**\*3** On December 31, 2009, Fulks moved to appoint the PCHU as supplemental counsel. After consulting with Fourth Circuit Court of Appeals Chief Judge William Traxler, and in view of the fact that Fulks already had eight fully competent attorneys working on his behalf, the court respectfully declined the motion to appoint two additional lawyers from the PCHU to Fulks's § 2255 team.

After a six-day hearing in late February 2010, the court proceeded to address the thirty-three claims raised in Fulks's § 2255 petition, issuing its 175–page order and judgment on August 20, 2010.

On August 27, 2010, the court received a motion by Ashmore to withdraw as counsel and to appoint Nolas of the PCHU, in his place. The court orally granted the motion and on September 3, 2010, a written order was filed. Fourteen days later, on September 17, 2010, Nolas filed the motion to alter or amend presently before the court. Appended to the motion are the affidavits of seventeen individuals, dated between September 2 and September 16, 2010. Notably, these affidavits were all obtained in a narrow window between the order appointing Nolas to represent Fulks and the filing of the motion to alter or amend. These affidavits are in support of the four basic claims raised in Fulks's motion to alter or amend which are as follows:

## CLAIMS IN MOTION TO ALTER OR AMEND

(1) A contention that John Blume, Fulks's principal criminal trial attorney, did not possess the degree of capital litigation experience that had been represented to the court;

(2) A reassertion of arguments previously made to, and rejected by, this court that Blume rendered constitutionally ineffective assistance of counsel in a variety of ways, including principally the decision to recommend that Fulks (a) make a proffer to the government regarding Alice Donovan's abduction without any corresponding concessions from the government; and (b) admit guilt to the crime charged, thereby foregoing the guilt phase of the trial and proceeding directly to the penalty phase;

(3) A contention that this court erred in refusing to postpone the evidentiary hearing and allow further exploration of the sexual abuse issue and related expert testimony that might have derived from the alleged newly developed evidence; and

(4) A contention that, contrary to representations made by the government's attorney, special arrangements or concessions were made with regard to four witnesses who were called by the government in the penalty phase of the criminal trial.

## STANDARD OF LAW

Rule 59(e) "was adopted to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment." *White v. New Hampshire Dep't of Employment Sec.,* 455 U.S. 445, 450, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982).

"Rule 59(e) provides that a court may alter or amend the judgment if the movant shows either (1) an intervening change in the controlling law; (2) new evidence that was not available at trial; or (3) that there has been a clear error of law or a manifest injustice." *Robinson v. Wix Filtration Corp.,* 599 F.3d 403, 407 (4th Cir.2010).

 **\*4**  The court finds that there has been no intervening change in controlling law, nor has the defendant alleged that there has been a clear error of law. Therefore, the only question before the court appears to be whether the evidence Fulks has now produced in seventeen new affidavits [4] was unavailable during the pendency of his § 2255 action.

The government responds in opposition to the motion arguing that the court should strike the additional affidavits supporting the Rule 59(e) motion because Fulks cannot show that this information was unavailable. The government also contends that one or more of Fulks's claims are untimely and unauthorized successive § 2255 claims and that this court

is without jurisdiction to hear such repetitive claims. *United States v. Winestock,* 340 F.3d 200, 205 (4th Cir.2003).

Because the court agrees with the government that Fulks cannot show that the information set forth in the seventeen post-judgment affidavits submitted was not available to Fulks or his counsel earlier, the court will strike all these affidavits as untimely under Rule 59(e). Moreover, it clearly appears that at least one of the four issues outlined above (issue number 4) is untimely and unauthorized as a successive § 2255 claim under *Winestock.* The court's decision to deny the motion to alter or amend rests upon these grounds. Out of an abundance of caution, however, and in the event that the Court of Appeals wishes to address these late issues on their merits, the court will issue an alternative ruling on the merits of the claims asserted in the present motion.

## THE NEW AFFIDAVITS

The affidavits of H.F. Pete Partee and Lesley Coggiola, criminal defense lawyers who practice in Greenville and Columbia, respectively, indicate that Blume's participation in two state capital trials with them was of a limited nature. Partee and Coggiola, along with Mary Lou Newberger and Henderson Hill, criminal defense attorneys from West Virginia and North Carolina, respectively, all opine that Blume committed procedural error by advising Fulks to plead guilty and make a proffer to the government without any concessions in return. One affidavit also challenges Blume's failure to visit the scene of some of the events that occurred during the seventeen-day crime spree by Fulks and his co-defendant, Branden Basham.

All four of these individuals are active practicing attorneys, listed in phone books and various bar directories. Accordingly, they were clearly available for consultation prior to this court's August 20, 2010 order and judgment.

The next group of affiants, Lewis Lambert, Jr., Lewis Lambert, Sr ., Kenneth Maynard, Odie Starks, and Mike Kaasee, are all individuals who were friends and neighbors of Fulks during his childhood. In their affidavits, they recount second-hand information regarding sexual abuse Fulks allegedly received as a child, although some of the information is cryptic and of limited probative value. There is no contention, let alone a showing, that any of these individuals were not available for interviews or to provide

testimony prior to this court's order and judgment of August 20, 2010.

**\*5** The next affiant, Harry Krop, PhD, conducted a three and one-half hour interview with Fulks on September 13, 2010. [5] During this interview, Fulks allegedly provided additional information regarding his sexual history. Dr. Krop opines that he has never seen anyone who was "sexually victimized as often and by so many different adults as Mr. Fulks was." Krop's declaration indicates that his interview with Fulks was done on a pro bono basis, with no indication as to why his pro bono activity could not have been performed earlier while the § 2255 case was actively pending before this court and while allegations of sexual abuse were being debated in the hearings that were conducted.

The next group of affiants are well-known to this court and to the lawyers involved in the case. Drs. Margaret Melikian (forensic psychiatrist), James H. Hilkey (clinical forensic psychologist), and Seymour Halleck (forensic psychiatrist), all gave affidavits in support of the § 2255 petition. These affidavits addressed Fulks's deprived childhood, the abuse (physical, emotional, and sexual) that they were aware of, and offered expert opinions as to Fulks's various disorders and problems. The import of the initial affidavits at that time was that they had been retained by Blume as potential experts to be called at trial, but were jettisoned at the last minute and not called. At the urging of Fulks's § 2255 counsel, and at great expense to the taxpayers, this court allowed these three witnesses to present live testimony at the § 2255 evidentiary hearing because, according to defense counsel, the court needed to have the benefit of seeing and hearing these important witnesses who were not called at Fulks's criminal trial. Melikian and Hilkey were put on the stand and testified extensively. For some unexplained reason, Halleck was not called, but the court did receive and consider his affidavit.

These three expert witnesses have all filed new affidavits indicating that had they known about the additional sexual abuse revealed by Fulks in his September 13, 2010 interview with Dr. Krop, their testimony regarding the effect of this abuse on Fulks's development would have been even stronger than it was in their original affidavits.

The final four affidavits relate to the contention that certain witnesses were promised favorable treatment by law enforcement in return for their testimony in contradiction to statements made by those witnesses at trial and statements made by the prosecuting Assistant United States Attorneys. Three of the affidavits are from the witnesses themselves: Beth McGuffin, Amber Fowler, and Veronica Evans. The fourth affidavit is from Amanda Oswalt, who did not testify at Fulks's trial but who purports to be a friend of Tina Severance (Fulks's former girlfriend), who did testify at trial. None of these affidavits constitute new evidence.

In their affidavits, Evans, McGuffin, and Fowler describe events that allegedly occurred during Fulks's 2004 criminal trial. Oswalt's affidavit centers on her alleged conversation in 2008 with Tina Severance. Thus, the information in these declarations was available long before this court issued its ruling on Fulks's § 2255 petition. Post-judgment declarations cannot serve as the basis for a Rule 59(e) motion when all of the events alleged therein occurred before the court entered judgment. *Ingle ex rel. Estate of Ingle v. Yelton,* 439 F.3d 191, 198 (4th Cir.2006). Moreover, a party relying on new evidence "must produce a legitimate justification for not presenting the evidence during the earlier proceeding.". *Id.* at 197. The reasons for non-compliance must be "compelling." *Robinson v. Wix Filtration Corp., LLC,* 599 F.3d 403, 410 n. 9 (4th Cir.2010).

**\*6** In his Rule 59(e) motion, Fulks does not point to any reason, much less a compelling reason, why these declarations were previously unavailable.

On this record, the court is constrained to strike all the affidavits and deny relief on the motion to alter or amend. Nolas, newly-appointed counsel for Fulks, urged upon the court an argument that all of this information was developed in the narrow, fifteen-day window between the appointment of PCHU counsel and the filing of the motion to alter or amend. This proposition strikes the court as implausible, but is one which the court will accept as true for purposes of this motion. Nevertheless, as indicated by the brief summary recited above, none of the information contained in these seventeen affidavits was, in fact, previously unavailable. There was no impediment to Fulks's § 2255 counsel developing this information to the fullest prior to this court's lengthy evidentiary hearing and exhaustive 175–page memorandum opinion.

Indeed, the record in this case reflects that the court gave Fulks's § 2255 counsel *more* time than it gave Fulks's trial counsel to develop the record. Blume and Nettles were appointed as trial counsel on January 6, 2003. Jury selection for the trial began on May 10, 2004, thus giving Blume and

the other trial attorneys a total of sixteen months to prepare for trial. The court appointed Watkins and Ashmore as § 2255 counsel on September 10, 2007. The § 2255 evidentiary hearing was not conducted until twenty-nine months later on February 22, 2010. The court took the matter under advisement and laboriously crafted its 175–page opinion over the ensuing six-month period, rendering its decision on August 20, 2010. In other words, the preparation time between the appointment of habeas counsel and the § 2255 hearing was nearly *twice* as long for the § 2255 phase of this case as compared to the actual penalty phase trial.

It would set a bad precedent indeed for the court to permit capital litigants who, for the duration of this case have received what this court views to be first-class legal representation, to come forward with seventeen affidavits following immediately in the wake of this court's 175–page order, with no showing whatsoever that the information was not available earlier. The fact that counsel was able to glean this information within two weeks of the court's ruling strongly suggests that the information was readily available earlier.

The need for reasonable promptness and finality in capital litigation is clearly reflected in Fourth Circuit Court of Appeals Order 113 which provides, in pertinent part, "the district court is required to render a decision and enter a final judgment in a capital § 2255 action within 450 days of the date on which the petition is filed or sixty days after the date on which the case is submitted for decision, whichever is earlier, subject to an extension of up to thirty days if the district court determines that the ends of justice would be best served by the delay." *See* Judicial Council Order 113, Death Penalty Representation in the Fourth Circuit (Oct. 3, 1996). Absent an extension, Order 113 would have required a decision from the district court by September 15, 2009. This court wrote Chief Judge Traxler on July 24, 2009 requesting the thirty-day extension as allowed under Order 113. Chief Judge Traxler granted the extension on July 28, 2009, thereby setting a new decision deadline of October 15, 2009.

 **\*7** The Order 113 deadline was then thrown into a state of confusion when Fulks took an interlocutory appeal of an adverse ruling of this court regarding a discovery matter. Although the Fourth Circuit denied relief, the Supreme Court stayed this action pending resolution of an unrelated case on the issue of whether an adverse ruling on an attorney-client privilege issue may be appealed on an interlocutory basis— an issue that was ultimately decided adversely to Fulks. The

court was powerless to comply with the time deadlines of Order 113 in light of the Supreme Court's stay, but did its best to handle the matter with dispatch once the stay was lifted and the case was returned to this district court. Such series of delays led in part to this court's decision to deny the effort to again postpone the February 2010 hearing so that Fulks could reassert his sexual abuse allegation after he had earlier personally indicated his firm intention to abandon this claim altogether.

The motion to alter or amend the judgment was filed on September 17, 2010, nearly a full year after the target judgment date of Order 113. This order is being rendered some four months later. Capital litigants simply cannot be allowed to sandbag the court by raising issues in affidavits that were readily available prior to judgment. Accordingly, the motion is denied on this basis. [6]

Alternatively, in the event that the Court of Appeals desires to address the issues raised in the motion to alter or amend on the merits, the court will proceed to review the four issues.

### 1. BLUME'S CAPITAL LITIGATION EXPERIENCE

Initially, Fulks argues that trial counsel John Blume, in his testimony during the § 2255 evidentiary hearing, "omitted crucial information about his lack of jury trial experience." Fulks submits the declarations of four attorneys, two of who state that Blume's involvement in two state capital trials was limited and was "far less extensive than suggested by his testimony." These two affiants, H.F. Pete Partee and Lesley Coggiola, were the lead attorneys in the two state death penalty trials to which Blume referenced in his Curriculum Vitae. At the § 2255 evidentiary hearing, however, Blume never testified that he was lead counsel, nor did he suggest that he played a key role in conducting voir dire or witness examination in those two state trials. Blume did not omit any information and neither of Fulks's habeas counsel asked him to provide details concerning his involvement in those state trials. Moreover, in its order appraising Blume's effectiveness, the court did not place any special significance on the depth of Blume's involvement in these two particular state trials.

Finally, and perhaps most importantly, this court was able to view Blume's trial performance firsthand. Unlike situations that frequently arise when federal courts are called upon to review the effectiveness of attorneys who represent

state capital defendants in state court, this court was able to personally observe Blume's performance in its own courtroom. Moreover, as the presiding judge, the court was able to observe subtle events and nuances that are not discernable in a written trial transcript.

**\*8** In addition to presiding over Blume's performance at trial, this court was given an extensive behind-the-scenes view of Blume's trial preparation at the § 2255 evidentiary hearing. As is set out in this court's order of August 20, 2010, Blume appeared to be a master organizer, formulating work assignments, charts, checklists, and multi-person review of all aspects of the events leading up to Fulks's trial. Accordingly, this court has no hesitation whatsoever in concluding that Blume possessed the necessary requisites to perform quite capably as a courtroom lawyer during Fulks's penalty phase trial. The court reiterates and incorporates herein by reference all of its findings regarding Blume's trial performance from its August 20, 2010 order.

### 2. BLUME'S RECOMMENDATION THAT FULKS PLEAD GUILTY AND MAKE A PROFFER TO LAW ENFORCEMENT WITHOUT A CONCESSION IN RETURN

The affidavits of Partee and Coggiola both take issue with Blume's trial strategy regarding the guilty plea and the proffer to law enforcement. Additionally, two other lawyers, Henderson Hill of North Carolina and Mary Lou Newberger of West Virginia, have offered similar opinions.

Both of these claims were raised in the initial § 2255 petition, fully briefed and vigorously argued before this court issued its August 25, 2010 order. In fact, the court permitted Fulks's habeas counsel, at government expense, to call an expert witness, Andrea Lyons from Chicago, who offered an opinion on these very subjects. The court rejected Ms. Lyons' testimony in all respects. *See* Order of August 20, 2010 at 76–83 (relating to the FBI 302 Statement) and 92–94 (relating to the decision to plead guilty).

Because the court has already heard extensive testimony from a self-proclaimed expert in this area of the law and rejected it, the court cannot countenance an effort to supplement the record to boost arguments that have previously been determined unavailing by this court.

Additionally, Ms. Newberger, who served as second-chair to Blume when he was appointed by the Federal Court in West Virginia to represent Fulks in the Samantha Burns murder case, opines that Blume was ineffective for failing to personally review all of the geographic locations involved in the seventeen-day crime spree engaged in by Fulks and his co-defendant Branden Basham. Such an argument is deficient in several respects. First, as noted above, Newberger was associated with Blume in the West Virginia criminal litigation which was concluded rather expeditiously when Fulks tendered a guilty plea and received an agreed upon life sentence. West Virginia does not recognize the death penalty in its state courts and apparently the United States Attorney in that district rather quickly concluded that the case could be disposed of by way of a stipulated life sentence. Blume's involvement in West Virginia, and Newberger's knowledge of it, was necessarily limited. Newberger does not know precisely what Blume did to prepare for the South Carolina litigation. Moreover, the evidence at the § 2255 hearing clearly disclosed that if Blume did not himself personally visit all the locations, his investigators certainly did. The court finds no error of constitutional dimension in Blume's failure to visit all of the many geographic locations that were identified during the testimony at trial.

### 3. THE SEXUAL ABUSE EVIDENCE AND RESULTING EXPERT TESTIMONY

**\*9** The argument regarding new evidence of Fulks's sexual abuse begins with this court's decision not to postpone the evidentiary hearing (that had been set and rescheduled on several occasions) when Fulks sought to resurrect the sexual abuse claim ten days before the February 22, 2010 hearing. As recited earlier in this order, Fulks had personally, on the record, and in writing, expressed his strong desire to drop this claim, indicating that he did not wish to falsely accuse his parents of sexual misbehavior towards him while he was a child.

The reference to the court's failure to postpone the hearing also hints that the court was particularly stingy with § 2255 counsel in terms of funds for investigative assistance. In this court's view, the court has been overly generous throughout the duration of this litigation in terms of providing tax-payer funded assistance to investigate and develop the issues in this case. All of the court's orders approving counsel's funding requests have been filed under seal and the government is not aware of the requests or the amounts. If, however, this issue

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   6

is raised on appeal, this court hereby authorizes the unsealing of the funding records so that the Court of Appeals will have full access to the total amount of funds approved by this court for investigatory and expert assistance.

Turning to the merits of the sexual abuse issue, it should be noted that Blume himself testified that he felt that it was very likely that Fulks had been sexually abused but "when multiple members of the trial team asked Fulks about it, he denied any sexual abuse at the hands of his family members." Order at 33. In spite of Fulks's intransigence, counsel was able to develop some information regarding sexual abuse that was put before the trial jury and thoroughly discussed in this court's order. As this court noted, "[T]he trial record is replete with witness testimony that Fulks's childhood environment was filled with inappropriate sexual activity including the existence of graphic pornography on the walls and ceilings; that Fulks was molested by an older man when he was a child; and that he had a relationship with a '20–something' year old woman when he was fifteen." *Id.* Later, the court observed, "Trial counsel painted a compelling and empathetic picture of a young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents ..." *Id.* at 51. Still later, the court found that "trial counsel effectively presented evidence that petitioner's childhood was one of physical abuse, emotional neglect, sexual abuse, and self-medication with drugs and alcohol." *Id.* at 61–62. Finally, the court concluded that the mitigation testimony in this case "spanned four days and included some twenty-four witnesses, many of whom testified as to Fulks's deplorable living conditions as a child, surrounded by constant violence, alcohol and drug abuse, and many instances of sexual depravity." *Id.* at 144.

 **\*10**  It can thus be seen that sexual abuse was a component of the mitigation testimony presented at trial and was developed by Blume to the extent practicable under the circumstances and in accordance with counsel's trial strategies. That Blume was unable to coax information regarding allegations of sexual abuse from family members is consistent with Fulks's statement directed to this court in a teleconference conducted on the record that he did not wish to allege that he was subjected to sexual abuse at the hands of family members. Additionally, none of the other fourteen lawyers who preceded Nolas and Donnella's involvement in this case were able to elicit sexual abuse information from Fulks either.

Fulks's present § 2255 counsel asked the court to accept the proposition that Fulks subconsciously repressed memories of family sexual abuse from the time that trial counsel's investigation in this case began (January 2003) until nearly eight years later (early September 2010). Fulks's revelations of sexual abuse included (1) a second-grade teacher; (2) a childhood friend, Gary Kaasee; (3) an older sister; (4) an adult female neighbor; (5) Fulks's stepfather; (6) an unidentified older man who forced Fulks to have sex with one of his close girlfriends; (7) Fulks's father who exposed him to sexual images; and (7) a teenage girl who taught Fulks how to perform sexual acts. Fulks revealed all of this activity to Dr. Krop in a three and one-half hour interview which Krop apparently accepted as absolute fact, leading to Krop's conclusion that Fulks was the most sexually victimized human being he had ever investigated.

It should also be noted that, as this court has previously found, Fulks has on several occasions demonstrated an uncanny ability to deceive others. *See* Order at 106 (detailing Fulks's successful impersonation of an FBI agent to rob two men on the highway); at 107 (setting forth Fulks's successful efforts to convince prison hospital authorities of severe pain to attempt an escape from the medical facility); and again at 107 (setting forth Fulks's ruse to a fellow jail inmate's mother that his mother-in-law had died, his wife was injured, and his infant daughter was in critical condition from a terrible automobile accident. The ruse was so successful that the jail inmate's mother bailed Fulks out of jail and loaned him her car so that he could travel to a distant hospital to visit his non-existent family. Fulks provided the mother with periodic progress reports on his family condition until the fifth day, when the car was supposed to be returned at which time the mother never heard from Fulks again). Suffice it to say that Fulks's recently-recalled incidents of family sexual abuse warrant a degree of skepticism at this juncture in the litigation.

Moreover, as set forth in detail above, evidence of sexual abuse by individuals was, in fact, put before the jury during the penalty phase trial, and considered by the experts who testified. All of this information is set out in detail in this court's August 20, 2010 order.

 **\*11**  Finally, and of equal significance, is the fact that Blume himself recognized that evidence of repeated sexual abuse as a child could have been a double-edged sword. As the Seventh Circuit has observed regarding a § 2255 claim that evidence of the petitioner's damaged brain should have been presented to the jury:

[J]urors may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that, when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate.

*Burris v. Parke,* 130 F.3d 782, 784–85 (7th Cir.1997).

The same could be said for the failure to produce more evidence of sexual abuse. Simply explained, if Fulks's propensity towards sexually violent conduct directed at women—which was abundantly detailed in the record from Fulks's girlfriends and former wives—was caused by the extensive sexual abuse he suffered as a child, it does not mean that the jurors would have used this as a reason to decline to impose the death penalty. Rather, they may have concluded that Fulks's violent sexual proclivities were due to forces beyond his control and that capital punishment was necessary to incapacitate Fulks from committing further violent sexual acts. Thus, Fulks has not shown the prejudice prong required under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

As this court has already noted, "[I]f it takes this [§ 2255] defense team, which is a very fine world-class team of defense attorneys, twenty-nine months and it still has not been able to ferret out any information about sexual abuse, especially when it is information that Mr. Fulks would be presumably in possession of ... I think it's a real uphill battle to argue that Mr. Blume was ineffective in not developing it in the sixteen months he had." Order at 13.

### 4. THE ALLEGED NEW EVIDENCE AND BRADY VIOLATION

In Claims 20 and 21 of the amended § 2255 petition, Fulks argued that his due process rights under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and their progeny, were violated by the prosecution's attempt to influence witness testimony through intimidation tactics and improper deal-making, none of which was disclosed to defense counsel. In the motion to alter or amend, these claims are supplemented by the affidavits of four women: Beth McGuffin, Amber Fowler, Veronica

Evans, and Amanda Oswalt. Three of these individuals (McGuffin, Fowler, and Evans) testified at trial. The other witness, Amanda Oswalt, did not testify at Fulks's trial, but claims in her affidavit that in 2008 she had a conversation with Tina Severance, a witness who did testify.

To varying degrees, the affidavits of these individuals indicate that their testimony (or, in the case of Oswalt, the testimony of Ms. Severance) at trial was perjured in that they were, in fact, offered deals or were under threats at the time they gave their testimony. Some of the witnesses recant, at least in part, some of their substantive testimony, while the others merely indicate that deals were made with them by the prosecution or their agents without actually changing any of their substantive trial testimony.

**\*12** Before delving into the specifics of the four affidavits, it should be noted that this claim relates to the testimony of four out of 156 witnesses who testified in this case. In many respects, the testimony of the witnesses was corroborated by that of other witnesses. In other respects, the testimony was not entirely helpful to the government.

The four affidavits warrant a degree of skepticism because at the December 8, 2010, hearing on the motion to alter or amend, defense counsel candidly admitted that she sought to allay any concerns that the witnesses might have regarding perjury charges that might be initiated by the government by telling the witnesses that "they would be protected by the court" with regard to new information or contradictory information contained in their affidavits. Specifically, defense counsel told the court at the December 8 hearing:

Now, we sent an investigator out, we sent a couple of investigators out after we were appointed in the case to talk to these women again and to try and give them as many reassurances as we could that they would be protected by the court if they came forward and told the truth ...

Tn. of Dec. 8, 2010 hearing at 54.

With these preliminary observations in mind, the court turns to the specifics of the declarations filed by the four individuals.

BETH MCGUFFIN AFFIDAVIT

McGuffin was a childhood friend of Fulks's who spent the nights of November 15 and 16, 2002 with Fulks shortly before he was apprehended. Her testimony was the subject of a claim in the original § 2255 petition wherein Fulks argued that McGuffin was not properly prepared by defense witnesses when she testified at trial.

During her testimony at Fulks's penalty phase trial, McGuffin testified that nothing was promised to her in return for her testimony. TT Vol. 6 at 166.

In the declaration obtained after the § 2255 hearing, McGuffin indicates that from the time of Fulks's arrest, she was subject to multiple and confrontational interviews with West Virginia FBI agents who repeatedly accused her of complicity in the death of Samantha Burns. [7] McGuffin says that it was implied to her that if she did not testify against Fulks, everyone in West Virginia would assume that she was involved with Samantha Burns's murder. McGuffin indicates that even after she testified, she moved back to West Virginia and to this day is harassed by the FBI regarding her potential involvement in the Burns murder.

As the government observes in its responsive memorandum, McGuffin's declaration does not come close to demonstrating government misconduct or suppression of material evidence. Even if FBI agents in West Virginia at some point suspected or accused McGuffin of complicity in Samantha Burns's murder, McGuffin does not state that the agents threatened her with charges if she did not testify at Fulks's trial. She states only that the FBI offered immunity in the Burns case if she revealed the location of the body. Even though she claims that FBI Agent Jeff Bruning told her "everyone in West Virginia" would think she "was a murderer" if she did not testify against Fulks, she does not claim that Agent Bruning threatened her with charges. Assuming, without deciding, that the West Virginia FBI agents "thought" McGuffin was involved in the Burns murder if McGuffin did not share what she knew, this does not lead to the conclusion that authorities were holding charges over McGuffin's head as a means of inducing her testimony.

AMBER FOWLER AFFIDAVIT

**\*13** Amber Fowler was Fulks's first wife who testified primarily to sexual and physical abuse inflicted upon her by Fulks. This abuse included hitting her on the face and dragging her by her hair through the house. She testified that Fulks did not work and that he obtained money by breaking into cars and stealing the contents. She testified that she had at one time obtained a restraining order against Fulks, but then later reconciled with him. Regarding the events of the murder, Fowler indicates that she and Fulks used to "park" where Samantha Burns's car was found. Unlike the other women who testified, Fowler was not directly asked if there were any deals offered to her in exchange for her testimony. She did, however, indicate that she was told to testify as to nothing but the truth.

In her declaration of September 15, 2010, Fowler indicates that, when she was not called to testify on a Friday as had been planned, FBI Agent Bruning gave her $400 for food, lodging, and incidentals for the intervening weekend so that she could remain in South Carolina and avoid a trip home to West Virginia over the weekend. She also indicates that after she testified, she was "shocked" to get a check in the amount of $1,500 for per diem expenses as a result of her South Carolina trip to testify.

The government responded with an affidavit from FBI Agent Jeff Bruning that he, in fact, gave Fowler only $60. Attached to his affidavit is a handwritten receipt signed by Fowler acknowledging that only $60 was paid. The receipt is witnessed by Assistant United States Attorney Jonathan Gasser, one of the prosecutors in the Fulks case.

Fulks claims that the government "paid [Amber Fowler] off" in a thinly-veiled attempt to influence her testimony. Fowler's affidavit also suggests that Agent Bruning told her that she "had to show some emotion" during her testimony before the jury. Agent Bruning's reply affidavit denies instructing Fowler to show emotion when testifying.

On this record, the court is constrained to deny relief as to this claim. First, as noted above, most of Fowler's testimony was merely cumulative to other women who testified as to the extensive physical and sexual abuse practiced upon them by Fulks during their respective relationships. Although Fowler indicates that she was given what she believed to be an excessive amount of money for expenses related to her testimony, she does not recant her testimony in any respect. Finally, whether the amount of cash paid to Fowler was $60 or $400, this amount, coupled with the $1,500 check, does not

strike the court as excessive for an out-of-state government witness from West Virginia who was in Columbia, South Carolina for a week.

### VERONICA EVANS AFFIDAVIT

Veronica Evans was Fulks's second wife, who also testified that she was abused on a regular basis while married to Fulks. She told the jury about being punched, dragged by the hair, and raped by Fulks. She also told them of an incident where Fulks poked her with an arrow, handcuffed her, punched her in the face, and then raped her. Evans testified that "no deals" had been offered to her in return for her testimony. Finally, Evans did admit that at one time she told one of her cell mates that she had been given a favorable deal, but at Fulks's trial she explicitly rejected this notion and said that she had lied to her cell mate in making this statement.

**\*14** In her September 16, 2010 declaration, Evans now indicates that her testimony that she had no deals with the government was false. She says that at the time of trial testimony, she had been promised that her record would be expunged of convictions for child endangerment and receiving stolen property in exchange for her testimony against Fulks. Evans now says that she had also been threatened that if she failed to testify against Fulks, she would be brought into court for violation of her probation and returned to prison to serve a fifteen year sentence.

The court agrees with the government that this information is not material under *Brady* for several reasons. To begin with, Evans's declaration is too vague to support a finding that the government made any undisclosed deals with her. Although she claims she "had been promised" an expungement in exchange for her testimony and "had been threatened" with a probation violation if she refused to testify, she does not identify who made the alleged threats or promises. Moreover, any incorrect statements that Evans made in her trial testimony regarding her probationary status were not material. Whether Evans had been released from probation, as she testified, or was on inactive status with supervision, as indicated by a court order appended to the motion to alter or amend, has no bearing on the substance of Evans's testimony about Fulks. Nor does it bear on her credibility.

Finally, as was the case with Amber Fowler, Evans's testimony regarding sexual and physical abuse by Fulks was entirely cumulative of that of the other women who testified at trial.

### AMANDA OSWALT AFFIDAVIT

Oswalt did not testify at trial, but has submitted an affidavit regarding a conversation she had in September or October 2008 with Tina Severance, a witness who testified at Fulks's trial. Severance was a correctional officer who met Fulks in prison, developed a relationship with him, and accompanied Fulks and Basham on their seventeen-day crime spree after they escaped from a Kentucky jail. Unlike the other women who testified at trial primarily as to episodes of abuse by Fulks, Severance provided substantive testimony about the crimes committed and other actions taken by Fulks and Basham while they were fugitives.

At trial, Severance testified that she was not being paid for her testimony by any source and that no "promises or rewards" had been offered to her in exchange for her testimony by the United States government or by state authorities in South Carolina or West Virginia.

Oswalt's declaration indicates that Severance lied at trial in several material respects. Oswalt says that Severance told her that, contrary to Severance's sworn testimony a trial, she "had a deal with the FBI and the government." The deal allegedly involved a probationary sentence for charges Severance was facing at the time. Oswalt claims that Severance told her "how it felt good that the FBI paid her to lie and that she was getting away with it." Oswalt indicates that "Tina said she knew Chad didn't kill anyone that she was happy that he was on death row." She also said "how happy she was that her deal allowed her to stay out of jail and put Chad on death row."

**\*15** Regarding the substance of the Severance testimony, Oswalt's affidavit says that "Tina said that the FBI told her to say certain things about Chad. She didn't say what those things were. However, she did say that the FBI wanted her to lie about what Chad did in order to make him look worse than he already did."

It should be noted at the outset that the declaration regarding the Severance testimony was not offered by Severance herself. Rather, it is a hearsay assertion by Severance's friend, Amanda Oswalt. It purports to relate to a conversation Oswalt had with Severance in September or October 2008, precisely two years prior to the declaration being executed by Oswalt.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

It stains credulity to accept the notion that a third-party witness would wait two years to come forward with damning information and then provide that information in the narrow two-week window between the appointment of Fulks's new habeas counsel and the filing of a motion to alter or amend.

In addition, the declaration contains what must be considered as exaggerations, to say the least. For example, Oswalt quotes Severance as saying that she knew that Fulks did not commit the murder, that she was "glad" that she had helped "frame" Fulks. There is no way that Severance could know for a fact whether Fulks or Basham, or both, committed the murder of Alice Donovan. By her own testimony, Severance was not with Fulks and Basham when the abduction and subsequent murder of Donovan occurred. Accordingly, the hearsay statement by Oswalt, even if accepted as true, contains a statement by Severance that is not based upon first-hand information.

Oswalt's declaration is quite simply insufficient to support a finding that the government improperly influenced Severance's trial testimony. The witness only claims to have heard Severance say that "the FBI and the government" offered her probation, "paid her," and instructed her to "lie about what Chad did." Oswalt states that Severance did not reveal what the government authorities had told her to say. In other words, Oswalt's double-hearsay declaration claims that, according to what Severance told Oswalt, some unidentified FBI and government agent or agents, at an unspecified time and place, instructed Severance to say something false about Fulks's activities. As noted above, there is no declaration from Severance corroborating that this alleged deal took place or even confirming a conversation ever took place between Oswalt and Severance. Oswalt's declaration provides no basis for finding that a deal existed or that the government suppressed it in violation of *Brady.*

Finally, Severance's testimony was corroborated in many respects by the testimony of another witness at Fulks's trial, Andrea Roddy.

### THE DECEMBER 2010 AFFIDAVITS AND EXHIBITS

The additional exhibits filed on December 15, 2010, merit little discussion. The first is a declaration of Arlene Andrews, Professor of Social Work at the University of South Carolina School of Social Work. She was retained by Blume as a potential witness, but was not called at Fulks's trial. Her affidavit indicates that she has now reviewed the declaration of Dr. Harry Krop, and now realizes that there is additional, significant information regarding Fulks's sexual abuse. She contends that the sexual abuse experienced by Fulks was a "defining moment of his childhood" and that his "history of sexual abuse is one of the most extreme that I have seen."

 **\*16** It can readily be seen that the Andrews declaration is cumulative to those offered by Drs. Melikian, Hilkey, and Halleck, which the court incorporates by reference its discussion of the declarations of these three witnesses. See pp. 17–21 infra.

### AMBER FOWLER AFFIDAVIT OF OCTOBER 28, 2010

In this supplemental affidavit, Fowler reiterates her earlier contention that FBI Agent Jeff Bruning gave her $400, not $60 cash as spending money when she was required to stay in South Carolina over a weekend after not being called to testify on a Friday. She also reiterates her earlier contention that Agent Bruning told her to show more emotion during her testimony. There is no reference to the signed receipt for $60 witnessed by then-AUSA Jonathan Gasser that accompanied the counter-affidavit of Agent Bruning.

The supplemental Fowler affidavit essentially restates the original affidavit submitted by this witness and merits no further discussion here.

### THURMOND/SCHOOLS/GASSER LETTER

The third exhibit is an August 13, 2003 letter from the AUSA's prosecuting this case to Fulks's trial attorneys Blume and Nettles dealing with a variety of pretrial matters. No indication is given as to the significance of this letter, nor which of the myriad claims asserted in this action the letter relates to. Nevertheless, the court has carefully reviewed the letter and finds no basis for disturbing its earlier order.

### CREDENTIALS OF FORMER
### AUSA JONATHAN GASSER

The final document is a Curriculum Vitae ("CV") of Jonathan Gasser, the AUSA who was one of the government's principal trial attorneys in Fulks's penalty phase trial. The CV is apparently taken from the website of the private law firm that

**U.S. v. Fulks, Not Reported in F.Supp.2d (2011)**

Gasser is presently associated with, the Law Firm of Harris and Gasser in Columbia, South Carolina. Included in the CV is a description of Gasser's litigation experience, with a brief mention of the Fulks case and the significant issues presented in that criminal trial.

Again, no indication is given as to the significance of this document, nor its relationship to the claims asserted. Nevertheless, the court has carefully reviewed the document and finds nothing contained therein which warrants an alteration or amendment of the judgment previously entered in this case.

CONCLUSION

For all the foregoing reasons, the motion to alter or amend is denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 116138

Footnotes

1   *Fulks v. United States,* 454 F.3d 410 (4th Cir.2006), *cert. denied* 551 U.S. 1147, 127 S.Ct. 3002, 168 L.Ed.2d 731 (2007).

2   The original order denying relief was entered on August 3, 2010. The court vacated that order pending completion and filing of the official transcript of the evidentiary hearing. The final order (ECF No. 1344) and judgment (ECF No. 1345) were entered on August 20, 2010. On August 25, 2010, a one-page order was entered to clarify certain claims on which this court denied a certificate of appealability.

3   The PCHU was formed in 1995 as an office of the Federal Public Defender for the Eastern District of Pennsylvania whose efforts are dedicated solely to capital habeas litigation. According to Fulks's motion to appoint PCHU, this unit has represented dozens of death-sentence prisoners in Pennsylvania's federal district courts, the third circuit, and four cases argued before the United States Supreme Court. The PCHU, as sole or supplemental counsel, represents individuals in capital § 2255 proceedings in multiple federal jurisdictions. Their office is funded by a grant of the Administrative Office of the United States Courts.

4   On December 15, 2010, while this order was being drafted, Fulks's counsel filed additional exhibits to the motion to alter or amend including a declaration of Arlene Andrews (dated October 1, 2010); a second declaration of Amber Fowler (dated October 28, 2010); a letter from the prosecutors Scott Schools and Jonathan S. Gasser to John H. Blume III and William F. Nettles (dated August 19, 2003); and an exhibit of Jonathan Gasser's website listing his qualifications.
   As was the case with the original seventeen declarations, there is no showing that any of the information contained in these new documents was not available earlier. The additional four documents are therefore stricken for this reason. Additionally, for substantive reasons discussed later in this order, the affidavits do not serve as the basis for altering or amending the judgment in this case.

5   Krop previously submitted an affidavit on February 12, 2010, in support of the Fulks's motion to reinstate his sexual abuse claim.

6   Additionally, the court finds issue number 4 to be barred under *Winestock.*

7   Samantha Burns was the college co-ed who was abducted, raped, and killed in West Virginia.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.