# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 4:02-992 |
| | ) | |
| | ) | |
| VERSUS | ) | Columbia, S.C. |
| | ) | May 4 & 7, 2004 |
| CHADRICK E. FULKS | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| ------------------------------- | ) | |

CHANGE OF PLEA PROCEEDINGS
MAY 4, 2004 AND MAY 7, 2004

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:        STROM THURMOND, JR., ESQ.
                          U.S. Attorney for South Carolina
                          SCOTT SCHOOLS, ESQ.
                          First Assistant U.S. Attorney
                          JONATHAN S. GASSER, ESQ.
                          Assistant U.S. Attorney
                          1441 Main Street, Suite 500
                          Columbia, S.C.  29201

For the Defendant         JOHN H. BLUME, ESQ.
        Fulks:            1247 Sumter Street, Suite 202
                          Columbia, S.C.  29201

                          SHERI LYNN JOHNSON, ESQ.
                          Cornell Law School
                          Myron Taylor Hall
                          Ithaca, NY  14853

                          WILLIAM F. NETTLES, ESQ.
                          Assistant Federal Public Defender
                          401 Evans Street, Room 240
                          Florence, S.C.  29503

GARY N. SMITH, CM
COLUMBIA, SC

Court Reporter:          Gary N. Smith, CM
                         901 Richland Street
                         Columbia, S.C.  29201
                         (803) 256-7743

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

(Proceedings on May 4, 2004)

THE COURT:  This is the case of United States of America versus Chadrick Evan Fulks, it is Criminal Docket Number 4:02-992.

Last week I received an e-mail indicating that the defendant, Mr. Fulks, wished to plead guilty to the indictment pending against him and proceed directly to a penalty phase before the jury.

Acting upon that information, we scheduled this afternoon's hearing.  In the notice I have requested that the defendant bring with him a medical professional who could assist us in terms of competency, if that should become an issue.

This morning I was contacted by a deputy marshal who informed me that the Just Care facility where the defendant has been housed gave the defendant sedatives on two occasions yesterday.  Because of my concern about competency, I ordered the medical records from Just Care, and I have received them.

And I would propose that we proceed this morning, I share this information with defense counsel, who may or may not

3

be aware of this, I'm not sure, and also the medical

professional -- who I understand is Dr. Ellen Berg; is that

correct?

MR. BLUME:  That's correct, Your Honor.

THE COURT:  What is Ms. Berg's specialty?

MR. BLUME:  She's a psychiatrist, a forensic psychiatrist.

THE COURT:  All right.

MR. BLUME:  And she's a medical doctor.

THE COURT:  Now, we have the question of whether this information should be shared with the government, which we will get to eventually if we get to a penalty phase.  At the appropriate point in the Rule 11 colloquy I'm going to ask what medications the defendant is taking, so Mr. Blume, do you have a problem with the government learning that now?

MR. BLUME:  With the medications given yesterday?

THE COURT:  Well, this is I think his entire regimen while he's been at the facility, including what he was given yesterday.  I think that's what it is.

MR. BLUME:  I haven't seen it, if you don't mind if I --

THE COURT:  Well -- all right.

And I'm prepared to take about a 10 minute recess if you need to look over that and discuss it with Dr. Berg.

MR. BLUME:  I don't have any problem with the

government having this.  In fact, I will show it to Dr. Berg, and I don't think it's going to affect anything.

THE COURT:  All right, that's his copy to keep, here is one for the government.

(Court at ease)

THE COURT:  Mr. Blume, have you had enough time to review the medications?

MR. BLUME:  Yes, Your Honor.

THE COURT:  I will be glad to take a recess and let you explore it more deeply if you want to.

MR. BLUME:  No, Your Honor.  We have reviewed the medication and showed it to Dr. Berg, and in her opinion it would have no effect on his competency to go forward.

THE COURT:  Very good.  Well, then if you will come around with your client.

EXAMINATION OF THE DEFENDANT

BY THE COURT:

Q.  All right.  You are Mr. Chadrick Evan Fulks; is that correct?

A.  Yes, sir.

Q.  Mr. Fulks, I am informed that you wish to change the plea that you entered previously and enter a plea of guilty to all eight counts of the superseding indictment pending against you in this case; is that correct?

A.  Yes, sir.

5

Q.   Now, Mr. Fulks, before I can accept a plea of guilty from you, it is necessary under the rules of criminal procedure for me to make sure that your plea of guilty is made freely and voluntarily, and therefore I need to ask you a series of questions.  If you do not understand my questions or the words I use, you should please tell me that so that I can stop and explain them to you.

Also, if at any time during this questioning you feel a need to stop and consult with your attorneys, if you will just tell me that, I will be glad to give you that opportunity.  Do you understand?

A.   Yes, sir.

Q.   Also, if you feel at any time that you have been on your feet too long or have some other personal emergency that requires a recess, if you will tell me that I will be glad to accommodate you in that respect as well.

A.   Yes, sir.

THE COURT:   All right, the clerk will please administer the oath to Mr. Fulks.

THE CLERK:   If you will please place your left hand on the Bible and raise your right hand.  State your name for the record.

THE DEFENDANT:  Chadrick Evans Fulks.

(Defendant sworn by the clerk)

BY THE COURT:

GARY N. SMITH, CM
COLUMBIA, SC

6

Q. All right, Mr. Fulks, do you understand that you are now under oath in these proceedings, and that if you answer any of my questions falsely your answers may be later used against you in another prosecution for perjury or giving false statements?

A. Yes, sir.

Q. All right. Mr. Fulks, how old are you?

A. 26.

Q. How far did you go in school?

A. 11th grade.

Q. Are you able to speak and understand English?

A. Yes, sir.

Q. Are you currently taking any drugs or medication?

A. Yes, sir.

Q. Tell me to the best of your knowledge what medication you are presently taking?

A. Klonopin.

Q. What is that for?

A. It's for nerves.

Q. All right.

A. And pain medication, a lot, pain medication.

Q. Pain medication?

A. Yeah.

Q. Do you know the name of it?

A. Keflex.

THE COURT: Let me ask Dr. Berg to come around if we

7

could.  This is why I asked her to be here.

Dr. Berg, I appreciate you being available on short notice for today's hearing.

I need to be absolutely certain that Mr. Fulks is competent today, that is to say, he appreciates the nature of the charges against him, he understands his rights as a defendant in this court, he understands the specific penalties involved and so forth, and so I'm most concerned with the medications he's presently taking and what effect it might have on his ability to think and reason this afternoon.

Your attorneys have shared with you the information that I have been provided by the Just Care facility here in Columbia regarding his current medications, have you reviewed those medications?

DR. BERG:  Yes, I have.

THE COURT:  All right.  Could you just walk me through what he is currently taking, to the best of your ability?

DR. BERG:  Yes, sir.

THE COURT:  And maybe, for the record, if you could spell the medicines as well.

DR. BERG:  Yes, sir.  The patient is currently taking Keflex, 500 milligrams, three times a day.

THE COURT:  K-e-f-l-e-x?

DR. BERG:  K-e-f-l-e-x.

GARY N. SMITH, CM
COLUMBIA, SC

8

THE COURT:  All right.  And what is that for?

DR. BERG:  That is for a urinary tract infection, and it was started on Friday.

THE COURT:  All right.

DR. BERG:  He is taking Zoloft, 100 milligrams a day.

THE COURT:  All right.

DR. BERG:  And that is for depression.  He is taking Klonopin, and he is taking half a milligram twice a day, and that is for anxiety.

He is taking Tylox, which is a pain medication, that is a narcotic that contains Oxycodone, along with Acetaminophen, and he is taking five slash 500 milligram strength of that, and he is taking that for pain up till every four hours.  He is also taking Tylenol, 325 milligrams, and he is taking --

THE COURT:  What is the Tylenol for?

DR. BERG:  That is a mild pain medication and basically a non-steroidal anti-inflammatory agent that will help his wound settle down.  He has a fistula going into his belly after having been stabbed with some shanks.  And he has an anti-bacterial, which is sort of a compress in there, and around this fistula there is inflammation.

THE COURT:  Back off the mike just a little bit, I think it will pick you up better.

DR. BERG:  Okay.  Sorry.  The fistula has some

inflammatory response around it, and the Tylenol in part acts as a mild pain killer, but mainly as an anti-inflammatory, anti-swelling agent.

THE COURT:  All right, so he's taking Tylenol more as anti-inflammatory than a pain medication?

DR. BERG:  Yes.

THE COURT:  Because the one you just gave me before that, the Tylox, is also for pain.

DR. BERG:  Yes.  And that's the stronger one, that's a scheduled drug.  It has Oxycodone in it, which is a narcotic.

THE COURT:  All right.

DR. BERG:  And then he is taking Ultram --

THE COURT:  That's U-l-t-r-a-m?

DR. BERG:  U-l-t-r-a-m, 50 milligrams three times a day, and that is for muscle spasms.

THE COURT:  All right.

DR. BERG:  And then yesterday he twice got an intramuscular injection of a combination of Haldol and Ativan, and that is a rapidly tranqualizing agent, and it's given when people are agitated.  And he got that repeated within a two hours' time difference.  Last injection was given at 6 o'clock yesterday evening, and should be cleared from his system by now.

THE COURT:  That should be cleared from his system?

DR. BERG:  That's correct.

10

THE COURT:  And that was for --

DR. BERG:  Agitation --

THE COURT:  -- a tranqualizing agent for agitation?

DR. BERG:  Yes.

THE COURT:  Which would be known to a laymen as a sedative?

DR. BERG:  Yes.

THE COURT:  All right.  And the effects of that should have been dissipated by now?

DR. BERG:  Yes, it should.

THE COURT:  All right, what else?

DR. BERG:  Then he takes Maalox for indigestion -- sorry, Milk of Magnesia for indigestion, and he takes Tums tablets for the same problem.  And then he takes a medication called Bethanachol, and I will spell it, it's B-e-t-h-a-n-a-c-h-o-l, tablet size, 25 milligrams.

THE COURT:  I don't see that on the list.

DR. BERG:  It's here.

THE COURT:  What page?

DR. BERG:  Page 2 -- oh, I'm sorry, page 3.

THE COURT:  Spell it again?

DR. BERG:  B-e-t-h-a-n-a-c-h-o-l.

THE COURT:  All right.

DR. BERG:  And the tablet size is 25 milligrams --

THE COURT:  Let me see the sheet you are working

GARY N. SMITH, CM
COLUMBIA, SC

from.

Is this the first one on this page, this short page you are looking at?

DR. BERG:  Yes.  The top one, yes.  First it says the trade name and then it says the generic name.  And I'm spelling for you the generic name that starts with B.

THE COURT:  All right.  Because I read it as U-r-a-c-h-l-o-r-i-n-e.

DR. BERG:  That's the trade name, it's the same thing.

THE COURT:  All right, but you said it's B-e-t-h-a-n-a-c-h-o-l.

DR. BERG:  Exactly.  The top name starting with the U is the sales name, sort of a -- what do you call it -- marketing name.  And the second one that starts with a B is the chemical or generic laboratory name, if you would.

THE COURT:  All right.

DR. BERG:  And the strength is 25 milligrams, and he takes that four times a day.  And that is for spasms and muscle function of his bladder, in order to facilitate that the bladder works sufficiently and empties the urine completely from the bladder.

THE COURT:  All right.  Is that it?

DR. BERG:  Yes.

THE COURT:  All right, now, is there any objection,

GARY N. SMITH, CM
COLUMBIA, SC

12

counsel, to actually putting this list in the record for the court recorder's benefit to get the spelling of these medications?

MR. BLUME:  No.

THE COURT:  All right.  Well, we will hand up a copy.

And Dr. Berg, I'm most interested in whether any one of these medications individually, or along with other medications, would substantially impair Mr. Fulks' ability to think, reason, understand, make important decisions, and communicate effectively?

DR. BERG:  Yes.  And I will first answer in general the question, and then specifically as it pertains to Mr. Fulks.

THE COURT:  All right.

DR. BERG:  The urinary tract medication, Bethanachol, can -- it is an agent that is a cholinergic agent, c-h-o-l-i-n-e-r-g-i-c --

THE COURT:  You don't have to get so close, it will pick you up.

DR. BERG:  Okay.  All right.  And it basically will not interfere with his cognitive functioning.  Zoloft, Z-o-l-o-f-t, is an antidepressant, who basically -- which basically lifts the mood and improves therefore concentration and memory.

GARY N. SMITH, CM
COLUMBIA, SC

The Klonopin, that is C-l-o-n-o-p-i-n, is a medication for his nerves. It's a medication in the family of mild tranquilizers or mild sedatives, like for instance Valium. And I -- the dose that it's at is small enough that it does not interfere with his cognitive functioning.

And the antibiotics he's on, Keflex, does not interfere with his cognitive functioning. The Tylenol does not interfere with his cognitive functioning.

The Tylox in somebody who is not used to taking medications of that kind, it might make them drowsy. Mr. Fulks is used to taking these kind of medications, so his metabolic system has adapted to the extent that it does not interfere with his cognitive function.

Maalox and Tums, or Milk of Magnesia, rather, are just locally acting agents that are not absorbed in the body.

The medication of interest was the one given yesterday twice, the combination of Haldol and Ativan. That is strong medication that will make people sedated or it may put them to sleep for some hours. It's used in psychiatric emergencies, and it clears the body within 24 hours, usually after six -- depending on the individual, from two to six hours the patient will wake up and be functioning.

Specific to Mr. Fulks, I saw him on Friday and he was then on the same regimen of medications that he is now, except that they had not started the antibiotic, the Keflex, and he

GARY N. SMITH, CM
COLUMBIA, SC

was competent to stand trial then.

And if one adds up his competency to stand trial on his current regular medication regimen, and considers that the rapid sedative medicine, Haldol and Ativan, has cleared his body, it is my opinion with a reasonable medical certainty that his medication as is will not interfere with his competency to stand trial.

THE COURT:  That's about as thorough an answer as I could ask for.

Let me ask this, let's just put this in the record. When was he given the Haldol yesterday?  Does this report indicate the time of day?

DR. BERG:  The last dose was 1800.  Excuse me, that's 6 p.m.  The first dose was 1730, that was 5:30 in the afternoon.

THE COURT:  So, he received them a half hour apart?

DR. BERG:  Yes.  The protocol for this is, you give them one dose and then you observe them for 30 minutes, and if they are still agitated, then you repeat the same dose again.

THE COURT:  So, that's not unusual for it to be 30 minutes apart?

DR. BERG:  No.  No, you can repeat up to three times.

THE COURT:  And so he has not been administered that from 6 o'clock yesterday until 2:30 day.  What is the normal time for dissipation for that medicine?

DR. BERG:  Within 12 hours.

THE COURT:  12 hours?  All right.  Have you interacted with Mr. Fulks since coming to the courthouse this afternoon?

DR. BERG:  Not this afternoon.

THE COURT:  All right.  As you might expect, the decision to plead guilty in a criminal case where one can possibly receive the death penalty is among the most important decisions that any person can ever make.

DR. BERG:  Yes.

THE COURT:  And I'm just interested in your professional medical views as to whether Mr. Fulks is capable of making that decision.  You have told me, I think, that in your professional opinion to a reasonable degree of medical certainty these medicines, individually or collectively, should not adversely affect his cognitive ability; is that correct?

DR. BERG:  That's correct.

THE COURT:  I'm just wondering if she should interview him before we proceed further?

DR. BERG:  I think that would be helpful, to --

THE COURT:  You do?

DR. BERG:  -- spend 15 minutes with him just to check on it, given the fact that he has been given the Haldol and the Ativan last afternoon.

THE COURT:  All right, let's do that.

16

BY THE COURT:

Q.  But before we do, Mr. Fulks, let me ask you just a few brief questions.  I'm not trying to embarrass you, and I don't want you to feel uncomfortable, but who is the man standing on your right wearing the suit there?

A.  Bill Nettles.

Q.  All right.  And who is he?

A.  My attorney.

Q.  All right.  Who is the other gentleman?

A.  John Blume.

Q.  Who is he?

A.  My attorney.

Q.  All right.  Have they worked very hard on your behalf?

A.  Very hard.

Q.  Do they come see you at the facility a good bit?

A.  Yes, sir.

Q.  Do they have anybody else working with them?

A.  Yes, sir.

Q.  Do you know some of those people?

A.  I have met them through John and Bill.

Q.  Do you remember any of their names?

A.  Yes, sir.

Q.  Tell me two or three names, if you can remember.

A.  Sheri Johnson is one of them.  I forgot Jill's last name.

MR. BLUME:  Jill Rider.

GARY N. SMITH, CM
COLUMBIA, SC

A.   Jill Rider.   And Matt -- I can't remember Matt's last name.

MR. BLUME:   Rawlings.

A.   Matt Rawlings.

BY THE COURT:

Q.   And you are currently at the Just Care facility?

A.   Yes, sir.

Q.   Is that like a hospital?

A.   Yes, sir.

Q.   How long have you been there?

A.   About three months.

Q.   About three months?

A.   Yeah.

Q.   Do they take good care of you there?

A.   Yeah.

Q.   How is the food?

A.   Excuse me?

Q.   How is the food there?

A.   Okay.

Q.   Okay?

A.   Yeah.

Q.   Do you know who is the president of the United States today?

A.   Yeah.

Q.   Who is that?

A.   George Bush.

18

Q.  All right.  Is he going to be elected without opposition or does he have an opponent this year?  Do you know?

A.  He's got an opponent.

Q.  Who is that opponent?

A.  Kerry.

Q.  All right.  Do you have any special interests or hobbies or anything like that?

A.  Yeah.

Q.  What do you like to do, Mr. Fulks?

A.  I like race cars.

Q.  Stock car racing?

A.  Yeah.

Q.  Okay.  Have you ever been to a stock car race?

A.  Yeah.

Q.  Where have you been?

A.  Indiana.

Q.  Been to Indiana?

A.  Yeah.

Q.  Have you been to Darlington?

A.  No, sir.

Q.  You know they might close that one down?

A.  Yeah, I seen that in the paper.

Q.  They have cut back to one race per year, and they might do away with that one race and not have any at all.

A.  And give to it California?

GARY N. SMITH, CM
COLUMBIA, SC

19

Q.   I think so.

A.   Yeah.

Q.   I think so.  Well, I never have understood, what is the difference between the Winston race and the Busch race?

A.   The points.

Q.   The points?  They give --

A.   The point system.  And the Busch race you don't get your points like you would in the Winston race.

Q.   All right.  Do you have anything you want to ask me before we go any further, Mr. Fulks?

A.   No.

Q.   I know you have been on your feet for a while, we are going to take about a 15 minute recess and let Dr. Berg talk to you just a little bit, and then we are going to come back and move forward, okay?

A.   All right.

          THE COURT:  All right.  Let's take a 15 minute recess.

          (Short recess)

          THE COURT:  Have you had enough time to meet with the defendant, Dr. Berg?

          DR. BERG:  Yes, I do -- I have.

          THE COURT:  All right.  Tell me in your professional opinion if he is competent to go forward today?  That is to say, does he have sufficient cognitive abilities to participate

GARY N. SMITH, CM
COLUMBIA, SC

in an important decision?

DR. BERG: Yes, it's my opinion, with a reasonable degree of medical certainty, that he has the cognitive abilities to continue with this procedure and that he is competent to stand trial.

THE COURT: Very good. Thank you very much.

Let me ask both attorneys, do either of you have any questions, concerns, or reservations of any kind regarding Mr. Fulks' competency? Mr. Blume?

MR. BLUME: No, Your Honor.

THE COURT: Mr. Nettles?

MR. NETTLES: No, sir.

THE COURT: Does the government have any concerns or suggestions regarding competency?

MR. GASSER: No, sir.

THE COURT: Are you satisfied that I made an adequate record?

MR. GASSER: We are extremely satisfied that you made an adequate record, Your Honor.

THE COURT: All right. Then I find for the purposes of this case that the defendant, Chadrick Fulks, is competent to plead to the charges in this case, and we will proceed along that basis.

MR. BLUME: Your Honor, can Dr. Berg be excused at this point?

21

DR. BERG:  Thank you.

THE COURT:  Yes.  Thank you very much, Dr. Berg.

DR. BERG:  Thank you.

BY THE COURT:

Q.  Now, Mr. Fulks, once again I'm going to ask you a series of questions.  There are no wrong answers to these questions, we just want candid, truthful responses from you to the questions that I give you.  If at any time you want to take a break and rest, or if you want to stop and talk with your attorneys, all you need to do is give me a signal.  Do you understand?

A.  Uh-huh.

Q.  All right, Mr. Fulks, have you had an ample opportunity to discuss this case with your attorneys?

A.  Yes, sir.

Q.  Are you satisfied with the representation your attorneys have provided you in this case?

A.  Yes, sir.

Q.  Have your attorneys done everything that you have asked them to do for you?

A.  Yes, sir.

Q.  Is there anything that you have requested of them that they have failed to do?

A.  No, sir.

Q.  Is there anything that you would like for either of your attorneys to do for you at this time before we proceed any

GARY N. SMITH, CM
COLUMBIA, SC

22

further this afternoon?

A.   No, sir.

Q.   Do you have any complaints of any kind against either Mr. Blume or Mr. Nettles?

A.   No, sir.

Q.   All right.  Now, Mr. Fulks, do you understand that under the Constitution and laws of the United States you are entitled to a jury trial on the charges against you in the superseding indictment?

A.   Yes, sir.

Q.   If you requested a jury trial, Mr. Fulks, you would be entitled to a number of procedural rights as a defendant in this court.  If you plead guilty, you will give up these procedural rights, so therefore I want to go through and list these rights for you so that you will have a clear understanding of exactly what you will give up if you plead guilty.

First, at a trial, you would have the right to the assistance of two attorneys to defend you in this case. Because the charges potentially involve the imposition of the death penalty, under federal law you are entitled to have two attorneys represent you throughout the case.  At least one of those attorneys has to be learned in death penalty cases.  Do you understand that?

A.   Yes, sir.

GARY N. SMITH, CM
COLUMBIA, SC

23

Q.  Now, in your case you have been provided with counsel from the time that you were first brought into this federal case, Mr. Blume, who has extensive death penalty experience in this district and around the country, and also, Mr. Nettles, who is a very experienced federal public defender, operating out of the Florence office.

Those two attorneys have been provided to you at no cost to you, because the magistrate judge determined that you did not have enough money to pay a lawyer.

So, the first right you have at trial, if we had a trial, would be the right to have two attorneys represent you in the events leading up to the trial and represent you at trial.  And if you wanted to take an appeal after the trial was over, they would represent you on the appeal as well.  Do you understand that?

A.  Yes, sir.

Q.  Now, if we went to trial in this case, because the government seeks to have the death penalty imposed, there is a potential that the trial would be conducted in two parts.  Part one, sometimes called the guilt or innocence phase, and that is the part of the trial where the evidence is presented and the jury is asked to answer the question of whether the government has proved your guilt by competent evidence and beyond a reasonable doubt.

If the government proves you guilty of either count 1

GARY N. SMITH, CM
COLUMBIA, SC

or count 2, which are the two counts that might involve the death penalty, then we would proceed into a second proceeding, sometimes called a penalty phase.  And at that phase, the government would seek to have the jury impose the death penalty.

So, in a death penalty case, unlike most civil cases, it's a two part process.  Part one involves the question of whether the government has proved you guilty beyond a reasonable doubt.  And if so, part two then comes into play, and that is the phase at which the jury determines whether you receive the death penalty or not.  Do you understand that?

A.  Yes, sir.

Q.  Now, there are also six other counts, counts 2 through 8 -- I'm sorry, counts 3 through 8, that do not involve the death penalty -- do not involve the potential for the death penalty, I should say.

So, at a trial on those cases, on those issues, rather, if the jury were to find you guilty, the judge would determine the penalty for counts 3 through 8.  Do you understand that?

A.  Yes, sir.

Q.  Now, as to all counts, counts 1 and 2 and counts 3 through 8, you would be presumed to be innocent and the government or prosecution would be required to prove you guilty by competent evidence and beyond a reasonable doubt before you could be

GARY N. SMITH, CM
COLUMBIA, SC

found guilty.

In other words, you would not have to prove that you were innocent, it would be up to the government to prove that you were guilty.  Do you understand that?

A.  Yes, sir.

Q.  Now, also the law requires that the witnesses for the government must come into court and testify in your presence, that is to say, in front of you in the courtroom.  And your attorney could cross-examine those witnesses.

In other words, your attorney could ask additional questions in addition to the questions put by the government lawyers, and your attorney could object to evidence offered by the government, and they could offer evidence on your behalf at trial.  Do you understand that?

A.  Yes, sir.

Q.  Now, at a trial, you would have the right to testify, if you chose to do so, but you would also have the right not to testify.  And if you elected not to testify, I would instruct the jury that they may not hold that against you in determining whether or not you are guilty.

In other words, the fact that you decide not to testify, if that should occur, cannot be used against you in any way, directly or indirectly at trial, and I would so instruct the jury.  Do you understand that?

A.  Yes, sir.

GARY N. SMITH, CM
COLUMBIA, SC

26

Q.   Now, also at a trial you would have the right to have the court issue subpoenas to compel the attendance of witnesses to testify in your defense.

In other words, anybody on the planet earth that you think might be helpful to you in terms of being a witness, you would have a right to have them brought to this courtroom to testify under oath.  And you would not have to attend to their travel expenses, the government would pay for their travel.  Do you understand that?

A.   Yes, sir.

Q.   Now, let me go back and discuss the two phases one more time.  If you plead guilty to counts 3 through 8, those are the counts that do not involve a potential for the death penalty, I would then determine the sentence.  Do you understand that?

A.   Yes, sir.

Q.   If you plead guilty to counts 1 and 2, or either 1 or 2, the sentence would not be determined by me, it would be determined by the jury.  Do you understand that?

A.   Yes, sir.

Q.   So, that means that if at the end of the day today you have pled guilty to all eight counts, somewhere down the road I would impose a sentence on counts 3 through 8, and then we would have -- along about the same time we would have a trial in front of a jury to determine the penalty on counts 1 and 2, to determine whether you receive the death penalty or life in

27

prison.  Do you understand that?

A.  Yes, sir.

THE COURT:  Is anything less than life imprisonment possible on counts 1 or 2?

MR. GASSER:  No, sir.

BY THE COURT:

Q.  We are going to come to this in just a moment, but on counts 1 and 2, you must receive either the death penalty or life imprisonment.  Do you understand that?

A.  Yes, sir.

Q.  All right, do you understand the rights that I have just outlined for you, Mr. Fulks?

A.  Yes, sir.

Q.  Do you understand that if you plead guilty, that means you will give up your right to a jury trial, and all the other rights I have just gone over with you, there will be no trial on the guilt phase of this case, and I will enter a judgment of guilty on counts 1 and 2 and counts 3 through 8?  Do you understand that?

A.  Yes, sir.

Q.  There will be no trial to determine whether you are guilty or not guilty.

MR. GASSER:  Your Honor, pardon me for interjecting, just so the record is clear, the kidnapping count would require either a death sentence or a life imprisonment sentence.  The

GARY N. SMITH, CM
COLUMBIA, SC

car-jacking count would require any number of years or life or death.

THE COURT:  All right.

MR. GASSER:  I just wanted the record to be clear on that.  But the kidnapping would require either life imprisonment or death sentence.

BY THE COURT:

Q.  Well, let me go back.  Mr. Fulks, we are going to get into the individual counts in just a moment, but count 2, which is a count charging a kidnapping resulting in death, if you plead guilty to that, the question of the penalty will be put to the jury.  The jury would either determine that you will receive the death penalty or you would receive life imprisonment without parole.  Do you understand that?

A.  Yes, sir.

Q.  Now, as to Count 1, that is the count charging you with a car-jacking resulting in death, the jury could impose a death penalty or they could impose --

THE COURT:  Help me with this, Mr. Gasser, if they do not return a death penalty --

MR. GASSER:  Any number of years or life imprisonment, as the statute so reads.

THE COURT:  Who determines the number of years?

MR. GASSER:  That would be the -- my understanding, that would be the jury.

GARY N. SMITH, CM
COLUMBIA, SC

29

THE COURT:  Do y'all agree with that?

MR. NETTLES:  Judge, I don't think there is any question there are two only two possible punishments here if he is convicted on counts 1 and 2, life or death, life without parole and --

THE COURT:  Was that because of a prior record or something?

MR. NETTLES:  No, sir, the statute on kidnapping is life without parole.  And since there is going to be a plea to it, there's going to be a life without -- the verdict in the case will either be life or death.

THE COURT:  Well, the plea is all or nothing.

MR. NETTLES:  That's right.

THE COURT:  If he pleads guilty to count 1, he's pleading guilty to count 2 as well.

MR. NETTLES:  Right.

THE COURT:  All right, well, let me go back.

BY THE COURT:

Q.  Mr. Fulks, I'm not trying to make this confusing, but if you plead guilty to counts 1 and 2, we will then have a trial in front of a jury to determine if you receive the death penalty.  The jury could give you the death penalty on count 1 or they could give you the death penalty on count 2.  Do you understand that?

A.  Yes, sir.

Q.  As to count 2, you have to receive at least a life sentence if you don't receive the death sentence.  Do you understand that?

A.  Yes, sir.

Q.  So, the bottom line is, if you plead guilty to counts 1 and 2, you are either going to get life in prison without parole or you are going to get the death penalty.  Do you understand that?

A.  Yes, sir.

Q.  All right.  Now, Mr. Fulks, do you understand that if you plead guilty, you will also have to give up your right not to incriminate yourself, because I will ask you questions about what you did to satisfy myself that you are guilty as charged, and that means you will have to acknowledge your guilt under oath here in the courtroom?

A.  Yes, sir.

Q.  Do you understand that?

A.  Yes, sir.

Q.  Now that I have discussed these rights with you, Mr. Fulks --

A.  Huh?

Q.  Now that I discussed these rights with you, do you still want to plead guilty?

A.  Yes, sir.

Q.  To all eight charges?

A.   Yes, sir.

Q.   All right.   Have you received a copy of the superseding indictment, that is, the written charges made against you in this case?

A.   Yes, sir.

Q.   Have you discussed these charges and the case in general with your attorneys?

A.   Yes, sir.

Q.   Now, I'm required by Rule 11 of the criminal rules, Mr. Fulks, to go through these charges with you.   I have got to tell you what the charge is, I have got to tell you the elements that the government must prove under each charge, and I have got to tell you about the penalty that you are exposed to.

Count 1 charges you with participating in a car-jacking resulting in death.   Specifically in count 1, the grand jury has charged that on or about November the 14th, 2002, in the District of South Carolina, you, along with Branden Leon Basham, with intent to cause death and serious bodily harm, by force, violence, and intimidation, did take from the person and presence of another, to wit, Alice Donovan, a motor vehicle that had been transported in interstate and foreign commerce, that is a 1994 BMW 318i, and Alice Donovan's death resulted, in violation of Title 18 of the United States Code, Section 2119 and Section 2.   Do you understand that

charge?

A.    Yes, sir.

Q.    Now, if this case were to go to trial, Mr. Fulks, as to count 1, there are six elements that the government would have to prove before the jury could find you guilty.  The government would have to prove all six of these elements beyond a reasonable doubt.  And I would instruct the jury that if the government failed to prove any one of these elements beyond a reasonable doubt, the jury would be required to find you not guilty.

These six elements are, number one, that you took a motor vehicle.  Number two, that the motor vehicle had been transported, shipped, or received in interstate or foreign commerce.  That means that the motor vehicle had traveled from one state to another or from one country to another.

The third element is that you took the motor vehicle from the person or presence of another individual.  In other words, the individual was nearby when you took the motor vehicle.

The fourth element is that the taking is done or attempted by force and violence or by intimidation.  The fifth element is that in doing so, the defendant intends to cause death or serious bodily harm.  And the sixth element is that death results.

Do you understand those six elements that the

government would be required to prove at trial?

A.   Yes, sir.

Q.   Now, the penalty.  I'm required to tell you about the maximum penalty.  The maximum penalty that could be imposed for this charge is death, the death penalty.  The fine could be up to $250,000.

If you didn't receive the death penalty and received a term of years, you would have to get supervised release of five years following release from prison.  And the special assessment, which is mandatory, is $100.  Do you understand that?

A.   Yes, sir.

Q.   Now, the second count of the superseding indictment charges you with kidnapping resulting in a death.  Specifically the grand jury has charged that on or about November the 14th, 2002, in the District of South Carolina and elsewhere, you, along with Branden Leon Basham, willfully and unlawfully did kidnap, abduct, and carry away Alice Donovan, and did willfully transport Alice Donovan in interstate commerce from Conway, South Carolina to North Carolina, and did hold her for ranson, reward, and otherwise, and Alice Donovan's death resulted, in violation of Title 18 of the United States Code, Section 1201(a)(1) and Section 2.

Do you understand that charge contained in count 2?

A.   Yes, sir.

Q.   If this case were to go to trial before a jury, at the guilt phase the government would be required to prove four essential elements before a jury could find you guilty.

The government would have to prove all four of these elements by competent evidence and beyond a reasonable doubt. I would instruct the jury that if the government failed to prove any one of these four elements, the jury would be required to find you not guilty.

These four elements are, number one, you unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim; number two, you held the victim for ransom, reward, or otherwise; number three, you willfully transported the victim in interstate commerce; and number four, death results.  Do you understand those four elements?

A.   Yes, sir.

Q.   The maximum penalty provided by law for count 2 is the death penalty.  As I said earlier, if you do not receive the death penalty from the jury, the law requires that you be put in prison for the rest of your life without parole.  Do you understand that?

A.   Yes, sir.

Q.   The fine is up to $250,000, and the special assessment is $100.  Do you understand that?

A.   Yes, sir.

Q.   Now, let me stop and say, when I say life in prison without

parole, that means exactly what those words convey.  You would be sentenced to prison for the rest of your natural life with no possibility whatsoever for parole or reduction of the sentence in any manner.  Do you understand that?

A.  Yes, sir.

Q.  All right, Mr. Fulks, do you want to take a little break?

A.  No, sir.

Q.  I don't -- I'm not in any hurry here, if you want to take a recess we will --

A.  (Shakes head in the negative).

Q.  All right.  Moving on to count 3.  Count 3 charges interstate transportation of a stolen motor vehicle.  In count 3 the grand jury has charged as follows:

On or about November 14, 2002, in the District of South Carolina and elsewhere, you, along with Branden Leon Basham, knowingly and willfully -- excuse me -- knowingly and unlawfully did transport in interstate commerce a stolen motor vehicle, that is a 1994 BMW 318i, from Conway, South Carolina to North Carolina, knowing the same to have been stolen, in violation of Title 18 of the United States Code, Section 2312 and Section 2.  Do you understand that?

A.  Yes, sir.

Q.  If this case were to go to trial on count 3, there are three essential elements the government would be required to prove at trial.  I would instruct the jury that if the

GARY N. SMITH, CM
COLUMBIA, SC

government failed to prove any one of these elements beyond a reasonable doubt, the jury would be required to find you not guilty.

These three elements are, number one, the defendant transported or caused to be transported a stolen vehicle; number two, the defendant knew or had reason to know that the vehicle was stolen; and number three, the defendant transported the vehicle in interstate commerce, that is to say, from one state to another state, or across state lines.  Do you understand that charge?

A.  Yes, sir.

Q.  Now, if you were convicted on this count, the maximum term of imprisonment you could receive is 10 years, there is a fine of up to $250,000, a period of supervised release following imprisonment of three years, and a special assessment, which is mandatory, of $100.  Do you understand that?

A.  Yes, sir.

Q.  All right.  Moving on to count 4.  Count 4 charges you with being a member of a conspiracy, along with Mr. Basham.

For your information, a criminal conspiracy is an agreement or mutual understanding knowingly made or knowingly entered into by at least two people to violate the law by some joint or common plan or course of action.  A conspiracy is in a very true sense a partnership in crime.

A conspiracy or agreement to violate the law, like

any other kind of agreement or understanding, need not be formal, written, or even expressed directly in every detail.

To prove the existence of a conspiracy or an illegal agreement, the government is not required to produce a written contract between the parties or even produce evidence of an express oral agreement spelling out all of the details of the understanding.

Now, in count 3, the grand jury has charged as follows --

MR. NETTLES:  Count 4, Judge.

BY THE COURT:

Q.  I'm sorry, count 4.  The charge is from on or about November the 4th, 2002, to on or about November 20th, 2002, in the District of South Carolina and elsewhere, you, along with Mr. Basham, unlawfully, knowingly, and willfully did combine, conspire, confederate, and agree with each other to commit the following crimes:

First, car-jacking resulting in death; second, kidnapping resulting in death; third, interstate transportation of a stolen motor vehicle; fourth, possession of firearms by a convicted felon; and fifth, possession of stolen firearms.

In other words, count 4 charges that you and Mr. Basham had this agreement, express or implied agreement, to violate five different substantive laws that I have just gone over with you, and for the most part these substantive laws

38

follow the other counts of the indictment.

Now, because this is a conspiracy charge, the grand jury has set out certain overt acts that were allegedly permitted -- performed, rather, in furtherance of the conspiracy. And there are quite a number of overt acts that are set out on pages 5 through 9 of the indictment.

It is not necessary that the government prove that all of these overt acts occurred, it is only necessary that the government prove at least one of them occurred.

And just to be completely safe, I'm going to go through each of these overt acts with you, but understand, the government does not have to prove that all of these things happened, and you do not necessarily have to admit that all of these things happened, but you need to understand this is what the government would attempt to prove at trial. The overt acts are as follows:

On or about November the 4th, 2002, you and Mr. Basham escaped from the Hopkins County Kentucky Detention Center, number 1.

On or about November the 5th, you and Mr. Basham kidnapped and car-jacked James T. Hawkins at knife point. You then transported Mr. Hawkins to Indiana and tied him to a tree using duct tape and electrical wire.

Number 3, on or about November the 5th and 6th, 2002, you and Mr. Basham drove Hawkins' truck to Portage, Indiana and

GARY N. SMITH, CM
COLUMBIA, SC

39

arrived at the residence of a woman referred to in the indictment as T.S., known to you. After you arrived at T.S.'s residence you, Mr. Basham, T.S., and her roommate, referred to as A.R., traveled in T.S.'s van to The Pines, Indiana and checked into the Sands Motel.

4th, on or about November 7th, 2002, you asked if T.S. could help you obtain firearms. T.S. and you devised a plan whereby T.S. and A.R. would lure T.S.'s friend, Robert Talsman, T-a-l-s-m-a, out of his residence so that Fulks and Basham could steal Talsma's firearms while Talsma was -- Talsma, I guess it is, was out of his house.

5th, on or about November the 8th, 2002, T.S. and A.R. went to Talsma's residence early in the morning. T.S. took Talsma into his bedroom and A.R. unlocked the doors and windows of the residence. T.S. and A.R. then took Talsma to breakfast.

While Talsma was at breakfast, Fulks and Basham stole the following firearms from Talsma's residence: an H&R .22 caliber nine shot model 949 revolver, two Ruger Vaquero, V-a-q-u-e-r-o, .45 caliber single action revolvers, and a Llama Mini Max .45 caliber pistol.

Number 6, on or about November 8th, 2002, you, along with Mr. Basham, T.S., and A.R. drove to Sturgis, Michigan and checked into a motel.

7th, on or about November the 9th, 2002, you, Mr.

GARY N. SMITH, CM
COLUMBIA, SC

Basham, T.S., and A.R. drove to Ohio and checked into another motel.  While in Ohio, you and Mr. Basham left the motel and returned in the early morning hours with a duffel bag full of camouflage clothing, including masks, hoods, and boots.

Number 8, on or about November 10th, 2002, you, Mr. Basham, T.S., and A.R. left Ohio and drove toward West Virginia.

9th, on or about November the 11th, 2002, you, Mr. Basham, T.S., and A.R. checked into the Hollywood Hotel in Huntington, West Virginia.  You and Mr. Basham left the motel with the duffel bag and returned sometime between 2 a.m. and 4 a.m. on November the 12th, 2002.

10th, on or about November the 12th, you, Mr. Basham, T.S., and A.R. left West Virginia and drove to Little River, South Carolina, where you checked into the Lakeshore Motel.

11, on or about November the 13th, 2002, you and Mr. Basham stole two purses, and you and Mr. Basham, T.S., and A.R. went shopping using checks that were in the stolen purses. You bought clothing and alcohol and returned to the hotel on the evening of November 13, 2002.

Overt act number 12 alleges that on or about November 14th, 2002, you, along with Basham, T.S., and A.R. checked out of the Lakeshore Motel and drove to Myrtle Beach, South Carolina, and checked into the Beachwalk Motel.  Shortly after noon, you and Mr. Basham left driving T.S.'s green mini-van.

41

The two of you eventually arrived at the residence of Sam Jordan in Conway.  You and Mr. Basham entered Mr. Jordan's residence and stole the following firearms: a Remmington 870 12 gauge shotgun, a Marlin model 882SS .22 caliber rifle, a Remington model 1100 12 gauge shotgun, a Marlin model 60 .22 caliber rifle, and a RPI Connecticut Valley Arms Magbolt 150 rifle.

Overt act number 13, alleges on or about November 14, 2002, upon leaving Sam Jordan's residence, you and Mr. Basham encountered Carl Jordan, who was driving by in his truck. After Mr. Jordan confronted you and Mr. Basham, you and Mr. Basham fired shots at Mr. Jordan.

After Jordan attempted to flee, you and Mr. Basham followed Mr. Jordan in T.S.'s green mini-van, and continued to shoot at Mr. Jordan.  After the encounter with Mr. Jordan, you and Mr. Basham abandoned the green mini-van in Conway.

Overt act 14 alleges that on or about November the 14th, 2002, you and Mr. Basham stole a white Ford F-150 pick-up truck from a residence in Conway, South Carolina.

Overt act 15 alleges that on or about November 14th, 2002, at approximately 2:47 p.m., you and Mr. Basham drove the stolen white Ford pick-up into the parking lot of a WalMart store in Conway, South Carolina, following a blue BMW sedan.

When the sedan pulled into a parking place, Mr. Basham got out of the truck and entered the passenger's side of

42

the blue BMW.  By displaying a .22 caliber revolver, Mr. Basham then forced the driver, Alice Donovan, to drive out of the parking space and toward the back of the parking lot where you were waiting with a .45 caliber pistol.

It is further alleged that you and Mr. Basham then abandoned the stolen truck and left the WalMart parking lot in Alice Donovan's vehicle, taking her and the vehicle against her will.

Overt act 16 alleges that on or about November the 14th, 2002, after car-jacking and kidnapping Alice Donovan, you and Mr. Basham used Ms. Donovan's debit card to purchase gas and obtain cash.

It is alleged that you then drove Ms. Donovan's BMW to North Carolina with Ms. Donovan in the car.  It is further alleged that in North Carolina at approximately 4:28 p.m., you and Mr. Basham forced Ms. Donovan to place a cellular telephone call to her daughter to advise her daughter that she had gone shopping and would be home late.

Overt act 17 alleges that on or about November 14th, 2002, you and Mr. Basham killed Alice Donovan and abandoned her body.  It is alleged that you then drove Ms. Donovan's blue BMW to the Beachwalk Motel in Myrtle Beach, South Carolina and retrieved personal belongings.  It is alleged that you then left T.S. and A.R. at the Beachwalk Motel and drove Alice Donovan's blue BMW to Huntington, West Virginia.

Overt act 18 alleges that on or about November 17th, 2002, you and Mr. Basham left West Virginia and drove to Ashland, Kentucky in Ms. Donovan's BMW.  It is alleged that after you arrived in Ashland, Kentucky, you drove Basham into a WalMart parking lot where Mr. Basham attempted to car-jack Andrea and Deanna Francis while in possession of an H&R .22 caliber nine shot model 949 revolver.

It is alleged that after Mr. Basham was approached by an Ashland police officer dispatched to investigate the attempted car-jacking, he ran from the police officer and fired the revolver at the pursuing officer.  It is alleged that Mr. Basham later identified himself to the Ashland police as Joshua Rittman.

Overt act number 19 alleges that on or about November 19th, 2002, you drove Alice Donovan's BMW to Goshen, Indiana, and arrived at your brother's house.

And finally, the last overt act is alleged to be that on or about November 20th, 2002, you drove Alice Donovan's BMW to Bristol, Indiana, where you abandoned the car in a shed.

After abandoning the BMW, you rode with your brother back towards Goshen, Indiana.  Upon observing an Indiana state trooper following your brother's vehicle, you allegedly told your brother to stop the car.  You then got out of the car and attempted to flee the pursuing law enforcement officers on foot.

Now, that is a very lengthy recitation of the overt acts that the government alleges were performed in furtherance of this conspiracy.  As I said earlier, the government does not have to prove all of those acts occurred, the government has to prove that at least one of them occurred.

Now, do you understand the charge of conspiracy in count 4 and the overt acts that I have just read to you?

A.  Yes, sir.

Q.  If this case were to go to trial as to count 4, the government would be required to prove the following:

There are four essential elements that the government would be required to prove, I will instruct the jury that if the government failed to prove any one of these beyond a reasonable doubt, the jury would be required to find you not guilty.

These four elements are, number one, there was an agreement between two or more persons to violate federal criminal law, or the conspiracy, as I have defined that term; number two, you knew of the conspiracy; number three, you knowingly and voluntarily became a part of the conspiracy; and number four, at least one overt act was taken in furtherance of the conspiracy.

Do you understand those four elements that the government would be required to prove on count 4?

A.  Yes, sir.

GARY N. SMITH, CM
COLUMBIA, SC

Q.   Now, as to count 4, the maximum penalty provided by law is as follows:

The term of imprisonment is a maximum of five years, the fine is up to $250,000, supervised release following imprisonment is three years, and the special assessment, which is mandatory, is $100.  Do you understand that?

A.   Yes, sir.

Q.   All right.  Count 5 charges you with being a member of a conspiracy to use and carry firearms during and in relation to a crime of violence.  I have already told you generally what a conspiracy consists of.  In count 5, the grand jury has charged as follows:

From on or about November the 4th, 2002, to on or about November 20th, 2002, in the District of South Carolina, you, along with Branden Leon Basham, did knowingly and intentionally and unlawfully combine, conspire, confederate, and agree together and have a tacit understanding with each other, and others known to the grand jury, to knowingly use and carry firearms during and in relation to, and to possess firearms in furtherance of, crimes of violence which are prosecutable in a court of the United States as charged in counts 1 and 2 of this superseding indictment, all in violation of Title 18 of the United States Code, Section 924(o).

Mr. Prosecutor, we don't have any overt acts alleged as to that conspiracy?

GARY N. SMITH, CM
COLUMBIA, SC

MR. SCHOOLS:  Your Honor, that statute doesn't require the proof of --

THE COURT:  All right, that's -- all right.

BY THE COURT:

Q.  Now count 5, unlike count 4, is a charge that does not require the proof of any overt acts so there are no overt acts alleged.

As to count 5, if the case were to go to trial, I would instruct the jury that the government would have to prove three essential elements beyond a reasonable doubt before the jury could return a verdict of guilty.  I would tell the jury that if the government failed to prove any one of these beyond a reasonable doubt, the jury would be required to find you not guilty.

These elements are, number one, there was an agreement between two or more persons to use and carry firearms during and in relation to a crime of violence; number two, you knew of the conspiracy; and number three, you knowingly and voluntarily became a part of the conspiracy.  Do you understand those elements, Mr. Fulks?

A.  Yes, sir.

Q.  Now, as to the maximum penalty, the law provides the maximum term of imprisonment for count 5 is a term of 20 years in prison, the fine could be up to $250,000, supervised release following imprisonment is three years, and a special assessment

47

is $100.  Do you understand that?

A.  Yes, sir.

Q.  Count 6 charges you with using a firearm during and in relation to a crime of violence.  In count 6, the grand jury has charged that on or about November the 14th, 2002, in the District of South Carolina, you, along with Branden Leon Basham, knowingly used and carried a firearm during and in relation to, and possessed a firearm in furtherance of, crimes of violence for which you could be prosecuted in a court of the United States, as charged in counts 1 and 2 of the superseding indictment.  All in violation of Title 18 of the United States Code, Section 924(c)(1)(A) and Section 2.  Do you understand that charge?

A.  Yes, sir.

Q.  If this case were to go to trial the government would be required to prove three essential elements of count 7 beyond a reasonable doubt.  I would instruct the jury that if the government failed to prove any one of these beyond a reasonable doubt, the jury would be required to find you not guilty.

These elements are, number one, you had previously been convicted of a crime punishable by a term of imprisonment exceeding one year -- I'm sorry, we are on count 6, aren't we?

There are three elements to count 6, again, the government would have to prove all three beyond a reasonable doubt.  The three elements are, number one, that you used,

GARY N. SMITH, CM
COLUMBIA, SC

carried, or possessed a firearm; number two, that you used or carried the firearm during and in relation to, or possessed the firearm in furtherance of, a crime of violence; and number three, the crime of violence was one that could be prosecuted in a court of the United States, such as count 1 or count 2 of the indictment here.  Do you understand those three elements?

A.   Yes, sir.

Q.   The maximum penalty that can be imposed for a violation of count 6 is life imprisonment, and the law requires that this term of imprisonment be consecutive to any other term of imprisonment the court would impose.

There's a mandatory minimum sentence of at least five years, you would have to receive at least a five year sentence if convicted.  The fine could be anything up to $250,000, supervised release following imprisonment would be five years, and the special assessment, which is mandatory, would be $100. Do you understand the maximum penalty as to count 6?

A.   Yes, sir.

Q.   Moving on to count 7, charging you with possession of firearms in the status of a convicted felon.  In count 7 the grand jury has charged that on or about November the 14th, 2002, in the District of South Carolina, you, along with Branden Leon Basham, each having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess in and affecting commerce firearms, that

GARY N. SMITH, CM
COLUMBIA, SC

49

is, an H&R .22 caliber nine shot, model 949 revolver, a Llama Mini Max .45 caliber pistol, a Remington 870 12 gauge shotgun, a Marlin model 882SS .22 caliber rifle, a Remington model 1100 12 gauge shotgun, a Marlin model 60 .22 caliber rifle, and an RPI Connecticut Valley Arms Magbolt 150 rifle, each of which had been shipped and transported in interstate commerce, all in violation of Title 18 of the United States Code, Sections 922(g)(1) and 924(a)(2) and Section 2.  Do you understand that charge, Mr. Fulks?

A.  Yes, sir.

Q.  As to count 7, there are three essential elements that the government would be required to prove.  I would instruct the jury that if the government failed to prove any one of these three elements beyond a reasonable doubt, the jury would be required to find you not guilty.

These elements are, number one, you had previously been convicted of a crime punishable by a term of imprisonment exceeding one year; number two, you knowingly possessed, transported, shipped, or received the firearm; number three, the possession was in or affecting commerce because the firearm had traveled in interstate or foreign commerce at some point during its existence.  Do you understand those three elements?

A.  Yes, sir.

Q.  The maximum punishment for a violation of count 7 is a term of imprisonment of 10 years, the fine could be anything up to

$250,000, supervised release following imprisonment would be three years, and the special assessment is $100.  Do you understand the maximum penalty, Mr. Fulks?

A.  Yes, sir.

Q.  And finally, the last count, count 8, charges you with possessing stolen firearms.  In count 8 the grand jury has alleged that on or about November the 14th, 2002, in the District of South Carolina, you, along with Branden Leon Basham, knowingly did possess stolen firearms, that is an H&R .22 caliber nine shot model 949 revolver, a Llama Mini Max .45 caliber pistol, a Remington 870 12 gauge shotgun, a Marlin model 882SS .22 caliber rifle, a Remington model 1100 12 gauge shotgun, a Marlin model 60 .22 caliber rifle, and an RPI Connecticut Valley Arms Magbolt 150 rifle, each of which had been shipped and transported in interstate commerce, knowing and having reasonable cause to believe the firearms were stolen, all in violation of Title 18 of the United States Code, Sections 922(j) and 924(a)(2) and Section 2.  Do you understand that charge, Mr. Fulks?

A.  Yes, sir.

Q.  If this case were to go to trial as to count 8, there are four essential elements that the government would be required to prove.  I would instruct the jury that if the government failed to prove any one of these four elements beyond a reasonable doubt, the jury would be required to find you not

51

guilty.

These elements are, number one, you knowingly received, possessed, concealed, stored, bartered, or sold a firearm; number two, the firearm was stolen; number three, you knew or had reasonable cause to know the firearm was stolen; and number four, the firearm had traveled in interstate or foreign commerce.  Do you understand those elements?

A.  Yes, sir.

Q.  As to the maximum punishment provided by law, the maximum term of imprisonment that could be imposed is 10 years, the fine could be up to $250,000, supervised release following imprisonment would be three years, and the special assessment, which is mandatory, is $100.  Do you understand the maximum penalty that could be imposed?

A.  Yes, sir.

Q.  Now, one thing I would like to go back and emphasize.  In almost every count you have been alleged -- it is alleged that you violated a federal law, either directly or as an aider or abettor.

In Section 2 of Title 18 of the federal code, it provides that someone who aids and abets someone else who commits an offense can be guilty of the crime as an aider and abettor.

And just to be safe, I would like to explain that concept to you in case it should come into play in this case.

52

We are going to have to take a recess unless somebody can give me an aiding and abetting charge real quickly.

I used to keep them on the bench, and in this new courthouse I have them in my library.

MR. BLUME:  I believe Mr. Nettles has one.

THE COURT:  All right.

MR. NETTLES:  I believe I have an old one, Judge.

THE COURT:  All right.  Let me say, I have been doing a lot of reading, and if I skip a word or misstate something or inavertently skip over something, I ask the lawyers, please don't hesitate to stand up and correct me, because this is all very important.  You are not going to hurt my feelings at all. I want to get this right.

BY THE COURT:

Q.  Now, Mr. Fulks, as I have said, every single count, all eight counts, charge that you either committed the crime directly or that you aided and abetted Mr. Basham in committing the crime.  Do you understand that?

A.  Yes, Your Honor.

Q.  Now, the concept of aiding and abetting is one that you might not understand.  The law is that in order to aid and abet another to commit a crime, it is necessary that you willfully associate yourself in some way with the criminal venture and willfully participate in it, as you would in something you wished to bring about.  That is to say, that you willfully seek

GARY N. SMITH, CM
COLUMBIA, SC

by some act or omission of your own to make the criminal venture succeed.

An act or omission is done willfully if it is done voluntarily and intentionally, with the specific intent to do something the law forbids or with the specific intent to fail to do something the law requires to be done.

In order to aid and abet another to commit a crime, it is necessary that the defendant in some sort associate himself with the venture, that he participate in it as something he wishes to bring about, and that he seek by his action to make it succeed.

Do you understand the concept of aiding and abetting?

A.  Yes, sir.

THE COURT:  Is the government satisfied I correctly explained the concept of aiding and abetting?

MR. GASSER:  Yes, sir.

THE COURT:  Mr. Blume, are you satisfied?

MR. BLUME:  Yes, sir.

THE COURT:  Mr. Nettles?

MR. NETTLES:  Yes, sir.

BY THE COURT:

Q.  All right.  Now, the last part of the indictment of the superseding indictment is a notice of special findings made by the grand jury.  And these relate to count 1 and count 2, which are the two counts that could potentially result in the death

54

penalty being imposed.

These special findings are as follows:  As to count 1 charging car-jacking resulting in the death of Alice Donovan, and count 2, charging kidnapping resulting in the death of Alice Donovan --

MR. NETTLES:  Judge, before you go into that, I want you to understand that we are not pleading to the special findings.  And I don't know if Your Honor is just reading over those for notice purposes or not, but the guilty plea would be to counts 1 through 8.  The special findings are for notice as to the penalty phase.

THE COURT:  Is there any need for me to go through them with him?

MR. NETTLES:  I don't think so.

THE COURT:  What about that, Mr. Schools, Mr. Gasser?  These are the so-called aggravating factors, right?

MR. GASSER:  Your Honor, we would just like the record to reflect and the court would have colloquy with the defendant that he has full understanding that by pleading guilty to the eight counts, eight substantive counts in the superseding indictment, that the sentencing jury would be instructed that they have to accept those eight counts as fact, that he is in fact guilty, and we would go right into the special findings and the sentencing phase aspect of the trial.

THE COURT:  And these special findings relate to the

55

sentencing phase?

MR. GASSER:  Yes, sir.

THE COURT:  Well, do you see a need for me to read those to him on the record here today?

MR. GASSER:  No, sir, I'm sure they have been thoroughly gone over by defense counsel.

BY THE COURT:

Q.  Well, Mr. Fulks, up until now, I have read to you from pages 1 through 13 of the indictment, these are the pages that set out the actual charges of counts 1 through 8.

If you plead guilty to counts 1 through 8, you will then have admitted that you are in fact guilty of the crimes charged in counts 1 through 8, each individual count, eight of them.  There will be no need for the government to prove that those violations of law occurred.

Now, pages 14 through 16 of the superseding indictment set out some special findings made by the grand jury.  These special findings are things that would come into play at the penalty phase on counts 1 and 2.

In other words, these are things the government would attempt to prove against you at the penalty phase on count 1 and count 2 in an effort to have the jury return a verdict of the death penalty.  Do you understand that?

A.  Yes, sir.

Q.  So, by pleading guilty, you essentially are admitting the

56

allegations in pages 1 through 13, counts 1 through 8, but you are not admitting these special findings.  It will be up to the jury to determine whether the government has proved these special findings or not.  Do you understand that?

A.   Yes, sir.

Q.   Now, these special findings are nevertheless very important because they are going to be issues that are in dispute in front of the jury, and so it's important that you have read over them and understand what they are.  Have you read over these findings and discussed them with your attorneys?

A.   Yes, sir.

Q.   Let me just -- I'm just going to summarize or paraphrase each one very briefly, just for the record.  Mr. Fulks, you are not admitting any of these, I just want to be sure you understand the government is going to try to prove these things at the penalty phase, if we have a penalty phase on counts 1 or 2.

A, that you and Mr. Basham were 18 years of age and older at the time of the offense.

B, that you and Mr. Basham intentionally killed Alice Donovan.

C, that you and Mr. Basham intentionally inflicted serious bodily injury that resulted in the death of Ms. Donovan.

D, that you and Mr. Basham intentionally participated

57

in an act, contemplating that the life of a person would be

taken, and intending that lethal force would be used in

connection with a person, other than one of the participants in

the offense, and that Alice Donovan died.

E, that you and Mr. Basham intentionally and

specifically engaged in an act of violence, knowing that the

act created a grave risk of death to a person.  That such

participation in the act constituted a reckless disregard for

human life, and Alice Donovan died.

F, the death of Ms. Donovan and the injury resulting

in the death of Ms. Donovan occurred during your commission and

Mr. Basham's commission and attempted commission of and during

your flight from the commission of an offense under Title 18 of

the federal code, Section 1201.

G, that you and Mr. Basham committed the offense as

consideration for the receipt and in the expectation of the

receipt of something of pecuniary value.

H, that you and Mr. Basham intentionally killed and

attempted to kill more than one person in a single criminal

episode.

Those are factors that will be put before the jury in

a penalty phase proceeding if you plead guilty to counts 1 and

2.  Do you understand that?

A.  Yes, sir.

Q.  All right, Mr. Basham, I have gone over each of the eight

counts with you, and as to each count I have told you the specific charge against you.  I have gone through the essential elements that the government would be required to prove before the jury could find you guilty of each count.

I told you about the maximum penalty that can be imposed, and where applicable, I have told you about the mandatory minimum penalty that must be imposed.

I have told you the concept of aiding and abetting, and I have told you about the special findings the grand jury made, which will be disputed issues at a penalty phase on counts 1 and 2.  Do you understand all the legal matters that we have just been discussing?

A.  Yes, sir.

Q.  Is there anything you want me to go back and explain to you or explain in more detail?

A.  No, sir.

THE COURT:  Is the government satisfied that I have adequately explained the charges and the elements to the defendant?

MR. GASSER:  Yes, sir.  We would also just like the record to reflect with regard to the voluntariness of his guilty plea and his understanding of the criminal proceedings that -- and would ask acknowledgement from Mr. Fulks, that Mr. Fulks has been through these same proceedings on prior occasions in federal court in Tennessee and state court in

GARY N. SMITH, CM
COLUMBIA, SC

59

Tennessee, in state court in Kentucky, state court in Indiana, and in state court in West Virginia.

He has been charged with criminal offenses, he has had the protection of the right to counsel during those offenses, and he has pled guilty before in various federal and state jurisdictions.

So, I want the record to reflect that he has been through this process and this colloquy with other state court and federal court judges, with the advise of counsel.

THE COURT: Well, the state court proceedings might be a little different, they might be a little more abbreviated than what we have here.

MR. GASSER: But they are the same when it comes to the right to a jury trial, the right to face his accusers, the right to confront witnesses. The fact that the government, be it state or federal court, would have to prove charges beyond a reasonable doubt. I just wanted the record to reflect this isn't the first time that a judge has ever had conversation or had advised Mr. Fulks of his constitutional rights.

MR. NETTLES: Your Honor, regardless of what has happened in the past, the only thing that is relevant here is that the plea is voluntary. So, I think that's the only thing, whether or not he voluntarily --

THE COURT: Well, I think the point Mr. Gasser is trying to make is that he has stood before a judge before, and

any claim that he might be unduly intimidated or coerced or something would be somewhat lessened because of his past experience.  I think that's the only point he's trying to make.

MR. GASSER:  Yes, sir, that's --

THE COURT:  Which, I mean, if he's pled guilty before, the record will stand on that.  And if that ever becomes an issue, that can be argued in the court of appeals. All right.

All right, let me ask defense counsel, Mr. Blume, are you satisfied, and Mr. Nettles, are you satisfied, are both of you satisfied that the defendant understands the nature of the charges against him in each count, 1 through 8, the essential elements that the government will be required to prove, and the maximum penalty that he faces on all eight counts?  Mr. Blume?

MR. BLUME:  Yes, Your Honor.

THE COURT:  Mr. Nettles?

MR. NETTLES:  Yes, sir.

THE COURT:  Have you both thoroughly discussed these charges and all the evidence associated with these charges and all the things the government would be required to prove?  Have you discussed that with the defendant prior to today's hearing? Mr. Blume?

MR. BLUME:  Yes, sir.

THE COURT:  Mr. Nettles?

MR. NETTLES:  Yes, sir.

THE COURT:  All right.  Then after conducting an extensive colloquy with Mr. Fulks, I find that the defendant fully comprehends and understands the nature of the charges against him generally, and he also understands the essential elements of each of the eight counts that the government would have to prove if a trial was held.

I find that he also understands the maximum possible penalty for each count.  And where applicable, he understands the mandatory minimum penalty for each count -- for the one that does have a mandatory minimum.

BY THE COURT:

Q.  All right, Mr. Fulks, as to counts 3 through 8, the counts that do not involve the potential for a death penalty, the sentencing will be imposed by me, not by the jury.  The sentencing will be imposed under the Sentencing Reform Act of 1984.

Under that law, the sentencing commission has issued guidelines for judges to follow in determining the sentence in a criminal case.  So, I'm going to briefly go through what the sentencing guidelines are.

But it is very, very important that you understand that what I'm about to go over with you only applies to counts 3 through 8, the counts that do not involve a potential death penalty, for which I will impose a sentence.  What I'm about to

say has no application whatsoever to count 1 or count 2.

So, as to counts 3 through 8, the sentencing commission guidelines will apply in determining the sentence. Have you discussed the sentencing guidelines generally with your attorneys?

A.  Yes, sir.

Q.  You understand then, Mr. Fulks, that as to 3 through 8, I will not be able to determine the guideline sentence for your case until after a presentence report has been completed and after you and the government have had an opportunity to challenge the reported facts and application of the guidelines recommended by the probation officer.  Do you understand that?

A.  Yes, sir.

Q.  Again, as to counts 3 through 8, the sentence that is imposed may be different from any estimate that your attorney may have given you.  Do you understand that?

A.  Yes, sir.

Q.  Again, as to counts 3 through 8, after your guideline range has been determined, the judge has the authority in some circumstances to depart from the guidelines and impose a sentence that is more severe or less severe than the sentence called for by the guidelines.  Do you understand that?

A.  Yes, sir.

Q.  Again, as to counts 3 through 8 only, under some circumstances you or the government may have the right to

GARY N. SMITH, CM
COLUMBIA, SC

63

appeal any sentence that I impose.  Do you understand that?

A.   Yes, sir.

Q.   Do you understand that parole has been abolished, and that if you are sentenced to prison you will not be released on parole?

A.   Yes, sir.

Q.   Again, as to counts 3 through 8, if the sentence that you received from this court is more severe than you expected, you will still be bound by your plea and will have no right to withdraw your plea.  Do you understand that?

A.   Yes, sir.

Q.   If you, as to counts 3 through 8, if you are sentenced to prison, the law requires that upon release from prison you be subjected to supervised release.  This probably will not apply, because if you are convicted on count 2, you must get life imprisonment without parole.  So I don't want to confuse anything here, but I'm just going through the motions of telling you that as to counts 3 through 8 only, upon release from prison you would have to be subjected to supervised release.

If you are under supervised release, you are under a court order that prescribes rules for your behavior while on supervised release.  If you violated any term or condition of supervised release, I could put you back in jail.  Do you understand that?

64

A.   Yes, sir.

Q.   Now, let me hasten to add, I don't want to cause any misunderstanding here, what I have just gone over with you about supervised release relates only to counts 3 through 8. I'm telling you about those out of and abundance of caution because the law says I'm supposed to.  But in a case where you have death penalty counts alongside non-death penalty counts, there is a potential for some confusion.

So, let me once again emphasize as to counts 1 and 2, the sentence or the penalty will be determined not by me but by the jury.  The jury can give you the death penalty or the jury can give you life in prison without parole.  And so if you are sentenced on one of those two, the thing about supervised release following a release from prison is not going to apply. Do you understand that?

A.   Yes, sir.

Q.   All right.  Mr. Fulks, has anyone threatened you, or anyone else, or forced you in any way to plead guilty?

A.   No, sir.

Q.   Are you pleading guilty of your own free will because you are guilty?

A.   Yes, sir.

Q.   Has any negotiated plea agreement been entered between you and the government in this case?  Have you worked out any deal or bargain, struck a deal with the government on anything?

65

A.  No, sir.

Q.  So, you are just pleading straight up, so to speak, to the eight charges?

A.  Yes, sir.

Q.  The government has promised you nothing in return?

A.  No, sir.

Q.  All right, now, Mr. Basham, Rule 11 of the rules of federal procedure -- I'm sorry Mr. Fulks, I'm sorry, I apologize.

Rule 11 of the Federal Rules of Criminal Procedure requires that I determine if you understand the charges, if you are pleading guilty freely and voluntarily, if you are competent to plead and so forth.  Then I must also determine if you are in fact guilty of what you want to plead guilty to.

So, at this point in the proceedings I must go through each of the eight counts of the indictment and ask you what you did to make yourself factually guilty of the charge. And you are under oath, do you understand that?

A.  Yes, sir.

Q.  If you want to stop and consult with your attorneys at any time, you may do so.  All right, let's go to count 1 of the superseding indictment.

MR. NETTLES:  Just a minute, Judge.

(Off record discussion)

THE COURT:  Y'all want to take a recess?

MR. NETTLES:  I think that might be appropriate,

66

Judge.

THE COURT:  Let's take a 10 minute recess.

(Short recess)

THE COURT:  All right, before the break we had reached the Rule 11 colloquy where I asked the defendant, Mr. Fulks, to tell me what he did to be factually guilty of the crimes charged.  And that was pursuant to Rule 11(a)(3), which provides before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea.

In other words, I have to establish on the record not only that the defendant knows what the charges are, knows what his rights are, wants to plead guilty, no one has forced him to plead guilty, et cetera, et cetera, but I also have to determine that he is in fact guilty of what he is charged with doing.

Counsel asked for a recess, and during the recess I was informed by counsel that rather than giving me a narrative of what happened, the defendant, Mr. Fulks, wished to simply concede that the 302 form, the FBI form 302, which is a report of an interview the FBI did with Mr. Fulks, is accurate.

In other words, Mr. Fulks wanted to just reaffirm what he told the FBI as memorialized in the 302 form.  So, I spent some time going through what was said in the 302 form, and suffice it to say that, summarizing in great -- to a great extent, the 302 form by Mr. Fulks admits that he was involved

GARY N. SMITH, CM
COLUMBIA, SC

67

in helping abduct Ms. Donovan and take her car, so he has admitted his complicity in car-jacking and kidnapping.

But when we come to the part about the death of Ms. Donovan, again, summarizing in great part, Mr. Fulks admits that Mr. Basham raped Ms. Donovan and that then he, Mr. Fulks, raped Ms. Donovan.

But then when we come to the actual murder, Mr. Fulks says that while they were out in the woods, Mr. Basham took Ms. Donovan off into the woods with some tape and a gun, and that then he came back and told Mr. Fulks that he had taped Ms. Donovan to a tree and taken her clothes off so that if she escaped and tried to run, she would have difficulty in running or would be less -- hesitant to run and less likely to have them captured. And it was not until later during their venture that Mr. Basham actually informed Mr. Fulks that Ms. Donovan had been killed.

So, the reason for the long recess was, I have been agonizing over whether this 302 form says enough factually for me to determine that Mr. Fulks has admitted his guilt as required by Rule 11. And if I determine that he has not admitted his guilt, my only remedy is to reject the plea and require the case to go to a trial.

And I want to emphasize that, because I have had people ask me before, when you reject a guilty plea, does that mean the defendant gets to go free because you wouldn't take

68

his plea?

No, it does not mean that at all. It means we have to have a jury trial to see if the jury thinks he is guilty. So, on the state of the record here, we have to look at either aiding and abetting liability or Pinkerton liability. Aiding and abetting requires some type of specific intent to help bring about the crime.

I don't think it fits the facts set out in his 302 form, because, as I said, Mr. Fulks does not admit that he knew that she was going to be killed, and he does not admit that he wanted to help bring it about.

Then we are left with so-called Pinkerton liability, which was established by the Supreme Court in the case of Pinkerton versus United States back in 1946. In that case the Supreme Court held that a conspirator may be convicted of substantive offenses committed by co-conspirators in the course of and in furtherance of the conspiracy.

But what I have been agonizing over is, counts 1 and 2, two counts that carry the death penalty, do not charge a conspiracy. And count -- is it 3 or 4 that does charge a conspiracy? 4. Count 4 that charges the laundry list of the conspiracy, if you wanted to apply Pinkerton to that, you could. But the problem is that the maximum penalty for count 4 is five years.

So, I'm not sure that we need to -- I think the thing

GARY N. SMITH, CM
COLUMBIA, SC

69

to do is to just stop right here and resume tomorrow and let me hit the books and y'all hit the books tonight to see if the law is that Pinkerton can apply to a murder case where a conspiracy is not charged.

Now, I know that is not something that anybody in this room wants to hear, and I'm probably the most unpopular person in the courthouse right now, but I think that's the thing to do.

Because I do not want to take a plea and try this case to a jury on the penalty phase, and then have the Fourth Circuit tell me that Mr. Fulks did not admit enough facts to make him guilty.

So, I know y'all probably have other things you planned to do tomorrow, but I would like to resume at maybe -- Mary, what do we -- we have got several criminal matters tomorrow morning.  We can just push them back.

THE CLERK:  Have a motions hearing starting at 10.

THE COURT:  Well, they will just have to wait, this has to take priority.

THE CLERK:  Just two things in the morning.

THE COURT:  Mr. Nettles, do you want to say something?

MR. NETTLES:  Well, I think the court recognizes we all have things  -- had just made a -- I was leaving now --

THE COURT:  Let me say, I have run this by another

GARY N. SMITH, CM
COLUMBIA, SC

70

judge in this building who has grave concerns about it too.  Go ahead.

MR. NETTLES:  I was going to suggest, Judge, that we are going to be back in court again on Friday, and we kind of built our week around this and Friday, and I was -- I was going on about a three or four hour drive tonight so that I can meet with an expert first thing in the morning --

THE COURT:  I'm amenable to resuming Friday.

MR. NETTLES:  And I would propose we do this Friday. We are going to be here anyway, Judge.

THE COURT:  Mr. Gasser and Mr. Schools, what about that?

MR. GASSER:  Your Honor, we have no -- we would agree that this is -- that this issue is extremely important, and that due deliberation by the court as well as all the lawyers involved is probably the best avenue to take.

And we also can -- we can understand the scheduling problems for Mr. Nettles and Mr. Blume with witnesses as the trial date comes closer and closer, and so we have no objection to continuing the matter until Friday morning.

THE COURT:  All right.  We have other matters to take up Friday as well.  We have got the continuance motion, there have been another handful of jurors who have offered up hardship excuses I wanted y'all to take a look at.

I have to redo the -- if the guilty plea goes

71

forward, I have got to redo the video that we are going to do for the jury, taking out part one. There are two or three other matters we are going to take up as well.

MR. GASSER: One of the matters that was brought up that Mr. Blume and Mr. Nettles and Mr. Thurmond and Mr. Schools and I discussed right before the court resumed the bench was the issue of the general qualification of the jurors.

I guess it's kind of -- we are all kind of not sure as to how that would transpire, whether you would do that orally to each individual juror when they are brought in and they are sworn under oath, or whether you do it as a group. Of course --

THE COURT: I'm probably going to nail that down Friday. You mean just questions such as, "Have you heard anything about this case," just general questions that we could ask one time to a group and save time, in other words?

MR. GASSER: Yes, sir, the general qualification questions that are asked of all the jurors.

THE COURT: I think it might make more sense to bring them all in. You know, we are bringing in 24 per day. The literature we have read says we can expect to lose 30 percent based on the follow-up questionnaire we are going to give them, whether they have such strongly held beliefs for or against the death penalty that they cannot be fair.

If we lose 30 percent from 24, that will leave us

GARY N. SMITH, CM
COLUMBIA, SC

72

with about 16. Bring in the 16 as a group, qualify them on the general questions, and send them back. And bring them in one at a time and put them on the witness stand so they will be in front of a microphone. And then I do voir dire and y'all do voir dire. I think that's the way we could proceed.

MR. GASSER: Yes, sir.

THE COURT: And then we have got the motion on the jury selection method too. Y'all still oppose the so-called struck method, right?

MR. BLUME: I don't know that we necessarily have a legal basis to oppose it, it's still our position that the strike as you go is the most efficient.

THE COURT: Well, I thought it would save time, but the more I thought about it, the government suggests that by the time we get to the end of the questioning and then I say, "What say you for the government?" they are going to have to collaborate and scratch their head and whisper back and forth, and then go to your side. There is going to be an awful lot of dead time for each juror if we do that.

MR. BLUME: Well, I think -- I'm sorry, Your Honor.

THE COURT: So, I'm just kind of up in the air. We can talk about that Friday. We can talk about that Friday. Because we will have to do that whether the plea goes forward or not.

Well, I guess -- y'all understand my concern. My

73

concern is, I did not know when I walked out here that all I was going to have for a factual statement was his 302 that really admits kidnapping and admits car-jacking, but does not admit any complicity in the death.

And so the two options we have I think are looking at aiding and abetting, which I don't think it fits. Because aiding and abetting requires some manifestation of an intent to help bring about the crime that occurred. I don't think this 302 says that.

Then we have Pinkerton liability, the co-conspirator theory of imputing liability. But I'm just not sure of my authority to apply that doctrine to counts 1 and 2 which do not charge a conspiracy, and that's my precise question that I would like for y'all to take a look at. All right.

Now, when we come back Friday, do we need to go through competency again or --

MR. NETTLES: No, sir.

THE COURT: All right. All right, thank you. What time Friday?

THE CLERK: They have got a notice for 10 o'clock.

THE COURT: 10 o'clock Friday. We will be in recess.

(Thereupon, the proceedings on May 4, 2004, were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

GARY N. SMITH, CM
COLUMBIA, SC

74

(Change of plea proceedings on May 7, 2004)

THE COURT: This is a resumption of the proceeding that we began on Wednesday of this week in the case of United States of America versus Chadrick Evan Fulks.

The court was informed that Mr. Fulks wished to tender a plea of guilty to all eight counts of the indictment. We then began a Rule 11 colloquy and decided to recess the proceedings so that I could research a very troublesome legal issue that had arisen in the case.

Because of the seriousness of the charges in this case, I requested that Dr. Berg appear again today so that we could briefly explore competency before proceeding this morning. And I appreciate very much her being available on short notice.

Mr. Nettles.

MR. NETTLES: Thank you, Your Honor. Dr. Berg has had an opportunity to discuss those matters with Mr. Fulks this morning, she met with him for about 30 minutes, and she informs me that Mr. Fulks is competent to proceed here today.

THE COURT: All right. Is that correct, Dr. Berg?

DR. BERG: Yes, Your Honor.

THE COURT: How long did you meet with him?

DR. BERG: 30 minutes.

THE COURT: All right. Have you seen his medication chart?

GARY N. SMITH, CM
COLUMBIA, SC

75

DR. BERG:  Yes, I have.

THE COURT:  The new one that was -- since last Wednesday?

DR. BERG:  The only changes, last time, is that they removed his Tylox medication --

THE COURT:  They removed his --

DR. BERG:  Tylox medication.

THE COURT:  Tylox, T-y-l-o-x?

DR. BERG:  That's correct.

THE COURT:  Except for that, his medical regimen is the same as it was on Wednesday?

DR. BERG:  That's correct.

THE COURT:  And you remain of the opinion that the medicine he's taking individually or collectively would not impair his cognitive ability?

DR. BERG:  That's correct.

THE COURT:  All right.  Anything from the government?

MR. SCHOOLS:  No, sir.

THE COURT:  Mr. Nettles?

MR. NETTLES:  May she be excused, Judge?

THE COURT:  Certainly.  Thank you so much, Doctor.

DR. BERG:  Thank you.

THE COURT:  Mr. Fulks, let me just question you real quickly.

76

EXAMINATION OF THE DEFENDANT

BY THE COURT:

Q.   You understand why we are here again?

A.   Yes, Your Honor.

Q.   This is a serious matter and I want to be sure you are entirely comfortable with going forward today.  You are taking a lot of medicine, but the doctor that looked at you this morning said that medicine was not affecting your ability to communicate with me or think or make important judgments; is that correct?

A.   Yes, sir.

Q.   All right.  And you continue to be satisfied with your lawyer's representation in this case?

A.   Yes, sir.

Q.   All right.  Tell me just a little bit about yourself. Where were you born?

A.   Lincoln County, West Virginia.

Q.   What part of West Virginia is that located in?

A.   About a half hour from Huntington.

Q.   Okay.  Is that where they do a lot of snow skiing, or is that in a different part of West Virginia?

A.   No, that's about 100 miles.

Q.   100 miles away?

A.   From where they do the snow skiing.

Q.   Okay, look at the clock on the back wall back there and

GARY N. SMITH, CM
COLUMBIA, SC

77

tell me what time it is.

A.  10:32.

Q.  10:32.  Very good.

THE COURT:  All right, any questions or concerns by defense counsel?

MR. BLUME:  No, Your Honor.

THE COURT:  All right, thank you.  Well, I'm entirely satisfied -- you may be seated.

I'm entirely satisfied that the defendant was competent on Wednesday, and remains competent today after hearing from Dr. Berg and conducting a brief colloquy with him this morning.

Let me say just one housekeeping matter, on Wednesday we sent you a stack of hardship requests from jurors and we asked that you come today prepared to discuss those.  Well, since Wednesday, we got in 12 more.  So, we put on your desk this morning a stack which included what you had been given Wednesday plus 12 more at the back.

Now, on the bottom of each one I have written yes or no as to what I would think we should do with them, but I want your input.  There were only a very few that I rejected.  All of them pretty much seem like legitimate requests.

But my point is, I don't want to go into that now, but the jury clerk needs that information as soon as possible because they need to get the word out to these jurors today not

78

to come if we are going to excuse them.

Because we are under a severe shortage of money in paying jurors and we don't need to pay someone to come here, $100 to come here, for nothing.  So, once we finish the Rule 11 part of this case, we might want to take that up first thing so we can get word to the jury clerk.

All right.

MR. BLUME:  Your Honor, just one quick thing on that. I think the court said that there were 12 new ones --

THE COURT:  Right.

MR. BLUME:  -- and we only have eight, we were given eight new ones.  It's a small matter, but I just didn't know if there were four of those missing.  The government only has eight as well.

THE COURT:  All right, it is eight.  I think the total, from when the jury clerk met with us yesterday, they said there were 12 more.

(Off record discussion)

THE COURT:  All right, when we broke off the hearing on Wednesday we had come to the part of the Rule 11 colloquy where I asked the defendant what he did to be guilty of the two capital offenses in this case.

At that point counsel asked for a recess, and then I was told in chambers that rather than provide the defendant with the opportunity to give a narrative of what happened, it

GARY N. SMITH, CM
COLUMBIA, SC

was proposed that he simply confirm that the FBI 302 report of interview form accurately reflects what he told the FBI and would suffice to support a guilty plea to the two capital offenses in this case.

I was concerned, because as I said Wednesday, there was no acknowledgement in the 302 by Mr. Fulks that he had the requisite intent that I thought might be required to support a guilty plea to either car-jacking resulting in death or kidnapping resulting in death.

Since that time, I have received memoranda from both the government and the defendant, both memoranda suggest that the Pinkerton doctrine, the so-called Pinkerton doctrine, named after the Pinkerton case decided by the Supreme Court, could support a theory of vicarious liability imputing guilt to Mr. Fulks on count 1, the car-jacking count, and both memorandums suggested that Pinkerton is not required to support a finding of guilt as to count 2.

I agree with that statement as to count 2. And let me just say on the record, count 2 is a kidnapping count, and as I said on Wednesday, the elements under the statute to support a finding of guilt as to kidnapping resulting in death are the following four factors:

The defendant unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim; number two, the defendant held the victim for ransom, reward,

80

or otherwise; number three, the defendant willfully transported the victim in interstate commerce; and, number four, death results. There is no intent factor or mental state factor incorporated in those elements.

Now, of course, if the case proceeds to a penalty phase, there are intent elements that the government must prove at the penalty phase before the defendant can receive the death penalty. If the government fails to prove those intent factors, one of those intent factors, the defendant may not receive the death penalty.

So, I agree with both sides that Pinkerton is not required for me to make a finding that there is a factual basis for guilt based on the 302 report as to count 2.

I will also note, and my law clerk pointed this out to me yesterday, just for the record, that the kidnapping statute has its own internal conspiracy section, subparagraph C of Section 1201. The kidnapping statute, says:

"If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or life."

And it seems to me that the kidnapping statute, as I said, carved out its own conspiracy component. And I think a strong argument could be made that because of that Pinkerton could not apply to the kidnapping count. I just say that for

81

what it's worth.  Y'all might not agree.  But I think we will be in a very difficult situation if we were trying to apply Pinkerton to the kidnapping count.

Now, the other count, count 1, car-jacking resulting in death, does have a mental state requirement.  The fifth element that I related to Mr. Fulks on Wednesday was that in taking a motor vehicle in interstate commerce, et cetera, et cetera, the taking or attempted taking -- excuse me, the taking is done or is attempted by force, violence, and intimidation, and then fifth, in doing so the defendant intends to cause death or serious bodily harm.

And that's where we had a problem with the 302 statement not relating any facts that would support a finding of intent to cause death or intent to cause serious bodily harm.

The parties have briefed the question of whether Pinkerton may be applied to that situation and both sides have suggested that it may.  Is that correct Mr. --

MR. THURMOND:  Yes, Your Honor.

THE COURT:  -- Mr. Thurmond?

MR. THURMOND:  Yes, Your Honor.

THE COURT:  Mr. Blume, do you agree with that?

MR. BLUME:  Yes, Your Honor.

THE COURT:  I know you were on the road traveling since the Wednesday hearing.  The brief that came in was signed

82

by your law partner, Mr. Weyble, who was not really an attorney of record in this case, and that's why I wanted to be sure that you had had a chance to look at that law and were comfortable with the application of Pinkerton in this case.

MR. BLUME:  No, Your Honor, I did read the case, and I actually assisted electronically from the location in drafting the memorandum.

THE COURT:  All right.  And you are satisfied that there is no constitutional infirmity or legal infirmity in applying Pinkerton to the car-jacking resulting in death statute charged here?

MR. BLUME:  No, Your Honor.  Yes, I am satisfied that there is no legal impediment.

THE COURT:  All right.  Well, then we need to go back and then hear again from Mr. Fulks about the statement he gave to the FBI.

Our research revealed that it's really not enough to just put the statement in the record, I need to get the defendant to confirm the words of this statement.  And so I think it would be better if you just remain seated, and let me just go through this statement.  And I think I will pause at each paragraph break and ask the defendant if this is a correct statement of what he said.

MR. NETTLES:  Your Honor, let me just make sure he understands.

GARY N. SMITH, CM
COLUMBIA, SC

83

(Off record discussion)

MR. NETTLES: Okay, Judge, thank you.

BY THE COURT.

Q. All right, now, Mr. Fulks, do you remember when you were interviewed by the Federal Bureau of Investigation back in April of 2003, April of last year?

A. Yes, sir.

Q. Just about a year ago?

A. Yes, sir.

Q. And according to the paper that was given to me by your lawyers, the FBI agent interviewed you with both Mr. Blume and Mr. Nettles sitting there with you, and you gave some information to the FBI regarding Ms. Alice Donovan and what happened to her; do you remember that?

A. Yes, sir.

Q. And the FBI agent who interviewed you then sat down and wrote up a report of what you said, and that's the paper I'm now holding. I want to go through this report of what he wrote down to see if he correctly wrote down what you said.

And that way I don't have to ask you to tell me what happened here in court, I can just tell you what has been recorded that you said and see if you agree with it. Do you understand that?

A. Yes, sir.

Q. And do you understand you took an oath promising to tell

GARY N. SMITH, CM
COLUMBIA, SC

84

the truth when we began this hearing on Wednesday?  You are still under oath even though we are in a different day, you are still under oath at this time; do you understand that?

A.  Yes, sir.

Q.  Very good.  All right, this FBI 302 form report of interview says as follows:

"Chadrick Evan Fulks, date of birth, May 16, 1997, social security number --" I'm going to omit the social security number for privacy reasons.  "Currently incarcerated at the Lexington County Detention Center, Lexington, South Carolina, was transported to the office of the FBI in Columbia, South Carolina, by FBI agents.

"After arriving at the office, Fulks was made aware of the identity of the interviewing agents.  Also present in the interview room were Fulks' appointed counsel, John Blume and Bill Nettles, as well as defense investigator Pete Skidmore.  Lieutenant Rodney Sessions, Conway, South Carolina Police Department, was also present and participated in the interview of Fulks.

"Prior to the start of the interview, Fulks was presented with a copy of an advice of rights form, the contents of which were read aloud to him.  Fulks acknowledged that he fully understood his rights and he signed the waiver portion of the form.  Fulks indicated that he wanted to tell the truth and help us locate the body of Alice Donovan.  Fulks provided the

85

following information."

Mr. Fulks, that is just an introductory paragraph that says you were brought from Lexington to Columbia, you were put in a room with your lawyers, you were asked some questions, you understood your rights, and that you didn't have to give this statement; is that correct so far?

A. Yes, sir.

Q. All right. Then the information you provided is as follows:

"On November 14, 2003, Fulks and Branden Basham were traveling in a white pick-up truck. Fulks was driving the truck. Both Fulks and Basham knew that they needed to steal another vehicle, and Fulks drove into the WalMart parking lot. Fulks used the first entrance he came to in order to enter the WalMart parking lot. Basham was supposed to locate the car to steal.

"As Fulks drove the pick-up truck into the parking lot, they noticed a BMW pulling down one of the aisles looking for a space. Fulks drove the pick-up truck behind the BMW and as the BMW pulled into a space, Basham jumped out of the still moving pick-up. Fulks continued driving the pick-up down the aisle and lost sight of Basham. Fulks assumed that Basham was going to steal an unoccupied vehicle.

"As Fulks turned and began traveling down the adjacent aisle, heading back toward the store, he noticed that

GARY N. SMITH, CM
COLUMBIA, SC

86

Basham was waving his hand signaling Fulks to drive over to his location.  Basham was leaning into the driver's side of the BMW sitting on the female driver.  Fulks pulled the pick-up in front of the BMW and watched Basham fall over to the front passenger's seat.

"Donovan drove the BMW from the parking space to a location near the rear area of the parking lot.  Fulks followed in the --" excuse me -- "Fulks followed the BMW, parked the pick-up, and entered the BMW in the rear seat.  Donovan was told to drive the car, and the BMW traveled out of the parking lot.  The BMW continued south on Highway 501 towards Myrtle Beach.

"At the intersection of Highway 501 and Highway 378 the BMW turned left onto Highway 378.  Fulks recalls seeing a used car dealership on the corner.  The BMW continued on 378 and made a right turn onto Highway 701.  The BMW made a turn onto Church Street Extension.

"Donovan was ordered to stop the vehicle in an area believed to be the Conway City maintenance facility.  Fulks described the area as having a gravel parking lot and a white fence around it.  Donovan moved to the back seat by climbing between the seats.  Fulks began driving the BMW."

That's the first paragraph, Mr. Fulks.  Is that a correct statement so far of what happened?

A.  Yes, sir.

GARY N. SMITH, CM
COLUMBIA, SC

87

Q.  All right, continuing.  "Basham sat on the passenger's side of the back seat with Donovan sitting behind Fulks.  Basham was armed with a .22 revolver.  Fulks did not have a gun with him in the BMW.

"Fulks drove through Conway and recalls seeing a lumber yard and crossing over railroad tracks.  Fulks became lost and eventually headed up on Highway 90.  Fulks continued on Highway 90 toward Little River.

"While Fulks was driving, Basham began going through Donovan's purse looking for credit cards.  Basham was able to find an ATM card.  Fulks stopped at a Pantry convenience store and went into the store.  Fulks attempted to use Donovan's ATM card, but was unable to obtain money because of a wrong PIN number.  Basham had obtained the PIN number from Donovan and had written it down on a piece of paper.

"Fulks traveled to a bank not far away from the Pantry.  Fulks parked the BMW just up the street from the bank and walked to the outside ATM machine.  Donovan and Basham remained inside the car.  Fulks was able to get approximately $200 from the ATM after making several transactions."

Again, is that correct so far, Mr. Fulks?

A.  Yes, it is.

Q.  "Fulks returned to the BMW and pulled onto Highway 17 North.  Fulks headed towards North Carolina.  Fulks did not know that he was in the State of North Carolina until he later

88

noticed a state trooper with a vehicle pulled over on Highway 17.

"After traveling for a while, Donovan requested they stop to get drinks and she requested cigarettes. Fulks located a gas station and stopped. Fulks entered the convenience store while Donovan and Basham remained in the back seat of the BMW.

"Fulks purchased three bottles of Mountain Dew and chewing gum. Basham told Fulks to buy some tape. Fulks purchased an unknown type of black tape and a roll of radiator repair tape. Fulks did not buy cigarettes since he didn't have an I.D. with him.

"Donovan told Fulks that the gas gauge on the BMW did not work properly and may be in need of gas. Fulks pulled the BMW over to the gas pumps and used Donovan's credit card to pay for the gas at the pump."

Is that a correct statement so far, Mr. Fulks?

A. Yes, sir.

Q. Continuing. "After leaving the gas station, Fulks pulled back onto Highway 17 and continued north. Fulks noticed a state trooper with a car stopped on Highway 17, and before reaching the trooper, Fulks made a left turn onto a two lane paved road. Fulks made a left turn onto a dirt road and traveled down the road until coming to a dead end at a hunting cabin.

"While Fulks was driving up the dirt road, Basham

GARY N. SMITH, CM
COLUMBIA, SC

89

began trying to take Donovan's shirt off.  Several men were standing outside the cabin, and as Fulks drove by the men waved.  Fulks waved back, made a U-turn, and continued back down the dirt road.

"Fulks pulled into a small dirt U-shaped driveway where a fenced in cemetery was located.  Fulks pulled the BMW straight up to the fence.  Basham began forcibly taking Donovan's clothes off.  Basham placed her clothing across the back seat and then ordered Donovan to lay across the seat.  Donovan was completely naked.  Basham performed oral sex on Donovan and then had intercourse with her.  Basham had his pants down around his ankles.

"While Basham was having sex with Donovan, Fulks was sitting on the hood of the BMW facing the cemetery.  After Basham was finished, he told Fulks to have sex with Donovan.  Fulks didn't want to, but felt pressure from Basham to have sex with Donovan.  Fulks had intercourse with Donovan and ejaculated inside her while Basham stood near the cemetery fence.

"Fulks got out of the BMW and noticed a truck had pulled into the U-shaped driveway.  Fulks ducked down in front of the BMW, and after a minute the truck pulled out.  Fulks and Basham got back into the BMW and immediately left the area.

"Fulks drove around the area for a while and became lost.  Fulks noticed several signs pointing to several area

GARY N. SMITH, CM
COLUMBIA, SC

90

beaches.  Fulks continued on the road until seeing a sign pointing to Myrtle Beach.  Fulks got back onto the main highway, which he recognized as being the same highway they had traveled up on."

That's the end of that paragraph.  Mr. Fulks, is that a correct rendition of what you told the agents in that paragraph?

A.  Yes, sir.

Q.  Next paragraph.  "Donovan remained naked on the back seat and was told by Basham that she could not put any of her clothes back on.  At some point, Donovan put her panties and tennis shoes on.

"Fulks stopped at a Scotchman convenience store and used Donovan's credit card to get gas.  Fulks got back onto Highway 90 after turning around at the Cherry Grove exit.  Fulks recalls seeing a --" excuse me -- "Fulks recalls driving over a bridge swing and turned left onto Highway 90.

"Basham wanted Fulks to begin looking for dirt roads off of Highway 90.  Fulks turned down the first dirt road he came to, but quickly turned around after seeing several houses and barking dogs.  Fulks turned down several other dirt roads, but found they all had houses on them.

"Fulks continued driving down Highway 90 when he recalls seeing a wildlife sign on the side of the road.  Fulks passed the dirt road which the wildlife sign pointed to and

GARY N. SMITH, CM
COLUMBIA, SC

91

turned around at a small grocery store, possibly an IGA. Fulks drove back and turned right onto a dirt road.

"It was dark at this time, and Fulks noticed that Donovan's wrists were taped together. Basham must have taped her wrists together sometime between leaving the cemetery and turning onto Highway 90."

That's the end of that paragraph. Mr. Fulks, is that a correct rendition of what you told the FBI agents in that paragraph?

A. Yes, sir.

Q. "Fulks continued driving down the dirt road and recalls seeing a long wooden dock with a green security fence. Fulks turned the BMW around just after passing the dock, and pulled up to the right side of the road. The telephone poles were on the left side of the road.

"There was a pole located near where the BMW was parked which had silver number markings on it. Basham told Donovan that he did not intend to hurt her, but only tie her up and leave her in the woods.

"Basham got out of the car. While Basham was out of the car, Donovan asked Fulks to convince Basham to leave the gun in the car since he was only going to tape her up. Basham would not leave the gun in the car. Basham signaled Fulks to back up the BMW and shut the headlights off.

"Basham took Donovan out of the car and walked to the

GARY N. SMITH, CM
COLUMBIA, SC

92

front of the BMW. Basham was holding Donovan by the elbow and had a gun in her side. Basham began walking to the right, but for some reason quickly walked back to the left.

"Fulks did not see Basham holding any tape when he got out of the car. Fulks did not know if Basham had tape in his pants pocket. Fulks last saw Basham and Donovan walking into the woods, possibly to the left side.

"Basham returned approximately 20 minutes later and appeared by the front of the BMW. Basham was holding Donovan's panties and tennis shoes. The shoes had clumps of dirt slash mud on them. Basham put the clothing in the rear seat of the BMW and told Fulks to get out of there.

"Basham smelled badly, and had dirt slash mud on his shoes and lower part of his pants. Basham told Fulks that he had taken Donovan's clothing from her so that if she got free she may want to run so quickly to get help."

I believe the word "not" was left out of that sentence probably. "Her clothes were taken so that if she got free she may not want to run so quickly to get help." Is that -- do we need to clarify that or not?

MR. THURMOND: Your Honor, Agent Long who drafted the 302 advises that is correct, the word "not" should be in that sentence.

THE COURT: All right.

BY THE COURT:

GARY N. SMITH, CM
COLUMBIA, SC

93

Q. Now, Mr. Basham, that is a very important paragraph. All the paragraphs are important, but that's a very important paragraph. Is what I just read to you from that paragraph a correct statement of what you told the FBI agent and what happened?

A. Yes, sir.

Q. The last sentence the agent says he made a mistake and left out the word "not." And the idea is that Mr. Basham told you he had taken Ms. Donovan's clothes so that if she got free she would be scared to run around without any clothes on. So the word "not" was left out of that sentence; do you agree with that?

A. Yes, sir.

Q. And you also agree that with that change this paragraph I just read accurately reflects what happened on November the 14th?

A. Yes, sir.

Q. All right, moving to the next paragraph. "Fulks drove back onto Highway 90 and turned right. Fulks drove onto an on-ramp, possibly Highway 22, but the road was closed ahead. While traveling on the on-ramp, Basham threw several papers and possibly Donovan's cell phone into the woods. After making the turn, Fulks traveled back onto Highway 90 towards Conway.

"Fulks and Basham arrived in the area of the Beach Walk Motel in Myrtle Beach. Fulks parked the BMW in a parking

94

lot two motels down from the Beach Walk Motel.  They waited for several minutes to make sure that there were no police around the motel.

"Fulks and Basham walked to the Beach Walk Motel where Fulks found Tina Severance washing clothes in the downstairs laundry room.  Fulks told Severance to bring the clothes upstairs.

"Fulks told Severance --" excuse me -- "Fulks took Severance into the bathroom of the motel room and told her that Basham had shot at police and may have killed someone.  Fulks told Severance that they had to get out of the area and gave Severance some money to turn the phone on.  Fulks told Severance that he would call her later that night.  Fulks also told Severance about her van and that the police had it."

Now, is that a correct summary of what you told the police -- the FBI and what happened?

A.  Yes, sir.

Q.  All right, continuing.  "Fulks and Basham took all their clothes and returned to the BMW.  Fulks began putting the bags in the trunk.  Basham suggested that they take Donovan's clothing and belongings and put them in the trunk so they could put their clothes in the back seat.

"Basham told Fulks that if the police started chasing them, they would be able to get their bags and run.  Donovan's panties, shoes, and other items were put in the trunk.

GARY N. SMITH, CM
COLUMBIA, SC

95

"Fulks drove north on Ocean Boulevard and turned onto Business 17, Kings Highway. Fulks was wearing tan pants and a tan long-sleeve T-shirt with stripes. Basham was wearing black jeans, black shirt, and a long black trench coat. Neither Fulks nor Basham showered or changed their clothes when they returned to the Beach Walk Motel."

Is that a correct summary of what you told the FBI and of what happened?

A. Yes, sir.

Q. Continuing. "Fulks drove north into North Carolina. At some point in either North Carolina or Virginia, Basham asked Fulks if he had ever killed anyone, which Fulks answered 'no.' Basham told Fulks that he had killed Donovan by choking slash strangling her and taping her to a tree.

"Basham killed Donovan for both of them because she would have been able to identify both of them if she went to the police. Basham explained to Fulks that he had killed a female two years ago in Madison, Kentucky. Basham placed her in a shallow grave and covered her up with tree bark. The girl had not been found."

Is that a correct statement of what you told the FBI?

A. Yes, sir.

Q. "Fulks stopped somewhere in North Carolina and used Donovan's ATM card. Fulks made several transactions and received approximately $500. Fulks continued driving through

GARY N. SMITH, CM
COLUMBIA, SC

96

West Virginia --" excuse me -- "Fulks continued driving through Virginia and West Virginia, making stops at rest areas and gas stations for food.  Somewhere in West Virginia near a rest stop, Fulks stole a license plate from a vehicle and put the tag on the BMW.  Fulks disposed of Donovan's license plate near a campground in West Virginia.

"Basham disposed of Donovan's panties, pants, and other items in a trash dumpster at a carwash located between Huntington, West Virginia and Ohio.  The remaining clothing, shoes, and rolled up tape containing hair were thrown in a trash can at the carwash.  The carwash was run by an older male subject.

"Donovan's purse was thrown in a large ditch somewhere behind a state police barracks on Rotary Road, or a rotary type road.  The remaining ATM and credit cards were disposed of on Route 2 in Altzier, A-l-t-i-z-e-r, West Virginia."

Is that a correct summary of what happened, Mr. Basham?

A.  Yes, sir.

Q.  All right, we are almost to the end.  "Fulks stopped at Beth McGuffin's residence in Huntington, West Virginia.  After staying there, Basham wanted Fulks to drive to Kentucky.  Basham wanted to meet with Basham's mother.  Basham had called his mother and wanted to get a small bag which was at her

97

residence.  The bag contained a 9 millimeter pistol.

"Fulks did not want to drive to Kentucky, Fulks believed that the police would still be looking for them and it would be unsafe to return to.

"While Fulks was driving, Basham took a .22 caliber revolver and aimed it at Fulks' head, demanding that Fulks drive to Kentucky.  Fulks and Basham fought over control of the gun.  Basham put the gun away and made a joke out of it."

Is that a correct summary of what happened?

A.  Yes, sir.

Q.  "Fulks drove into Kentucky and arrived at a mall parking lot where Basham had arranged to meet his mother.  Fulks noticed a police officer in the area.  Fulks dropped Basham off at a pay phone in front of a movie theater.  Fulks drove away from the area.

"The police officer began chasing Basham across the parking lot.  Basham had a gun in his hand and was running across the parking lot.  The last thing Fulks recalls seeing was Basham standing near one of the intersections in the parking lot, still wearing the black trench coat.

"Basham was watching Fulks as Fulks quickly drove out of the mall and headed in the direction of Ohio.  Fulks stopped in Ohio and then onto Indiana.

"Fulks parked the BMW several blocks away from his brother Ronnie Fulks' residence.  Fulks walked up to his

98

brother's house.  Ronnie Fulks had seen the local news and knew what was going.

"Chad and Ronnie Fulks took the BMW down a deserted road and hid the BMW in a barn building.  Fulks took an old tarp and some hay and covered the BMW.

"Ronnie Fulks took Chad back to Goshen, Indiana to Ronnie's residence.  After a short time, Fulks left Ronnie's residence in another car and was stopped by police.  Fulks ran from the vehicle and was arrested by police."

Is that a correct summary of what happened?

A.  Yes, sir.

Q.  And finally, "Fulks described the clothing Donovan was wearing as blue jeans, white T-shirt, white tennis shoes, white bra, yellow panties with small designs.  Donovan was never allowed to get out of the BMW until Basham took her out on the car on the dirt road off Highway 90."  I believe that should be, "out of the car on the dirt road off Highway 90.

"Fulks described a pocket knife which Basham located in Donovan's purse.  The knife was between five and six inches long with a brown wooden-type handle.  Basham believed that Donovan may have been trying to get the knife from her purse when Basham grabbed the purse from her while sitting in the back seat of the BMW.

"After Basham found the knife, he continued to go through the purse looking for money, credit cards, and other

99

items.  Fulks never knew what had --" excuse me -- "Fulks never knew what had happened to the knife after Basham found it."

Is that a correct summary of what happened?

A.  Yes, sir.

Q.  All right, Mr. Fulks, I have just read all the words, verbatim, in the FBI agent's memorandum or recording of what you told him.  And it's important that you understand that by confirming here in court today what the agent wrote down, you are admitting to all these facts I have just read.  Is that -- do you understand that?

A.  Yes, sir.

Q.  And you are admitting these facts under oath; do you understand that?

A.  Yes, sir.

Q.  Has anyone threatened you or forced you to make this admission?

A.  No, sir.

Q.  Has anyone promised you anything in return for making this admission?

A.  No, sir.

Q.  You are making these admissions I just read, you are doing so freely and voluntarily?

A.  Yes, sir.

THE COURT:  Anything further from the government on the factual recitation?  I know we have to get a lot more facts

100

in the record some way on the remaining counts about the weapons and interstate commerce and all that, but focusing on this statement for now, is there anything else that the government wants me to cover?

MR. GASSER: No, sir.

THE COURT: All right. I'm prepared to accept the plea -- I'm prepared to state that there's a factual basis for the plea. We have got a ways to go before I can accept the plea. I'm prepared to conclude that there's a factual basis for the plea as to counts 1 and 2, all the elements appearing to have been satisfied.

As I said earlier, I do not think it is necessary to rely on the Pinkerton doctrine to accept the plea as to count 2, the kidnapping. As to count 1, because it does have an intent requirement in the fifth element, it is necessary to rely on Pinkerton.

I have some concerns about the applicability of Pinkerton, and I cancelled all my hearings yesterday all day so I could read and have my law clerk help me look through the law on this. But with the concession by the government and the defense counsel that Pinkerton applies, I'm prepared to accept the factual basis for count 1 based on Pinkerton.

I realize that one could make a due process argument that although Pinkerton has been applied to ordinary conspiracies and ordinary criminal ventures, that due process

101

would prevent it from applying to a capital case.  But we found no authority in any reported decision or anything anywhere to suggest that due process, or any other constitutional provision, would bar the use of Pinkerton.

All right, now, what about the factual basis for the remaining counts?  I understood the government wanted to make a rendition of what it intends to prove, and the defendant may agree with some and disagree with others; is that right?

MR. GASSER:  Your Honor, I'm prepared --

THE COURT:  Hold on one second.

MR. GASSER:  Your Honor, the government is at this time, whenever the court so chooses, we are ready to provide a thorough and factual basis for the plea, if you want me to do that at this juncture.

THE COURT:  I'm just trying to think how we should -- I understand y'all have agreed to disagree on the intent element on the capital charges, and we need to get a clear record of that.

And then we also have got to deal with all these other elements of counts 3 through 8, that I don't have anything in the record about yet.  And I'm just thinking that -- I'm wondering how -- should we break it into two parts, is what I'm saying?

MR. GASSER:  What I propose that we -- that I provide the government's position as to the guilty plea.  And at the

GARY N. SMITH, CM
COLUMBIA, SC

102

conclusion of my remarks -- and I believe Mr. Schools may have some remarks -- we can then, if we have to, we can revisit the issue of Pinkerton and revisit the issue as to their affirmation to some of the facts, counts 3 through 8.

BY THE COURT:

Q.   All right.   Now, Mr. Fulks, let me say now, the government lawyers are going to tell me what they think the facts are in this case.   Some of what they tell me is going to relate to counts 3 through 8 about possessing stolen weapons and things like that.

The statement that you gave that we just went over didn't talk about stolen weapons or having -- being a felon who possessed a weapon and the elements that support counts 3 through 8.   So, they are going to give me some facts to support counts 3 through 8, and I'm going to ask you if you agree with those facts.   Do you understand?

A.   Yes, sir.

Q.   Now, as to counts 1 and 2, the counts for which you can receive the death penalty, they are going to give me some additional facts as to those counts also.

You don't have to agree to those additional facts as to counts 1 and 2, but it's important that you understand the government is reserving its right, if we go into a penalty phase, to try to prove those facts as to counts 1 and 2.

In other words, they are going to try to prove that

GARY N. SMITH, CM
COLUMBIA, SC

103

you had a part in the killing and you intended to kill Ms. Donovan; do you understand that?

A.    Yes, sir.

Q.    And the government will have to prove that by competent evidence and beyond a reasonable doubt to the jury's satisfaction before those facts can be said to exist.

So, I don't want any confusion.  Some of what the government is going to tell me, I think you will -- I'm told you will agree with, in terms of the stolen weapons and all these other counts.

I'm also told that some of what the government is about to tell me you won't agree with.  So, it's important that you listen very carefully to what the government lawyers say and then we will come back to you and see what you agree with and what you do not agree with.

MR. NETTLES:  Judge, just before we get started, I think that 302 also establishes all of the facts relevant -- all the elements relevant to count 3 also, which is interstate transportation of a stolen motor vehicle.

THE COURT:  I think you are right.  You are right.  You are right.  All right, Mr. Gasser.

MR. GASSER:  May it please the court, Your Honor.  Your Honor, I would respectfully request some indulgence during this process.

It's the government's position that a thorough

104

presentation needs to be provided in the record during this guilty plea for a number of reasons, one of which, if there is any direct challenge after the fact as to this particular guilty plea, as well as any collateral challenge as to Mr. Fulks' decision, or any advice that he was provided, the government feels that it's important to provide a thorough presentation at this time.

THE COURT:  I'm not in a hurry, I don't have any court the rest of the day.  I'm not trying to rush anybody.  I still wonder if we shouldn't break it out and talk about counts 3 through 8 and -- because there is so much that you disagree about on counts 1 and 2, but I think 3 through 8 you do agree with.  You had rather do it all at once?

MR. GASSER:  Yes, sir.

THE COURT:  All right.  Okay.  Go ahead.

MR. GASSER:  Your Honor, with regard to the counts 1 through 8, criminal conduct began on Monday, November the 4th, 2002.  Mr. Fulks' criminal conduct in this crime spree of his lasted 17 days, coming to rest on November 20th, 2002.

To understand the events that began on November the 4th, 2002, and to put Mr. Fulks' state of mind and his relevant intent factors into context, the actual events prior to November the 4th, 2002 need to be discussed.

On August the 25th of 2002, it was a Sunday, Mr. Fulks was arrested at a WalMart parking lot in Madisonville,

105

Kentucky.  His wife at the time, Veronica Evans, drove to the WalMart with him and his -- and her three year old son, Miles Evans.

When she got to the WalMart, she went inside and she went to some of the customer service individuals and she asked them to call 911 because she feared for her safety and the safety of her three year old son.  She claimed that her husband was in the parking lot, that he had a gun.

Police officers from the Madisonville Police Department arrived, they seized Mr. Fulks.  Inside the car that he and that Veronica Evans were driving was Miles Evans, the three year old boy, and they found a firearm, a gun, inside the car.

Mr. Fulks was arrested at that time because an NCIC check revealed he was a convicted felon.  He was arrested on state -- Kentucky state charges, possession of a firearm by a convicted felon, for theft of a motor vehicle license plate, and for giving false information to police.

Those were the three charges that he was arrested on and he was placed into custody on August the 25th, 2002 in Madisonville, Kentucky.  He was placed at the Hopkins County Detention Center.

During the course of that investigation, Your Honor, and during the on-scene investigation, Veronica Evans was in possession of stolen credit cards.  She was arrested as well.

106

Because she was arrested and he was arrested, there was nobody to take care of Miles, the three year old. So social services was called in, he was taken into the equivalent of our emergency protective custody.

MR. NETTLES: Your Honor, and Mr. Gasser, I apologize for interrupting. But, Judge, I think that we are getting into an area that goes into aggravation. And I understand what the government is doing here today, the problem is that some of the things that Mr. Gasser might recite to you are going to be very contested as to admissibility at the penalty phase.

If this evidence -- if Mr. Gasser goes into that and it is reported in TV or print media or radio, we may run into a situation where potential jurors are contaminated. I just -- I raise that issue because I think it's -- I think we need to be cautious here.

THE COURT: Well, I intend to thoroughly voir dire the jury about exposure to news coverage.

MR. GASSER: Your Honor, it's absolutely -- it's our -- it's the government's position that we want to provide a thorough basis for, a factual basis, including his intent for this plea.

Simply because the defense -- and we understand you can accept the plea based on Pinkerton, but the government feels that we need to put on the record, a thorough record clearly demonstrating all the evidence indicative of his intent

107

during this crime spree, and his intent involving the car-jacking and kidnapping of Alice Donovan, and that's why all of these factors are extremely important.

THE COURT: Well, right. But when you finish, I'm going to have to ask him what he agrees with and what he disagrees with.

MR. GASSER: Yes, sir.

THE COURT: And that might be a long list of things before you finish.

MR. GASSER: I understand.

THE COURT: All right.

MR. GASSER: Thank you.

At that time, Your Honor, Miles Evans was taken into protective custody and was sent -- and went to stay with two foster parents, and that would have been during the early morning hours of Monday, August the 26th. So, he was charged with those three offenses that I've previously stated.

Veronica Evans was cooperating with law enforcement and they were able to get a search warrant at the home -- the mobile home that the two of them lived in. And at the mobile home they found other firearms, an AK 47, a shotgun, and some other pistols.

They also found thousands and thousands of dollars worth of stolen items, and therefore he became a suspect in those offenses as well.

108

At the time an NCIC check revealed, Your Honor, that Mr. Fulks had violated a supervised release in the Eastern -- in federal court in the Eastern District of Tennessee. So, he was wanted for a supervised release violation in the Eastern District of Tennessee.

That also revealed that he was on parole, having been let out of prison, Indiana state prison, the Westville Correctional Institute, on March the 22nd, 2002. And he had not followed the conditions of his parole, so there was a parole warrant from the state of Indiana out for him.

There is also -- he was out on bond pending resisting arrest, the equivalent of failure to stop for a blue light in South Carolina, stemming from a May 20th, 2002 incident involving the Merrillville Police Department in Indiana.

He had also at that time on August the 26th become a prime suspect in some armed robberies that had occurred on June the 19th, 2002 on Interstate 65 in Tennessee, where two individuals were robbed at gunpoint on the side of the road, and a third individual was the victim of an attempted robbery.

So, at the time on August the 26th when Mr. Fulks is sitting in the Hopkins County Detention Center, he's wanted by federal authorities in the Eastern District of Tennessee, he's wanted by state authorities in the state of Indiana for violation of supervised release or parole, he's got pending a resisting arrest charge in Indiana, and he is a suspect and

109

later on -- a suspect in two armed robberies and attempted armed robbery in Kentucky.

During -- on Monday afternoon, August the 26th, the foster mother for Miles Evans is giving the child a bath and noticed bruising on the child, and noticed some other injuries on the child, that for purposes of the record I don't need to get into at this point.

However, as a result of that, an aggravated child abuse investigation began. Veronica Evans was interviewed, the foster parents were interviewed, the child was taken to a hospital. Social services people were interviewed, the government is in -- will be in the position to offer evidence and testimony that points to Mr. Fulks as the abuser of that child. I understand that that will be significantly challenged by the defense.

However, what is important about that, Your Honor, is that the facts of that investigation were presented to a Kentucky grand jury, and Mr. Fulks was indicted for aggravated child abuse.

And on November the 3rd, the day before he escaped, Detective Scott Smith with the Kentucky State Police went to the Hopkins County Jail, served an indictment on Mr. Fulks for aggravated child abuse. He had already been interviewed by the FBI and knew he was a suspect for the armed robbery that occurred on I-65.

GARY N. SMITH, CM
COLUMBIA, SC

110

Mr. Fulks, when he was served with that indictment, had made some statement to Detective Smith to the extent, "Y'all want to put me away for the rest of my life, and I'm not going to stick around to be here." That's what Detective Smith testified during these proceedings.

So, the reason why, it's the government's position, that this court is aware, that the record reflects all of the charges and all of the allegations that were pending against Mr. Fulks at the time of his escape, is critical to these intent factors that you have previously discussed with Mr. Fulks, and that the government will discuss during the pendency of this presentation.

Monday, November 4th, 2002, Hopkins County Detention Center, 6:30 p.m., Mr. Fulks --

THE COURT: Should we try to do like I did with the 302 and do it paragraph by paragraph and see what is agreed to and what's not? I don't want to interrupt your --

MR. NETTLES: Judge, I can just tell you right now, we are not going to agree to anything he says other than what is in that 302 and the elements necessary to establish -- the facts necessary to establish the factors in counts 3 through 8.

We understand -- we understood that the government was going to do this on the record, to show that they didn't agree necessarily --

GARY N. SMITH, CM
COLUMBIA, SC

111

THE COURT: All right.

MR. NETTLES: -- with what we were doing. We did not understand that we were going to have to come in here, and in fact we tried to avoid the situation where we had --

THE COURT: I'm not going to force you to commit one way or the other if you don't think you should at this point, but I don't think I can stop Mr. Gasser from putting this on the record.

MR. NETTLES: I'm not trying to stop him from putting it on the record. The court heard my concerns about potential taint of the jury panel, I just -- I don't think we need to go through it, each one by one, that was the -- because I just think it's important that we are not going to agree to that, other than the bare facts essential to establish the elements of the offense, Judge.

BY THE COURT:

Q. All right. Mr. Fulks, it's important that you understand that if I accept your guilty plea and we go into a penalty phase trial in front of a jury, the government lawyers are going to be trying to prove all these facts that Mr. Gasser is telling me about now. Do you understand that?

A. Yes, sir.

Q. Now, you are presumed innocent of all of these facts right now, but some of these -- some of these things may come into evidence. There may be some that I keep out, I don't know,

112

it's not before me today.  But Mr. Gasser is reciting now everything that he thinks he is entitled to prove at trial in a penalty phase to try to convince a jury to give you the death penalty.  All right, do you understand that?

A.  Yes, sir.

THE COURT:  All right.  Please proceed.

MR. GASSER:  Thank you, Judge.

6:30 p.m., Monday, November the 4th, Mr. Fulks and Branden Basham had been cellmates together at the Hopkins County Detention Center.

Correctional Officer Dian Blair was working that afternoon.  There is a recreation area within the prison that is enclosed with cement walls, and it's a basketball court. The basketball court, it's enclosed, but it's open air.  It's like a catwalk type of fencing that makes up the roofing of that particular area.

At 6:30 p.m. Mr. Fulks and Mr. Basham, in baggy prison garb, prison uniforms, asked to go out into the rec area.  And Ms. Blair, the correctional officer, lets them out. Mr. Basham has one blanket, one prison issue blanket draped over his shoulder, but the other -- and Mr. Fulks has a shampoo bottle filled with water and Mr. Basham has a water bottle, and those are the only items visible that they have.

Ms. Blair's responsibility later on that evening was to provide medication to all of the other inmates, so she let

113

the two, Mr. Basham and Mr. Fulks, out into this rec area.

Ms. Blair goes about her business providing the medications, and somewhere around 8 or 8:15, she goes back out to check on them, Mr. Basham and Mr. Fulks. Neither of them are there in the rec area. All that she sees is in the corner of the rec area is a blanket, the blanket that Mr. Basham had draped over his shoulder.

She assumed someone else had let them in. She starts making inquiries in that regard, and it is determined that Mr. Basham and Mr. Fulks are not in the facility. Where the blanket is, they sent some people up. It's a slated roof.

They sent some people up onto the roof and they see where on the fencing, where the fencing had been pried apart and there was a gaping hole there. And there was bed sheets and bed linens that had been tied together, dropped down the side of the -- the outside exterior wall. And in fact the rope, the rope, the bed sheet rope, had actually broken and some of it was still hanging there, some of it was still on the floor.

At that point in time the investigation began. The investigation revealed, Your Honor, that Mr. Basham had spent some time and had lived in a bus that had been converted into a living quarters just a few miles away from the jail.

There were clothes in that bus. Their prison garb, their prison uniforms have, to this day have never been found.

GARY N. SMITH, CM
COLUMBIA, SC

114

It was not found by government authorities.  But a manhunt began on that evening, Monday evening, November the 4th.

On November the 5th, Your Honor, some eight to 10 miles from the jail in Hansen, Kentucky, at approximately 9 o'clock, Branden Basham knocks on the door of James Hawkins.  Mr. Hawkins lives in his house, is a 42 year old man living in Hansen, Kentucky, and he lives there with his mother and with his, at that time, 11 year old son.

Mr. Basham indicates that -- asks Mr. Hawkins if he can come in and use his phone because his car had broken down.  Mr. Hawkins let's him use the phone.  Mr. Basham allegedly makes a couple of calls, and then Mr. Basham asks Mr. Hawkins if he will give him a ride to the car.

Mr. Hawkins agrees.  All he's wearing -- he is getting ready to go to bed and this is November, all he is wearing is a pair of shorts.  He puts on a vest type jacket and some flip-flops, and he begins -- he decides to drive Mr. Basham ostensibly to his broken down car.

Mr. Fulks is waiting there in the driveway.  Mr. Basham says that's his brother, and he picks up Mr. Fulks.  Eventually, Your Honor, eventually during the search for the car, Mr. Basham pulls out a knife, a steak knife, and a car-jacking commences.

Mr. Fulks orders Mr. Hawkins to pull over at a Whirlpool manufacturing plant.  By this time they had gone into

115

southern Indiana near Evansville. And Mr. Hawkins does what he is told, he pulls in. Mr. Fulks then begins driving the truck and the car-jacking and kidnapping is -- continues.

Mr. Fulks orders Mr. Basham to duct tape Mr. Hawkins' wrists. Eventually Mr. Hawkins is driven 42 miles from his residence and into a rural farm area. He's driven down about 200 yards off of a secondary road, he is duct taped to a tree.

As Mr. Basham is duct taping him to a tree, Mr. Hawkins will testify that Mr. Fulks indicated that Mr. Basham is not tying him tight enough, and Mr. Fulks continued to duct tape him to a tree. They also bound and gagged him so that he could not cry out. They put up a dog house to block any view from anybody on the road.

Temperatures dropped into the 30s, it took Mr. Hawkins approximately 15 hours to be able to untie himself from the tree. That was Tuesday, November the 5th.

Mr. Basham and Mr. Fulks drives Mr. Hawkins' truck into northern Indiana, into Portage, Indiana. The reason they drove, why they drove to Portage, Indiana is because Mr. Fulks had acquaintances there. And that is where Wednesday, November the 6th, they drive to Tina Severance's mobile home.

Eventually Mr. Hawkins' truck is discovered by the FBI at a Days Inn parking lot in Portage, Indiana, and that occurred on Sunday, November the 10th.

But on Wednesday, November the 6th, Basham and Fulks

GARY N. SMITH, CM
COLUMBIA, SC

116

hook up with Tina Severance and another woman by the name of Andrea Roddy. They check in that day to the Sands Motel in Michigan City. They spend November the 6th and November the 7th at the Sands Motel in Michigan City, drinking and just socializing with these two women.

On November the 7th, which is a Thursday, on that evening -- this is part of the overt act that is alleged in the indictment, which is why I'm going into this, Your Honor, for the record.

On November the 7th, Ms. Severance, Ms. Roddy, Mr. Fulks, and Mr. Basham conspire and discuss and plan a robbery of the home of Robert Talsma for the next day. Ms. Severance had worked as an Indiana correctional officer at Westville Correctional Center.

Mr. Fulks was an inmate there. Mr. Fulks started a relationship with Ms. Severance while she was a guard and Mr. Fulks was an inmate. They continued that relationship when he was paroled on March the 22nd, 2002.

Mr. Fulks knew that Ms. Severance was being taught how to fire firearms by Mr. Talsma, he knew that Mr. Talsma owned firearms. On the morning of Friday, November the 8th, 2002, Ms. Severance and Ms. Roddy go to Mr. Talsma's residence in Michigan City. And while they are in there, Ms. Severance gets Mr. Talsma's attention back in a bedroom and Ms. Roddy unlocked the back door.

117

The three of them go to breakfast. Mr. Fulks and Mr. Basham enter the house, burglarize the house and steal four firearms. They steal a .22 caliber revolver, they steal a .45 caliber revolver. Actually they steal two .45 caliber revolvers, and they steal a .45 caliber pistol, a semi-automatic.

That occurred on Friday, November the 8th. The four of them hook back up again and they drive to Sturgis, Michigan. Sturgis, Michigan is right over the line -- the border. It's not too far from Michigan City and Portage, Indiana.

They spend Friday night and Saturday night at the Woods Motel in Sturgis, Michigan. Part of that time Mr. Fulks goes to his brother's residence, they are drinking and using illegal drugs.

Sunday, November the 10th, 2002, the four of them, in Tina Severance's van, leave Sturgis, Michigan, and they drive to Piketon, Ohio. Piketon is approximately 90 to 100 miles north of Huntington, West Virginia.

While in Piketon, Ohio, they, as a group, began breaking into cars in WalMarts and stealing purses, wallets, credit cards. They begin writing bad checks at stores for items. They purchased camouflage clothing, camouflage pants, camouflage shirts, a turkey mask, binoculars, gloves. All that is done in a WalMart store in Piketon, Ohio.

We know they broke into Amy Ward's car and her purse

118

was stolen, because when Mr. Fulks was arrested in Goshen, Indiana on November the 20th, he had Amy Ward's driver's license in his pocket. So, that's the factual basis for that overt act in the indictment.

On Monday, November the 11th, they leave Piketon, Ohio and make the short drive down to Huntington, West Virginia. Mr. Fulks spent at least 12 years of his life in the Huntington, West Virginia area. He has significant relatives and family ties in that area, and just across the border into Ohio, his mother and his sister, grandmother, aunts and cousins, and other relatives.

They check into the Hollywood Motel in the early afternoon hours of Monday, November the 11th. They leave, Mr. Fulks and Mr. Basham, sometime that afternoon, leave in a van, dressed in camouflage clothing. They do not return until sometime between 2 and 4 o'clock in the morning on Tuesday, November the 12th.

The government has not alleged any allegations or any criminal conduct with regards to Samantha Burns in this indictment. However, we will, should the court allow us, we will be presenting evidence of the abduction and the murder of Samantha Burns by Mr. Fulks and Mr. Basham during the penalty phase.

Tuesday, November the 12th, they check out of the Hollywood Motel and they drive to Little River, South Carolina.

GARY N. SMITH, CM
COLUMBIA, SC

119

They check into the Lakeshore Motel on Tuesday, November the 12th, 2002.  The Lakeshore Motel, Your Honor, is right on Highway 17.  It's actually right before you get into Little River, it's right across the Coquina Harbor and Myrtle Beach Yacht Club.

The four of them check into the motel, and then they spend the next couple of days doing the same thing that they did in Piketon, Ohio.  At certain malls in and around the Myrtle Beach area, they are breaking into cars, they are stealing women's purses, they are stealing credit cards and checks, they are using those checks to purchase items, including alcohol.

They are taking items back and then getting cash for those items.  They are buying drugs from people.  And that was a -- the government will produce evidence and testimony that those were ongoing events throughout this episode.

On Wednesday, November the 13th, they are observed by a resident of the Savannah Bluff area of Conway.  They are observed in a green van.  That area has mobile homes and large lots and a couple of ponds back there.  That area is right off of 501.

Your Honor is familiar with, when you are driving -- you are driving to the beach on 501 and you cross over the bridge, where -- with a power plant on your left, you cross over the Waccamaw River.  Once you hit land, right there on the

120

right there's a motel, and that's called the Savannah Bluff area of Conway.

They are observed there on that Wednesday, November the 13th. That woman, Ms. Helen Cook, actually tells her neighbors there are some suspicious people in a green van, and describes the individuals. And like a lot of neighbors do, asked her to be on the lookout.

The next day around noon, that neighbor observes the van, just observes the driver, having blond short military type hair, which Mr. Fulks had at the time, and the passenger having dark, short military hair, which Mr. Basham had at the time, right near her house. Gets the license tag, Indiana license tag, writes it down, and the tag comes back to Tina Severance. That is around 12 or 12:20.

Around 1:45, several miles away from the Savannah Bluff area, Mr. Carl Jordan is driving on his property to check on the property. Carl Jordan, he is the owner of a hauling company and his sons work for him.

He spends most of his days kind of driving around and checking on things. He owns the property and land where his brother has got a mobile home, and two of sons who are married with kids have got mobile homes.

He drives up onto that land checking on it, and he notices a green van parked behind one of his son's mobile homes.

GARY N. SMITH, CM
COLUMBIA, SC

121

And when he pulls up on it, the sliding doors open and he notices shotguns and rifles.  In fact, he notices a Remington 1100, which is his, as well as jewelry and clothing and other items in the van.  He pulls around and pulls his pickup truck right in front of the van, blocking its exit.  And he gets on the cell phone and he starts to call 911.

Before he can even do that, Your Honor, Mr. Fulks comes out of the back door of the mobile home.  Mr. Jordan has identified Mr. Fulks and will identify Mr. Fulks.

He runs to the van and he shoots at Mr. Jordan.  The bullet went through the back window within a foot of Mr. Jordan's head, and the bullet is lodged in the roof of the car. Mr. Basham comes around the front of the car and is shooting.

Again, the reason why the government believes that is critical and that's important for the record, is because of the intent factor.  This is occurring at 1:45, in broad daylight, when Mr. Jordan did not have that much time to actually see the faces of Branden Basham and Chad Fulks, and they are attempting to kill him, is the government's position.

Mr. Jordan speeds away.  Mr. Basham and Mr. Fulks get into the van, chase after him, are firing the firearms as they are driving down the road.

Eventually they stop to turn around.  Mr. Jordan gets in behind them and starts chasing them, trying to get a license

122

tag.  Mr. Fulks pulls the van -- drives to a Cooper Metal Works, is seen by a couple of workers there.  Gets the van stuck in a field.  Mr. Fulks and Mr. Basham run across the corn field about 100 yards or so, come up onto the property of Ms. Moore.

They knock on the door of Ms. Moore, they attempt to, again, to claim that their car is broken down.  Ms. Moore is frightened, she does not allow them in.

They cross the street to Ms. Oleita Hyman's residence.  Ms. Oleita Hyman is a widow, she lives on the family farm.  There's an old beat up white pickup truck there that she keeps the keys in for her farm help.  They steal that car, that white pickup truck.  This is all occurring now, Your Honor, sometime between 1:45 and 2:30.

They drive that pickup truck to the WalMart in Conway.  At approximately 2:40 -- and this is all caught on videotape -- Alice Donovan is pulling in in her BMW.  Ms. Donovan was off of work.  She had worked -- she worked at Precision Southeast in Marion.

She was off work that day, and she had talked to her husband that morning and indicated that she was going to go into town, into Conway, to get an early start on Christmas shopping for her grandchildren.

She pulled into the WalMart parking lot, right behind her is the pickup truck.  She pulls into an aisle -- and all

GARY N. SMITH, CM
COLUMBIA, SC

123

of this is on videotape -- and before the white pickup truck stops, a person you can see jumping out of the white pickup truck right when Ms. Donovan pulls her BMW into the slot.

You can't see what is going on inside the BMW, but you can see the white pickup truck pull around and park in front of the BMW. Because when Ms. Donovan pulls in, there was not another car in that space. You see that BMW pull out and go towards the back part of the parking lot where it abuts 501, and you see the pickup truck then follow the car. That pickup truck --

THE COURT: Let me ask, I take it the video does not allow you to see the drivers of the two vehicles?

MR. GASSER: No, sir, it does not.

That pickup truck is later found the next day by a highway patrol officer who called the Horry County Police Department, and Ms. Hyman's pickup truck was found in the back of the parking lot depicted on the video.

The car-jacking and kidnapping of Ms. Donovan has begun at that point. It is approximately 2:40 on Thursday, November the 14th. Mr. Basham was armed with a .22, and the government will produce -- it's the government's position that at least the other .45 that was stolen was in the possession of Mr. Fulks.

For the record, one of the .45s -- when they got to Ms. Moore's residence, before they stole Ms. Hyman's pickup

GARY N. SMITH, CM
COLUMBIA, SC

124

truck -- later on, a couple of weeks later, a duffel bag and clothes and a pistol, a .45 pistol was found at the wood line behind Ms. Moore's residence; clothing items in the duffel bag that is identified as clothes of one of the two defendants.

Also when the van got stuck, inside the van were rifles, shotguns, other items that were belonging to Mr. Jordan's son, Sam Jordan, as was a .45 caliber revolver in the van. The two guns that were unaccounted for at that time was a .22 revolver and .45 revolver.

They take -- eventually Mr. Fulks starts driving the BMW. They drive to the Pantry, as is indicated in the 302. The Pantry is on Highway 90. There is some video, but you can't see the face of the person. At the same time that Ms. Donovan's card is being accessed, there is some video of a person, but the way the layout of the store is and the camera, you can't see the person's face.

They attempted -- Mr. Fulks attempted to get money out of an ATM machine. No money is obtained. He drives a little bit further down Highway 90, actually almost right across the street from the Lakeshore Motel, to the NBSC -- or to the Carolina First Bank there, and he withdraws $400 from Ms. Donovan's account there on Highway 17 across from the Lakeshore Motel.

They then drive on up in the BMW, up Highway 17, Your Honor. At approximately 4 o'clock, Ms. Donovan's car is

GARY N. SMITH, CM
COLUMBIA, SC

125

pulling into a BP Amaco convenience store in Shallotte, North Carolina, 14 miles from the Carolina First Bank in South Carolina.  And the ATM receipts show around 3:45 the money being gotten out of the ATM machine, and it's 14 miles to the Shallotte BP gas station.

The video, it is as clear a video as you can possibly have in a situation like this.  The video is very clear that Mr. Fulks pulls the car up, gets out of the car, standing there, he's pumping gas.  You can see some movement between the bucket seats that could be a hand, or some other item.  But according to all the statements of everybody involved, Mr. Basham is in the back seat of the car with Ms. Donovan, armed at that time.

Mr. Fulks is pumping gas, he goes into the store, again very clear --

THE COURT:  This video does identify Mr. Fulks?

MR. GASSER:  Yes, sir, very clearly.

THE COURT:  And the BMW as well?

MR. GASSER:  Yes, sir, very clearly.

The inside video has Mr. Fulks, a frontal shot at the counter purchasing three Mountain Dews, as well as some electrical tape and some other tape.  The Brunswick County Sheriff's Department also got a receipt matching up to that time.  They got the receipt for the three Mountain Dews and the tape on it as well.

GARY N. SMITH, CM
COLUMBIA, SC

126

They then leave at approximately 4 o'clock, they leave that gas station. At approximately 4:30 that afternoon, Ms. Donovan called one of her daughters back in Gallivants Ferry, the Conway area, and indicates to her that -- the phone call was very brief. She just indicates to her daughter to let Barry, her husband, know that she's going to be late. She's getting some shopping done, she doesn't know when she's going to be home.

That is the last time anybody ever heard from Alice Donovan again. That phone call was made on Alice Donovan's cell phone, and we were able to determine what cell tower that that phone call was pinging off of. And it was the cell tower off of Lewis Swamp Road in Shallotte, North Carolina.

So, the cell tower records prove that Ms. Donovan was alive and that she was physically in North Carolina, simply because in the video you can't see her at the BP Shallotte gas station.

The next sighting, Your Honor, is approximately --

THE COURT: That would demonstrate the interstate nexus.

MR. GASSER: Yes, sir, the kidnapping charge.

THE COURT: All right.

MR. GASSER: The next sighting, Your Honor, is at the Bee Tree Farm, sometime between 5 and 5:30. Mr. Fulks and Mr. Basham, as is indicated in the 302, pull off of Highway 17 onto

127

a paved road, and they pull off of a paved road onto a dirt road. That area is known as the Bee Tree Farms area of Brunswick County.

They are driving down the dirt road and all of a sudden the dirt road ends and they are in a meadow, a field, not realizing there is a hunt club there. There are several individuals that were doing some cleaning at the hunt club, and they were barbecuing that evening, sitting outside on the side porch getting ready to barbecue.

They obviously notice a BMW, somewhat out of place on a dirt road in a hunt club. They noticed the BMW. All of the individuals, all four of the individuals there describe the driver as having blond hair, a short military type. They describe the male in the back seat as having brown hair, short military type, and they describe a female in the back seat.

Of course, at that point in time, Your Honor, they have no idea what has transpired 45 miles or 50 miles away in Conway, South Carolina. They have all identified the BMW, and the woman is alive in the back seat.

The next person is about nine-tenths of a mile. When the BMW turns around in the field and starts going back on the dirt road, about nine-tenths of a mile from the hunt club on the left-hand side, there is a small family cemetery. There is a horseshoe parking area, a dirt parking area.

As is indicated in Mr. Fulks' 302, they pulled into

128

that cemetery. Ronald Purdue, a witness who lives near there, is driving down the road and he needs to make a cell phone call to his father because he's worried that some of his hunting dogs had gotten out.

So, he pulls -- just happens to pull off into that little driveway area, and he notices and he identified the BMW. And he knows somebody is in there because the engine is running and the brake lights keep going on.

He can't see into it, but the brake -- the engine is running and the brake lights keep going on and off. There is nobody on the hood of any car and there is nobody on the outside of the car. He doesn't think much about it and he ends up driving away.

The next, Your Honor, is of course the statement from Mr. Fulks that in that cemetery both he and Brandon Basham raped Alice Donovan. According to the 302, according to Mr. Fulks, they then took Alice Donovan alive back to South Carolina.

And I think it's important that the record reflect at this time, Your Honor, the government's position is, the government does not concede that those facts are genuine, that those facts are true and those facts are accurate.

This court knows from other proceedings that Branden Basham has denied killing Alice Donovan as well. That Branden Basham, although he acknowledges that she was raped, indicates

GARY N. SMITH, CM
COLUMBIA, SC

129

that Mr. Fulks is the killer.

And so the government wants the record to reflect at this point that even though we are offering -- we would also offer the 302 and intend on offering that testimony, I want the record to reflect that the government is not necessarily implying or indicating or agreeing with defense counsel that this is merely a Pinkerton theory on guilt. Because the evidence -- the court is aware that there is -- that the co-defendant in this case denies being the actual killer.

Your Honor, they end up -- whether they killed Ms. Donovan in North Carolina and disposed of her body in North Carolina or whether they drive her back to South Carolina and dispose of her body in South Carolina, they end up going back into the Myrtle Beach area.

They do attempt to use her ATM card at approximately 9 o'clock at an NBSC there on the main thoroughfare. They also go to a Scotchman and get gas, which is right across the street from the NBSC.

THE COURT: Are you saying you do not know which state the murder occurred in?

MR. GASSER: The government -- there is no credible and reliable evidence to indicate who killed Ms. Donovan, whether or not both of them -- it's the government's position that they were both -- there is inferences and logical inferences, when you tie in a multiplicity of factors, there's

GARY N. SMITH, CM
COLUMBIA, SC

130

a logical inference that they were both actively involved in killing her and disposing of her body.

THE COURT:  I understand that.  But I just remember in the back of my mind a Fourth Circuit decision about four or five years ago, and it was a technical issue on appeal, of whether the murder had occurred in one state and the deceased's body was taken across state lines, which may not have been sufficient to support the charge.

MR. GASSER:  That may have been a state court prosecution on habeas in the federal court, which would make sense, because that's why we are here today and this is a federal case.

Because the North Carolina local prosecutor, if he were to try this case, in order to get jurisdiction he would have to cut a deal with Mr. Fulks and use his testimony.  And in South Carolina, Mr. Hembree would have to cut a deal with Mr. Basham to use his testimony if they would want the jurisdiction.  Because there is absolutely no way of knowing where she was killed because her body has not been discovered.

THE COURT:  All right.

MR. GASSER:  They end up coming back to --

THE COURT:  In any event, you say you have proof that while she was alive she was transported into North Carolina?

MR. GASSER:  There is no question we have proof.  We have her talking -- her voice on a phone around 4:45, her cell

131

phone, pinging off the cell tower in Shallotte, North Carolina. And we have the individuals at the hunt club identifying the car and the physical descriptions of the three individuals involved.

THE COURT: All right.

MR. GASSER: And of course we have the statement from Mr. Fulks that she was alive in North Carolina.

THE COURT: And you say that interstate transportation, coupled with the fact that she is now deceased, would support the capital charges?

MR. GASSER: Absolutely.

THE COURT: Regardless of whether she was taken to North Carolina and killed or taken to North Carolina and brought back to South Carolina and killed here, that's my point?

MR. GASSER: For purposes of federal jurisdiction, it is irrelevant where she was killed and it is irrelevant where her body is.

THE COURT: Right. As long as she crossed state lines at some point while she was alive?

MR. GASSER: Yes, sir.

THE COURT: All right.

MR. GASSER: They then eventually drove back -- I would note, Your Honor, that on November -- during the early morning hours of November 14th they had checked out of the

GARY N. SMITH, CM
COLUMBIA, SC

132

Lakeshore Motel in Little River and they had driven to the southern part of Myrtle Beach City and had checked into the Beachwalk Motel during the morning of November the 14th.

And that Ms. Severance and Ms. Roddy stayed behind at the Beachwalk Motel prior to Mr. Fulks and Mr. Basham leaving before noon to go about their business that day that I previously described.

They come back to the Beachwalk Motel sometime that evening. They park their car away from the Beachwalk Motel because Mr. Severance testified that the two were coming from the back parking lot area, walked off into the courtyard at the motel.

They were both excited and in an excited state, very hurried. Mr. Fulks tells Ms. Severance that they had a shootout with the police and that the police have her van, and that they need to leave town and that he will contact her.

Nonetheless, they end up gathering up all of their clothes and they take their clothes and their personal items, they get back in Ms. Donovan's BMW and they head out of the State of South Carolina.

On Friday morning, November the 15th, at approximately 12:20, they use Alice Donovan's ATM card at an ATM machine in Raleigh, North Carolina. The records indicate that they were successful in taking out $600.

The reason why they were able to get that much,

GARY N. SMITH, CM
COLUMBIA, SC

133

because normally there's a limit how much you can get, and even though they had gotten $400 before, it had crossed into the next day. So, they get $600 from her account in Raleigh, North Carolina.

Later on that day on the 15th, they arrive in Huntington, West Virginia. That is a Friday. They hook up with Beth McGuffin on that Friday. Ms. McGuffin is a childhood friend of Mr. Fulks.

THE COURT: Could you slow down just a little bit, you are going kind fast for the court reporter. Calm down just a little bit if you could -- all right.

MR. GASSER: They hook up with Ms. McGuffin, she is a childhood friend of Mr. Fulks. That Friday afternoon or that Friday evening, Mr. Fulks attempts to either trade or sell one of the firearms to the brother of Ms. McGuffin. He either attempts to trade or sell the BMW to a friend of Ms. McGuffin's brother.

We will have at least three witnesses that will testify that Mr. Fulks was the one trying to get rid of the firearm and Ms. Donovan's BMW that Friday evening.

That Friday evening Mr. Basham and Mr. Fulks start using drugs and alcohol with Ms. McGuffin and another individual. They are smoking marijuana, they are smoking crack, they are drinking beer. And this is approximately a little more than 24 hours after Ms. Donovan has been raped and

GARY N. SMITH, CM
COLUMBIA, SC

134

killed.

That Saturday they stay at Ms. McGuffin's house. They continue to drink alcohol and use illegal drugs. Other individuals participate with them in that conduct.

On that Sunday, November the 17th, Mr. Basham and Mr. Fulks that evening leave Huntington and drive to Ashland, Kentucky in Ms. Donovan's BMW. It is approximately 7:30. Ashland, Kentucky is just right across the border, Your Honor, from Huntington, West Virginia, it's not too far.

Andrea Francis is a 15 year old girl at the time, her and her mom had gone to a movie at a mall in Ashland, Kentucky. And after the movie, they went to purchase some items at the local WalMart.

As they are walking back to their car, Andrea Francis was on her cell phone talking to a friend of hers. Mr. Basham approaches her armed with a gun, attempts to carjack this 15 year old girl. The mother comes up on the scene, they say something to Mr. Basham that spooked him.

Mr. Fulks is driving around the parking lot area. He says that in his 302, but we can also prove that physically because a woman by the name of Heather Jo Jacobi had her car broken into at that mall and her purse stolen. And they found Heather Jo Jacobi's personal items. Ms. McGuffin gave them to law enforcement.

Also, when Ms. Donovan's car was found on November

GARY N. SMITH, CM
COLUMBIA, SC

135

20th, some of Heather Jo Jacobi's items were in the car. The only way that Ms. McGuffin could have gotten those items and the only way they could have gotten in the car would have been Mr. Fulks handing it to them. Because in the time Mr. Basham attempted to carjack this 15 year old little girl, he was never again in the car. He took off running.

They called 911. There just happened to be a police car there, and Mr. Basham then attempts to shoot and kill the police officer. He is later apprehended during a full scale search. He is later apprehended.

The .22 firearm which is included in the indictment, which is one of the reasons why I'm getting into this for the record, the .22 firearm is recovered.

The next day, on Monday the 18th, when Ashland police officers go back, they travel the route that Mr. Basham had taken, he had run across another parking lot, run across some railroad tracks, tried to jump in the Ohio River and was arrested.

So, they walked that route and they looked in all of the railroad box cars, and sure enough they found Robert Talsma's .22 in one of those box cars, physically in Kentucky, for purposes of the record and the indictment.

Mr. Fulks drives back that Sunday evening November the 17th to Huntington, drove back to Ms. McGuffin's residence. She will testify that they were actually watching the 11

GARY N. SMITH, CM
COLUMBIA, SC

o'clock news when the story came on about the arrest of Branden Basham. She recognized Mr. Basham as being in her home the previous two days.

Mr. Fulks spends the night there on November the 17th with Ms. McGuffin. He eventually on Monday, November the 18th, leaves during the evening hours of Monday, November the 18th. A state trooper in Marion County, Ohio, checking rest areas off of a highway, he notices a BMW without a front license plate backed in. His training indicates at rest areas when cars are backed in, that that is suspicious. In Ohio you are supposed to have a license plate on -- as well.

He gets out of the car, he walks around and looks at the license tag. But this time, and as indicated by Mr. Fulks' 302, Mr. Fulks had stolen a West Virginia license tag and put it on Ms. Donovan's South Carolina -- had gotten rid of Ms. Donovan's South Carolina license tag.

Trooper Brent Hunter runs the tag and it comes back stolen. We have on video, Your Honor, he gets back in his car, he turns on his video. He attempts to effect the -- he actually backs up and he tries to make an arrest at that point. And clearly on the video we have Mr. Fulks in Ms. Donovan's BMW. He had been sleeping or trying to sleep.

He's reaching down. As a result of that, the trooper doesn't know what he's reaching down for, it's dark, at night, the trooper pulls his firearm -- this is all on video -- and

137

Mr. Fulks speeds away.

Included on the video, Your Honor, is a high speed chase in which they reach 130 miles an hour. Another trooper with Ohio State Police, Nick Malo, tries to lay out some spike sticks. Mr. Fulks --

THE COURT: Tried to do what?

MR. GASSER: Lays out -- they are called spike sticks, so if the wheels go over the spike sticks the tires pop.

While he is doing that, Mr. Fulks is driving 130 miles an hour on this highway, does not have his lights on. Misses the trooper by less than a foot driving 130 miles an hour, literally misses him by less than a foot.

Continues on. The trooper that -- Hunter is chasing him is concerned because he sees a flashlight fly in the air, thought his colleague, who happens to be a personal friend as well, is struck, and he stops to render aid. Fortunately Trooper Malo was not struck. But the car chase ended at that point. They tried to pick it back up again, but he was gone. That was Monday evening, the 18th.

Tuesday, November the 19th, Mr. Fulks arrived at his brother, Ronnie Fulks' residence. He had lived with his girl friend Andrea Adams and her son James Lambdin. Arrived at their home in Goshen.

What's critical about that, Your Honor, is the

GARY N. SMITH, CM
COLUMBIA, SC

138

government intends on calling Ronnie Fulks as a witness. We also intend on calling his brother Duane Fulks as a witness. Duane Fulks saw Mr. -- his brother with two guns, before they even left to go to West Virginia early on in this spree.

I would just note for the record that when we call any relative of Mr. Fulks, the government would respectfully request the court's consideration of Rule 6 -- 610 (c), I believe, because they are adverse parties. And I just want to note that now for the record, as far as the method or mode of interrogation, or witness questioning.

Mr. Ronnie Fulks has admitted in the statement to the FBI that when his brother comes to his house that Tuesday evening, November the 19th, that he asks him and inquires about that he has seen him on TV, because that chase actually made it on the news down in Ohio. And he asked him about the situation, in which Mr. Fulks admits to his brother that he, Mr. Fulks, carjacked the lady in South Carolina.

That testimony, that information was provided by Ronnie Fulks to FBI agents, so we intend on offering that. Should Mr. Fulks deny that, we intend on impeaching him. That is Tuesday, November the 19th. He spends the night on November 19th.

Sometime that day or the next day, Wednesday, November the 20th, he gets his brother to follow him, his brother and his brother's girlfriend, Ms. Adams. He's in the

139

BMW, he being Mr. Chad Fulks. His brother and Ms. Adams follow him, and he takes Ms. Donovan's car to a farm outside of Goshen, Indiana. He parks the car in a barn and he puts a tarp over the car.

Sometime later on that day, Your Honor, law enforcement had been made aware by the FBI that Mr. Fulks had relatives in that area, and so the local police department were using undercover narcotics agents and other individuals to surveil several places in the Goshen area, including Ronnie Fulks' residence.

They have photographs of Mr. Chad Fulks. The undercover recognized Mr. Fulks at the house on Wednesday, November the 20th. Ms. Fulks gets in the back seat of his brother's and Ms. Adams' car, they are driving somewhere. And the undercover radioed to a marked unit, they attempt to a stop the car, the car speeds up for a short distance, stops.

Mr. Fulks jumps out of the carp, flees on foot. More law enforcement are called to the scene. And he is on Wednesday, November the 20th, on the 17th day of this episode, he is arrested in Goshen, Indiana.

As I indicated, Amy Ward's driver's license is found in his pocket, other items are found in Ms. Donovan's car.

You have published into the record his 302, Mr. Fulks' 302, and as I indicated, Your Honor, Mr. Basham has given a statement in which he denies being the actual killer.

140

So, there are statements as a part of this investigation in which Mr. Basham actually has indicated that Mr. Fulks is the killer.

There are other statements in which Mr. Basham has provided to a counselor, in his youth, in which he implicates himself and Mr. Fulks in the killing of both women --

THE COURT:  A counselor where?

MR. GASSER:  When he was a youth, a counselor when he was growing up, at one of his schools.

THE COURT:  All right.

MR. GASSER:  So, you have got the statement you published into the record of Mr. Fulks claiming that he was present and he is guilty of carjacking and kidnapping, "But I didn't kill anybody."

And, of course, you have got some statements of Mr. Basham indicating, "I was present and -- aiding and abetting and kidnapping and carjacking, but I didn't kill anybody."

And then we have got other statements Mr. Basham made to this counselor in which he implicates himself and Mr. Donovan in both killings.

And then there are letters that Mr. Basham wrote to Ms. McGuffin, the woman I told you about in Huntington, West Virginia, in which he implicates the defendant.  And again, I wanted to put all of that on the record at this guilty plea.

THE COURT:  The version to the youth counselor that

141

implicates both, did it give details of who did what?

MR. GASSER: No, sir. The youth counselor specifically asked Mr. Basham a question and he responded -- and the words he used were that "We killed those women."

You have heard from the statements with regard to forensics, the van of course, when it was caught or stopped in the field on November the 14th in Horry County, South Carolina, it was processed.

Most of -- a lot of that evidence deals with the Samantha Burns matter, so it not applicable to this particular proceeding.

Ms. Donovan's car was processed for evidence, Your Honor. They found -- on certain items inside the car they found both Mr. Basham's and Mr. Fulks' fingerprints.

Of course, we have got a dozen or more witnesses that can place both of them in Ms. Donovan's car from November 14th to when Mr. Basham was arrested on the 17th. And, of course, from November 14th to when Mr. Fulks was arrested on November the 20th.

Nonetheless, there are fingerprints on certain items. Mr. Fulks' fingerprints are found on a Swisher cigar wrapper, found on a mirror inside the car. And Mr. Basham's fingerprints were found on duct tape, several fingerprints were found on duct tape that's found inside Ms. Donovan's car.

On the back seat of the car there was a stain on the

GARY N. SMITH, CM
COLUMBIA, SC

142

back seat.  That section of the back seat was removed pursuant to a court order that you signed.  Blood and body hairs were extracted from both Mr. Basham and Mr. Fulks.  Those items were sent to the FBI laboratory in Quantico.

An FBI serologist and DNA analyst were able to determine that a semen stain on the back seat of Ms. Donovan's BMW is in fact the DNA of Chad Fulks.  There was no serological evidence linking Mr. Basham to the car.

And, of course, there is no body, so we have no way of knowing whether she was strangled, whether her throat was cut, whether she was shot.  So, there is nothing to take from the body to compare to any of the firearms or anything else.

Forcibly removed head hairs were found in the trunk of Ms. Donovan's car during the vacuuming of that trunk.  Hairs consistent with Branden Basham and a hair consistent with Chad Fulks were included in that trunk vacuuming.  That is the extent of the forensic evidence from the car.

Trace evidence, the government's position is somewhat irrelevant since again they can physically be put in the car by eyewitness testimony and by fingerprint evidence.  But that is the extent of the forensic evidence.

Your Honor, with regard to the searches of the body, I think the record needs to be clear.  Because again if anybody, you know, directly or collaterally attempts to attack Mr. Fulks' decision to plead guilty when there are no bodies, I

143

believe the government -- I need to just briefly spend some time on that issue.

To the extent of the searches early on, Mr. Basham was arrested, as I indicated, in Ashland, Kentucky. He was being interviewed by the FBI in Ashland, Kentucky.

Mr. Fulks was arrested in Goshen, Indiana and taken into federal custody, actually. He had lawyers in Indiana and Mr. Basham had lawyers in Kentucky.

With the consent -- as you well know, based on other hearings -- Mr. Basham and Mr. Basham's lawyer in Kentucky were cooperating with law enforcement, and Mr. Basham was describing an area on a map. And that map was faxed from Kentucky to the FBI and Myrtle Beach Police Department, the Conway Police Department in South Carolina.

One of the Conway police officers noticed that map that was sketched at the direction of Mr. Basham as being the Savannah Bluff area. I mean, he drew 501, the motel, there's a boat ramp, there's a gravel road.

I mean, when you look at an aerial photograph and you look at the map that Branden Basham -- it's almost exact, and one of the officers noticed that. And, of course, we have got the witnesses that placed the van there in their description as well.

Mr. Basham had indicated that that's where you would find Ms. Donovan's body. They interviewed Mr. Fulks' lawyer,

144

and as a result of that interview, searches -- as a result of the interview, searches were conducted of the Savannah Bluff area and 501 for Ms. Donovan's body.

The searches lasted, Your Honor, for three full days. There were cadaver dogs, there were dive teams, there were four wheelers, there were helicopter searches with thermo imaging. People from the United States Army, people from the United States Marines, law enforcement officials from SLED, Conway City, FBI, Horry County Sheriff's Department, Horry County Police, they searched three days in the Savannah Bluff area. They found nothing.

You know about the Thanksgiving day episode up in the Bee Tree Farm with Mr. Basham, and the thorough search involving the location of Alice Donovan's body.

After -- even before that November the 28th search, Your Honor, starting on November the 21st, North Carolina has what unfortunately South Carolina doesn't have, but they have a network of search and rescue teams throughout the State of North Carolina. They are volunteer workers that come together and assist law enforcement. They are actually certified, there's a training you go through.

Starting on November the 21st, literally up until almost -- as I'm standing here before this court today, tens of thousands of man hours involving law enforcement officials, involving the same mechanisms -- helicopters, dogs, dive teams,

GARY N. SMITH, CM
COLUMBIA, SC

145

military personnel, concerned citizens -- have logged tens of thousands of man hours searching for Ms. Donovan's body in the Brunswick County area, to no avail.

With the advice of counsel, Mr. Fulks in April -- the 302 that you published indicates that she is somewhere off of Highway 90. I would note that as a result of talking with his lawyer, law enforcement reinforced their search of Savannah Bluff and Highway 90 where, in April of 2003 -- isn't anywhere near the Savannah Bluff area that they searched.

He indicates through his lawyers and private investigator that she is in a specific area and he actually describes a specific boardwalk. And he describes in the 302 driving down there and seeing that boardwalk. And that boardwalk exists.

And it's amazing, it's something that is very, very unique. And he remembers seeing it on the right-hand side and turning around and coming up and stopping by these poles.

And they hired cadaver dogs from -- the defense team did, and notified the FBI of the results, that there were hits by these cadaver dogs. And, of course, the FBI conducted a thorough grid search of that area, to no avail.

And then in March of this year, some 11 months later, Mr. Fulks at the request of his lawyers, takes law enforcement, members of the U.S. Attorney's Office to a completely separate area, away from that one area, at the other end of the

GARY N. SMITH, CM
COLUMBIA, SC

boardwalk, and drives to that particular area.

And out there, knowing it can be used against him, he tells the FBI agents, "I am absolutely positive Ms. Donovan's remains are here," and describes that area.  And for hours they conduct searches, defense counsel is out there, some of their team, to no avail.

THE COURT:  Well, are you going to take the position that this defendant, Mr. Fulks, deliberately misled authorities looking for the body?

MR. GASSER:  Absolutely.  Then in March of this year, he then took us to another area where he claims, "We are -- I am now -- now this is it, I am absolutely positive," to another area.  And, of course, that area was searched to no avail.

So, to the extent that -- I want the record to reflect the extent that the searches were conducted by not only law enforcement personnel, but military personnel, as well as concerned citizens throughout both the states of North Carolina -- based on what Branden Basham is telling us, with lawyers present on November the 28th, as well as with Mr. Fulks -- had indicated with lawyers present.

THE COURT:  You know, in the case of the missing intern in Washington, D.C. they finally located those remains very close to a walkway in a public park.

MR. GASSER:  Rock Creek Park, I'm familiar with that.

THE COURT:  They just missed it.  I mean, I don't

147

know if that search was as extensive as this one was, but that was always puzzling to me.

MR. GASSER: Yes, sir.

THE COURT: You say he's taken you to essentially three different locations?

MR. GASSER: Well, the first being Savannah Bluff, the second being one section off of Highway 90, the third being another section off of Highway 90, the fourth being another section off of Highway 90. I mean, he's danced all around that area off of Highway 90.

THE COURT: All right.

MR. GASSER: Again, for purposes of the record, I would like to -- and I'm almost finished with my presentation.

THE COURT: Well, let's finish and then we will take a little recess and come back.

MR. GASSER: Yes, sir. Again, I'm almost -- just a few more minutes. On the elements sheet, again, so the record is complete, on the elements sheet, the offense charged on count 1, I would note for the record that --

THE COURT: I'll tell you, let's take our break now and come back and get into these elements, because we -- the defense lawyers understand, as to these counts 3 through 8, or 4 through 8, I guess, we do have to get some kind of acknowledgement for the elements of those offenses.

MR. NETTLES: I think if you ask him, "Do you admit

GARY N. SMITH, CM
COLUMBIA, SC

148

that this element -- do you admit that this element is proven?" is sufficient, Judge.

THE COURT:  All right.  Let's take a 15 minute recess.

(Short recess)

THE COURT:  The jury clerk is really pushing me to rule on these excuses.  Have y'all had a chance to look at them?

MR. BLUME:  Yes, sir.

THE COURT:  Is there any objection to my proposed -- there are two that I changed my mind on after the jury clerk showed me.  I was looking at the wrong part of the questionnaire.  Excuse number E 244, I just read the part at the bottom that says, "Please excuse me, I think I will be too nervous."  I thought that wasn't enough.  But up above it says that they have -- they have to take dialysis, et cetera, et cetera.  I missed that part.

MR. GASSER:  Your Honor, I noted E 244, and would indicate to the court that the government would have no objection to excusing that juror.

THE COURT:  Well, I propose to change that no to a yes then.  Mr. Blume, what about that?

MR. BLUME:  No objection.

THE COURT:  No objection?  And then the other one I was going to change, this apparently was written by the spouse,

GARY N. SMITH, CM
COLUMBIA, SC

149

it's E 245. "I'm writing this letter for my husband. I can't do my best on the jury, my education is very limited. I have only a fifth grade education. I don't believe I could understand everything that might be said."

What about -- I put no on that excuse and said he needs to come in. But the jury clerk asked me to take a second look at it. What about that, Mr. Gasser?

MR. GASSER: The government would have no excuse to excusing that juror.

MR. BLUME: I agree.

MR. GASSER: I mean, no objection to excusing that juror.

THE COURT: All right, very good. Now, all the rest of them, I kind of stand by my tentative decision. What about it from the government?

MR. GASSER: What about E 257?

THE COURT: Is that near the back?

MR. GASSER: It was not one of the eight you gave us today, it was one of the -- it was included in the material.

THE COURT: I don't see 257. What is the excuse?

MR. GASSER: It indicates at the top a medical history of arthritis.

THE COURT: All right, that's another one where I didn't look at -- I looked at the part down below that said she had already served on jury once in state court, that's not an

150

excuse.  I didn't see the medical history up top.

MR. GASSER:  I think with three apparently major health problems, the government's position would be that we have no objection.

THE COURT:  All right.  So, you say excuse this one as well?  What about that, Mr. Blume?

MR. BLUME:  No objection.

THE COURT:  All right.  Without objection then we will put a yes on 257.  All right, any others of mine that you disagree with?

MR. GASSER:  The government concurs with all of the other requests and the decisions the court has made.

THE COURT:  Mr. Blume?

MR. BLUME:  I only have one other one, which was that -- potentially at least further inquiry could be made, number 252, indicates that the juror was a special education teacher.

And in all the other cases with teachers -- just for consistency's sake -- the court figured school would probably end sometime, maybe we can just find out when this person's school ends and whether they might be moved to the second or third week, if we get that far, of scheduling jurors, just for consistency's sake.

THE COURT:  All right.  So, what do you propose that we do with her?

151

MR. BLUME: If they can just find out when her school ends. Most teachers -- school is ending right about now --

THE COURT: Right.

MR. BLUME: -- and this is just one that -- I mean, it may be that because she's some teacher and -- her program goes year round. I don't know that, it just seems --

THE COURT: Tell me the number again.

MR. BLUME: 252.

THE COURT: That's in the new stack?

THE CLERK: No.

MR. BLUME: No, I believe it was one of the old ones.

Yes, it came with the list --

THE COURT: Well, see, I have got to find mine because I have got to mark on it.

Well, how about we move her to the last day of the second week and ask to follow up and see when her school ends?

MR. BLUME: That's fine, Your Honor. And if in fact it does not end, or goes -- that she is in some year round program, I can go ahead and say now that we wouldn't have any objection at that point to her being excused.

THE COURT: All right, very good, then we have agreement on pretty much all of them then.

All right, pick up where we left off.

MR. GASSER: Thank you, Your Honor. Again, I'm referencing the elements document. With regard to count 1, the

152

car-jacking resulting in death, with regard to element 2, the Alice Donovan BMW was manufactured in Germany, so that fact would take care of that particular element.

With regard to element 5, the one we have been discussing and dealing with --

THE COURT:  Let's take one at a time.  Does the defendant concede that the automobile subject to the car-jacking was manufactured in Germany and therefore the interstate commerce requirement has been met?

MR. NETTLES:  Yes, sir.

THE COURT:  Mr. Fulks, do you agree with that?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.

MR. GASSER:  And my understanding is the defendant has already admitted to elements 1, 3, and 4 of that count.

THE COURT:  Right, he has.

MR. GASSER:  As to element 5 again, I know the court indicated it would allow the government to expand on its position with regard to "In doing so the defendant intended to cause death or serious bodily harm."

We agree or we acknowledge that Pinkerton versus United States would be applicable.  However, Your Honor, I can't stress enough how the government does not -- and disagrees with any position or premise that only his guilt on that element would only be applicable based on the Pinkerton

GARY N. SMITH, CM
COLUMBIA, SC

153

theory.

It's the government's position, based on the totality of the presentation that has been provided to this court today, that Title 18, Section 2, aiding and abetting, would also be applicable based on Mr. Fulks' 302, as well as other evidence that was presented to this court.

THE COURT:  All right, now, I can't accept your competing version if he doesn't admit it.

MR. GASSER:  I understand that.  What I want to be able to do is put on the record what the government's position is.

THE COURT:  All right.

MR. GASSER:  Because it's our position -- Mr. Schools, Mr. Thurmond and I -- that we have a responsibility to put as much on the record -- so if anybody collaterally attacks defense counsel's advice to plead guilty even under Pinkerton.

THE COURT:  All right, I see.  I see.

MR. GASSER:  And it's our position that Section 2 of Title 18, "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal."

Your Honor, it's the government's position, particularly based on the admission of Mr. Fulks today and in his 302, that Mr. -- it was Mr. Fulks' aiding and abetting, he was the one that knew the area of Myrtle Beach, he had been to

GARY N. SMITH, CM
COLUMBIA, SC

Myrtle Beach on a number of occasions.  I don't believe they will dispute that.

On his own admission, he pulled off of an interstate or a highway that had other cars and other people.  He pulled off that interstate, he drove the car to a dirt road, he's the one that stopped.  Had he not stopped the car, Branden Basham and Alice Donovan would never have between able to get out of the car.

So, it's the government's position that he was aiding and abetting in the car-jacking resulting in death in that element, in the intent element.

In the light most favorable to him, that he is claiming that it was Branden Basham that was the killer, that based on the totality of the circumstances that day, and based on that fact that he -- based on the evidence that the government has presented that he himself shot at and attempted to kill Carl Jordan moments before Alice Donovan was abducted -- Mr. Jordan only had a brief opportunity to see his face, to be able to later identify him -- it's the government's position that it is a reasonable inference that a jury, had this case gone to trial, that a jury would find that both Mr. Basham and Mr. Fulks had the intent to cause death and serious bodily harm because they had raped Alice Donovan, and she had spent hours with them and would be able to come into court and identify them.

155

And therefore based -- the government's position is, there's a reasonable inference that a court and a jury would be able to draw that he himself not only as an aider and abetter, that he himself developed the intent to cause death or serious bodily harm because Alice Donovan would be able to identify him and put him in prison for the rest of his life.

THE COURT:  All right, as I understand your position then, you say, number 1, there is enough of a factual record established by Mr. Fulks' 302 to establish the intent requirement without reference to Pinkerton?

MR. GASSER:  Absolutely, Your Honor, that's the government's position.

THE COURT:  All right.  As a fallback position, you say if it's not enough, Pinkerton will come to the rescue, and through a Pinkerton vicarious liability theory for the acts of Mr. Basham, there's a factual basis for the plea?

MR. GASSER:  That's the government's position.

THE COURT:  And then your third position is, you have what you say is a wealth of other evidence showing intent and actual commission of the murder that bears on the reasonableness of his decision to plead guilty today in case there is a later challenge over the decision to plead guilty?

MR. GASSER:  That's the government's position, and that's why we wanted to clearly state that on the record and have the proceedings reflect that.

GARY N. SMITH, CM
COLUMBIA, SC

156

THE COURT: All right.

MR. GASSER: Finally, Your Honor, with regard again to that intent factor, I go back to the beginning of my presentation -- and I know that it was somewhat lengthy, as far as what charges were filed against him. And I'm not going to go through it all again, but if you recall, the record does reflect what he was wanted for and what he was being investigated for.

All of those crimes together clearly would have put Mr. Fulks in prison probably for the rest of his life. Taking several of them, the serious ones, the aggravated child abuse, if he were to be found guilty of that, the armed robberies out on I-65, if he would have been found guilty of those, it's the government's position that once he decided to break out of jail, that it was his desire not to be apprehended. And that if anybody or anything stood in his way of going back to prison, he would take care of that personally.

THE COURT: How many -- tell me again how many total charges were pending against him when he escaped?

MR. GASSER: He had a supervised release violation from the Eastern District of Tennessee, federal court, he had a parole violation out of Lagrange, Indiana, state, there was a state parole violation when he was released on March, 22nd, 2002, from the Westville Corrections Institute.

He had a pending, they call it resisting arrest, in

GARY N. SMITH, CM
COLUMBIA, SC

157

Middlebury, Indiana where he had run from the police in a car. He was being investigated for two armed robberies on I-65, and an attempted armed robbery on I-65. He was being investigated for possession of thousands of dollars' worth of stolen items.

He had in fact pled guilty on October the 28th, several days before he escaped, to 12 counts of credit card fraud, based on the items that were discovered when the police searched his mobile home on August the 26th, 2002, after he was arrested.

He had pled guilty, in fact was sentenced in his absence to five years, but he had pled guilty with counsel on October the 28th, 2002.

And he had been served with and was indicted for aggravated child abuse, second degree, in the State of Kentucky, which I believe might carry a penalty of as much as 40 years in prison.

All of those charges, whether the -- and I understand the defense is not going to concede that he's guilty of those, but it's the government's position that we intend to offer evidence of his guilt of those.

But nonetheless, the mere fact that those were allegations that he was facing, most likely prison for the rest of his life, is critical to understanding what his state of mind was and these intent factors when he was in South Carolina committing the crimes that are included in the eight count

158

indictment.

With regard to element 6, I want the record to reflect -- of course, he has acknowledged that death resulted. And I would cite to the court -- I provided this case months ago to defense counsel as well as the court -- the Government of the Virgin Islands versus Harris, and it is 938 Fed. 2d 401, it's a 1991 Third Circuit case. But it is, the case, Your Honor, is a compendium of all the relevant federal circuit courts, as well as state courts, that -- law on missing body cases.

And there are a lot of differences in the federal court law and many of the individual 50 state court laws, but where there is one area of uniformity, in states across this country and in the federal circuit courts, is that they look to the common law when it comes to somebody being held accountable for a homicide in which the body has never been discovered.

And the record will reflect that the Government of the Virgin Islands versus Harris stands for several legal premises. "Corpus delicti is defined as the body or substance of the crime charged; it has two components, unlawful injury and an individual's unlawful conduct as the source of that injury.

"Establishing corpus delicti requires proof that a specific injury, loss, or harm resulted, that the injury was caused by a criminal agency rather than by an innocent or

159

accidental one.

"To establish corpus delicti, the government need only prove that the crime has been committed, identifying the defendant as the perpetrator of the crime is not required. Proof of corpus delicti may be based on circumstantial evidence. Corroboration of confession is a factor to be considered in weighing the sufficiency of the evidence."

It goes on to say neither the body of the missing person nor evidence of the method used to produce death is required to establish corpus delicti. Evidence of the means used to produce death need not be shown to sustain a murder conviction.

The Fourth Circuit, Your Honor, addressed this issue in the United States versus Wills. It is cited as 2003 WL 22293602, it is a kidnapping case, Eastern District of Virginia. It was decided by the Fourth Circuit on October the 7th, 2003. Judge Widener wrote the opinion for the court of appeals.

In this case it was a kidnapping resulting in death case, the body has never been found, and the court reaffirmed the common law and applies it in the Fourth Circuit:

"Evidence sufficient to support a finding that the defendant killed the victim, supporting the conviction, although the victim's body was never found, the prosecution could rely exclusively on circumstantial evidence to establish

160

the victim's death."

I would note for the record that both Mr. Basham and Mr. Fulks have indicated on numerous occasions that Alice Donovan is in fact dead. And that the government also, Your Honor, can prove that Alice Donovan was 44 years old, she was in good health on November the 14th. She was happily married.

Her two daughters, from up in the northeastern part of the country had recently moved down to live with her. She had three grandchildren. She was actively involved in her grandchildren's lives.

She had a very good job at Precision Southeast in Marion, South Carolina. She earned a very good wage. Her ATM records reflect that she had several thousand dollars in that particular bank account. Her and her husband had just -- and was just finishing up building literally their dream home.

According to everybody that law enforcement has interviewed -- family members, friends, associates at work -- she was the happiest she had ever been in her life. And we would have, had this case gone to a jury, we would proved all of those factors and all of those facts to prove from a circumstantial perspective and to corroborate the statements of Mr. Fulks that she is in fact dead.

And I would just respectfully request -- I know that the court is going to inquire of defense if they also agree with that particular -- I figure they have agreed with that

161

particular element.

With regard to count 2 --

THE COURT: Why don't we take it one count at a time?

MR. GASSER: Okay. That's all the presentation we would have on count 1.

THE COURT: Mr. Nettles?

MR. NETTLES: Your Honor, we have already agreed to the element as to count 2, that the automobile was made in Germany. In terms of count 5, of course, we intend to plead under the Pinkerton vicarious --

THE COURT: You mean element 5?

MR. NETTLES: Element 5, I'm sorry, excuse me -- the Pinkerton liability, and we don't dispute the death as a result thereof.

THE COURT: All right, let me speak to Mr. Fulks also.

BY THE COURT:

Q. Mr. Fulks, this may sound overly technical, but before I can accept a plea from you I must determine that there are facts brought out in this courtroom proving these five elements of count 1. In your statement that we read earlier this morning, you admitted taking a motor vehicle from another person using force, violence, or intimidation; is that right?

A. Yes, sir.

Q. Now, that just leaves two other elements -- three other

GARY N. SMITH, CM
COLUMBIA, SC

elements, I'm sorry. One is that the vehicle had moved in interstate commerce. You have agreed it was manufactured in Germany and moved here; is that right?

A. Yes, sir.

Q. That satisfies that element. The sixth element is that death resulted. Do you agree that Ms. Donovan is dead?

A. Yes, sir.

Q. And then the only one left is number 5. That in taking the car, you intended to cause death or intended to cause serious bodily harm to Ms. Donovan. Your 302 statement does not indicate that you intended to cause death or bodily harm.

There is a body of law known as the Pinkerton doctrine -- and this is very legalistic but I need to explain it to you -- that holds that in a conspiracy where two or more people agree to commit some illegal act, the act of any conspirator can be imputed to the other members of the conspiracy.

For purposes of this case, that means if Mr. Basham intended to cause death or intended to cause serious bodily harm at the time Ms. Donovan was abducted, that will be sufficient to meet this element, element number 5, if y'all were working in a conspiracy together.

The government and your lawyers have agreed that this Pinkerton doctrine that I have just tried to explain on a very elementary basis would apply to number 5. Do you agree with

163

that?

A.    Yes, sir.

THE COURT:  All right, please continue.

MR. GASSER:  Thank you, Your Honor.  Count 2, the kidnapping.  My understanding is the defendant has already acknowledged all of the elements of the kidnapping, and the government would concur with the court's analysis that Pinkerton is inapplicable to count 2 for several reasons, and one being also that there is no intent element required, unlike the car-jacking, required for the federal kidnapping statute.

THE COURT:  I think a proper factual record has been demonstrated based on the 302 statement.

MR. GASSER:  Yes, sir.  And just for the record, when it talks about "held the victim for ransom, reward, or otherwise --" I apologize, I don't have the citing, but Fourth Circuit case law is -- corresponds to other circuit courts across the country in which that word "otherwise" is interpreted extremely broadly and extremely liberal as far as what their intent was.

And clearly again, just for the record, they had just been spotted, they had been in a shooting, they had been spotted breaking into a home.  They were in a white pickup truck, it was an old beat up pickup truck.

And it's the government's position and what our position will be -- not only today but also before the

164

sentencing jury -- is that these two individuals, including Mr. Fulks, needed to get rid of the white pickup truck because it was broad daylight, and they needed better -- they needed better transportation.

And they saw what was obviously an easy mark, a woman by herself in a BMW. And therefore law enforcement -- if they could get into that car, law enforcement, instead of looking for two while males in a white pickup truck, law enforcement would not know to be looking for two while males and a white female in a blue BMW. And again that is purely for the record.

And the government would, would rely on the previous presentation of the evidence for counts 3 and 4 -- I mean, elements 3 and 4.

THE COURT: All right.

MR. GASSER: As to count 3, I believe we again would rely on our presentation of facts and the previous colloquy that the court has had with Mr. Fulks.

THE COURT: And I think the 302 statement covers all three of these elements.

MR. GASSER: Yes, sir.

THE COURT: He admitted to participating in stealing the BMW, or at least knowing it was stolen, and it went across a state line, and it was stolen.

MR. GASSER: Yes, sir.

THE COURT: I mean, all of those elements have been

165

fulfilled already from the 302 form.

MR. GASSER: We agree. As to count 4, the same. We feel that the 302, as well as previous statements by Mr. Fulks and his attorneys, account for all of the elements of count 4.

I'm not sure whether or not Mr. Fulks, through his attorneys, would like to address the final element, number 4, the overt act aspect since we allege multiple overt acts, and my presentation of facts covered multiple --

THE COURT: I need some help from the lawyers here, from the defendant, to explain how these four elements have been met in this case.

MR. NETTLES: Well, I think that clearly the first three elements have been met by the 302. If you go into the 302 you will find specific overt acts that he admits to that correspond to the overt acts within the indictment, Judge. And you only have to have one.

Not only that, Judge, it's a multi-object conspiracy. So, all they have to do is prove one of the objects, they don't have to prove them all.

THE COURT: So, you say the 302 is sufficient --

MR. NETTLES: Yes, sir.

THE COURT: -- for count 4?

MR. NETTLES: Yes, sir.

THE COURT: All right, I agree.

MR. GASSER: Thank you. With regard to count 5,

GARY N. SMITH, CM
COLUMBIA, SC

166

we -- it's the government's position that the 302 and the government's presentation account for the three elements, and I would again note for the record, as Mr. Schools noted previously on Tuesday, that no overt acts are required under 924 (o).

THE COURT:  All right, Mr. Nettles?

MR. NETTLES:  We would agree that the 302 establishes guilt under that -- under this crime.

MR. GASSER:  As to count 6, the 924 (c) count --

THE COURT:  All right, I agree as to count 5.

MR. GASSER:  I'm sorry.

THE COURT:  All right.

MR. GASSER:  As to count 6, with regard to element 1, the first element, the defendant used, carried, or possessed a firearm.

Your Honor, the government's position would be either direct -- we have offered evidence of his direct possession, we have offered evidence of his constructive possession of firearms, and we have offered evidence that he aided and abetted under Section 2.  And therefore, either directly, constructively, or through the aiding and abetting statute, we believe the circumstances and facts of element 1 has been met.

THE COURT:  What about that, Mr. Nettles?

MR. NETTLES:  I think the 302 establishes all of

167

these elements, Judge.

THE COURT: All right, I agree.

MR. GASSER: As to count 7, element 1, the defendant has previously been convicted of a crime punishable by a term of prison exceeding one year.

THE COURT: All right, now, I'm not sure the defendant has conceded that here in the courtroom yet.

MR. GASSER: I'm going to publish into the record his previous conviction -- at least two of his previous convictions that would satisfy that element, I believe. Mr. Nettles is going to affirm and concede.

Your Honor, the first would be, the defendant pled guilty in Lagrange Superior Court, and was sentenced on February 15th, 2000 to burglary.

And I'm referring to the official sentencing order signed by Judge George E. Brown of Lagrange Superior Court in Lagrange, Indiana. Judge Brown accepted the defendant's guilty plea and entered a judgment of conviction for the offense of burglary as a class B felony, and sentenced Mr. Fulks to the following:

That he pay a fine to the state of Indiana in the amount of $500, plus court costs of $125, and that he serve 10 years at the Indiana Department of Corrections. The government would rely on that conviction.

And I don't know if you want to take them separately.

168

THE COURT:  All right.

MR. NETTLES:  We agree that that is a felony under 921 (a), Judge, and that he's been convicted of that offense, It carries more than one year.

THE COURT:  Mr. Fulks, do you agree with that?

THE DEFENDANT:  Yes, sir.

MR. GASSER:  And just to be absolutely thorough in case something would have happened to that conviction, on December the 1st, 1998, Mr. Fulks pled guilty in the Eastern District of Tennessee in federal court to the following federal felony offenses:

The interstate transportation of a stolen motor vehicle, violation of 18, United States Code 2312, aiding and abetting burglary of a vehicle with intent to commit theft, in violation of a Tennessee statute, and also 18, USC Section 13 and 2, two counts.  Those are felonies, those are felonies in the Tennessee state statute as well.  And evading arrest, in violation of 18, USC Section 13, 2 as well, and referencing the Tennessee state statute, which is a felony.

So, those four guilty pleas on December 1st, 1998, in federal court, the Eastern District of Tennessee, would also be applicable and would bar him from ever owning or possessing, either directly or constructively, a firearm in this country.

THE COURT:  Mr. Nettles?

MR. NETTLES:  Judge, I apologize, I'm sure the 2312

GARY N. SMITH, CM
COLUMBIA, SC

169

conviction is a federal felony, I know that. And I did not go into the Tennessee state court convictions, but if Mr. Gasser says they are felonies, he knows what the rule is, I don't dispute that at this time, Judge.

THE COURT: Well, do you agree that there is a conviction there?

MR. NETTLES: Yes, we do agree. He was convicted in the Eastern District of Tennessee of a felony, yes, sir, in addition to the previous one he had sustained in Lagrange, Indiana.

THE COURT: Mr. Fulks, do you agree with what Mr. Nettles just said?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

MR. GASSER: We would rely on both actual constructive possession, as well as aiding and abetting with regard to element 2 of count 7.

And we would, with regard to element 3, "The possession was in or affecting commerce because the firearm had traveled in interstate or foreign commerce at some point during its existence," I would like the record to reflect, Your Honor, that the .22 caliber revolver that was stolen from Mr. Talsma, from his residence in Michigan City, Indiana, was a Harrington and Richardson, model 949, .22 caliber 9 shot revolver, and it was made and manufactured in Gardner, Massachusetts;

170

The Llama model Mini Max, .45 caliber semiautomatic pistol that was also stolen from Mr. Talsma's residence in Michigan City, Indiana, and recovered in the duffel bag along the woods line of Ms. Moore's residence in Horry County, South Carolina, was manufactured in Spain;

The Remington model 870 12 gauge shotgun that was stolen from Sam Cooper's residence in Myrtle Beach, in Conway, that was recovered from Tina Severance's van, was manufactured in Ilion, New York;

The -- I'm sorry, Sam Jordan for the record, Sam Jordan's residence.

The Marlin model 882SS .22 caliber revolver that was stolen from Sam Jordan's residence in Conway, South Carolina, recovered in Tina Severance's van, was manufactured in North Haven, Connecticut;

The Remington model 1100 12 gauge shotgun that I made reference to earlier in my presentation, that was discovered in Tina Severance's van, and that was stolen from Sam Jordan's residence, was manufactured in Ilion, New York;

The Marlin model 60 .22 caliber rifle, again stolen from Sam Jordan's residence and recovered from Tina Severance's van in Horry County, was manufactured in North Haven, Connecticut;

The Connecticut Valley Arms Magbolt 150 rifle, stolen from Sam Jordan's residence in Horry County and recovered from

GARY N. SMITH, CM
COLUMBIA, SC

171

Tina Severance's van was manufactured in Norcross, Georgia.

That would be all the government has with regards to count 7.

THE COURT:  All right, Mr. Nettles, do you agree all the elements of count 7 have been put on the record?

MR. NETTLES:  Yes, Judge.

BY THE COURT:

Q.  Mr. Fulks, do you agree with the fact that the three elements of number 7, of count 7, have been established here today?  In other words, do you agree that the firearms that Mr. Gasser has been talking about all traveled from one state to another state at some point in time?

A.  Yes.

Q.  You agree to that?

A.  Yes, sir.

THE COURT:  And you have already said that you have been convicted of a crime punishable by imprisonment for more than a year, and your 302 statement indicates that you possessed at some point some of those weapons, so I find a factual basis has been shown for count 7.

MR. GASSER:  With regard to count 8, the government relies on its previous presentation of facts, previous 302 that was admitted to by Mr. Fulks, and we rely on the law of both actual -- or of actual constructive possession, as well as aiding and abetting with regard to element 1.

And we would rely on our presentation with regard to elements 2, 3, and 4, including the previous ATF tracing report that I just published into the record.

THE COURT: Mr. Nettles?

MR. NETTLES: We don't disagree with that, Your Honor, we think all four elements have been established.

BY THE COURT:

Q. All right, Mr. Fulks, the last count, count 8, charges you with possession of stolen firearms. You have already admitted that you possessed some of these firearms, your 302 statement talks about stealing them.

So, you -- since you have participated in the theft, you knew they were stolen, and then you have already conceded that they traveled in interstate commerce at some time, so do you agree that all four elements have been demonstrated here in court today as to count 8?

A. Yes, sir.

MR. GASSER: Your Honor, just let the record reflect it is the government's position -- again, not only should anyone challenge this matter, these proceedings today directly or collaterally, that the government has today presented and the defendant has in fact admitted through his 302 to a case that, based on the eight count indictment and the elements that need to be proven, a factual set of circumstances that is overwhelming, to a large degree uncontradicted, and extremely

173

powerful as far as the substance of its evidence.

I want to thank the court for giving me the -- all the time to be able to present the government's side in this, and I would just ask you to indulge me one moment while I confer with Mr. Thurmond and Mr. Schools.

Thank you, Your Honor.

THE COURT: All right. So, let's be very clear now, the defendant takes the position that there is an adequate basis for taking the plea to count 1, the car-jacking resulting in death, based on Pinkerton, and you concede that is enough for acceptance of a guilty plea; you reserve the right to take issue with the government's contention that your client had the requisite intent to receive the death penalty, which will be a question for the jury in the penalty phase?

MR. NETTLES: That's correct.

THE COURT: All right. And the government does in fact intend to prove one of the four statutory intent factors which will be required to obtain the death penalty from the jury, if there is one?

MR. GASSER: Yes, sir, we intend on -- it's our position we intend on offering evidence of all four, knowing that we only have to prove one.

THE COURT: All right. I want to be sure Mr. Basham understands this too before I make a final determination on accepting the plea -- I'm sorry, Mr. Fulks.

GARY N. SMITH, CM
COLUMBIA, SC

174

BY THE COURT:

Q. Mr. Fulks, you remember when we were here yesterday -- when we were here Wednesday, I explained to you your rights as a defendant if this case went to trial and I told you about the fact that the government has to prove that you are guilty, you don't have to prove that you are innocent.

And I told you you have a right to have your lawyers there representing you. I told you about various other procedural protections you would be entitled to. I want to be sure you understand, if you plead guilty and I accept your plea today, I want to be sure you understand what happens from this point forward. Okay?

A. Yes, sir.

Q. If I accept the guilty plea from you, we will then have a trial in front of a jury, which is known as a penalty phase, at which the jury, not me, but the jury will decide whether you should receive the death penalty or whether you should serve life in prison without parole.

And I want to emphasize, life in prison without parole means just what those words say. You would serve in prison the rest of your natural life, you would never be released on parole, supervised release, early release, or anything such as that. You would -- the rest of your life would be in prison. Do you understand what that means?

A. Yes.

175

Q. And obviously you understand what the death penalty means?

A. Yes, sir.

Q. I believe the federal law says if the death penalty is called for, it's carried out in a manner allowed by the state where the trial occurred --

THE COURT: Right?

MR. GASSER: That's correct.

BY THE COURT:

Q. Now, Mr. Fulks, that means that if the jury should determine that you should receive the death penalty, in South Carolina there are two methods of execution, one is by electrocution, the second is by lethal injection.

If the jury returned the death penalty, you would have to choose which one of those methods would be employed. If you refused to make a choice, it would be done by lethal injection, if the jury returns a death penalty verdict. Do you understand that?

A. Yes, sir.

Q. Now, if I accept a plea from you today, we are currently scheduled to begin selecting the jury for the penalty phase starting Monday of next week. Your lawyers have filed a motion asking me to delay the trial. They have asked me to delay jury selection and trial, or at least delay the trial, to give them some more time to go into some new evidence that they contend the government has presented to them.

GARY N. SMITH, CM
COLUMBIA, SC

176

But at some point, whether it's jury selection next week followed by a trial, or whether it's a little bit later, at some point we will have a trial in this courthouse, and a jury will be selected.

Normally in Columbia, South Carolina, the jury panel is brought from a region of the state that goes from Columbia up to Rock Hill and over to Myrtle Beach, about a -- if you sort of slice the state up like a piece of pie, we would be a third of the state going to Myrtle Beach and Rock Hill.

Your lawyers have suggested to me that because there has been so much news, publicity, about this case in the Pee Dee area, that we should draw the jury statewide, that is to say, the potential jurors can come from all over South Carolina.

I have agreed with your lawyers that that is a fair thing to do in your case. So, the jury, the potential jurors could be from anywhere in South Carolina. I will exclude from the jury anybody who has read enough about this case or heard enough about this case to form an opinion so they couldn't be fair.

I will also exclude people from potential service on the jury who for some reason or another cannot serve as a juror. If they tell me they are so strongly opposed to the death penalty that they would never give it under any circumstances, no matter what the facts are, I would have to

GARY N. SMITH, CM
COLUMBIA, SC

177

excuse them from potential service.

On the other hand, if a juror tells me that they are so much in favor of the death penalty that they would award the death penalty every time there is a conviction for something that calls for the death penalty, I would exclude people on that side as well.

We would make an overriding effort to determine -- to select, rather, a fair and impartial jury that could put aside whatever notions it had about the death penalty and decide the case based solely on the evidence presented in the courtroom and in accordance with the rules of law as I would explain them to the jury.

If any of the jurors had any connection with the prosecutors of any type, if they were social friends or had some acquaintance or connection, I would probably excuse them from the jury.

We will probably select 12 jurors -- the jury must consist of 12 people. We will probably select four alternates in case some of the jurors get sick or have to be dropped off the jury for some legitimate reason, we would have those alternates to bring in.

At the penalty phase the government would have to prove certain things before you could receive the death penalty, and that's what the whole penalty phase is about, is whether you receive the death penalty or whether you receive

178

life in prison without parole.

During that penalty phase, the government will go first. And they have to prove, first, that you acted with some type of intent, that you had some mental state with regard to these crimes, and that's what we have been talking about so much here this morning.

The statutory intent factors are set out in the notice of intent to seek death, which has been filed in your case. And just so you understand, even though you have not admitted here today that you had any intent to kill or commit serious bodily harm to Ms. Donovan, the government is going to try to prove that you did, at the penalty phase.

They are going to try to prove one of the following four things: Number one, that you intentionally killed Alice Donovan. Number two, that you intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan.

Number three, that you intentionally participated in an act contemplating that the life of Alice Donovan would be taken, and intending that lethal force would be used in connection with Alice Donovan, and that Alice Donovan died as a direct result of the act.

And the fourth intent element they are going to try to prove is that you intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of danger to Alice Donovan, who was not a participant in the

179

offense, such that participation in the act constituted a reckless disregard for human life and that Alice Donovan died as a direct result of the act.

Now, Mr. Gasser just told me he's going to try to prove all four of those things happened in your case. In order for the jury to return a verdict of death, the government has to prove at least one of those four things beyond a reasonable doubt. They don't have to prove all four, but they have to prove at least one of those fours things beyond a reasonable doubt.

And that is one of the issues that the jury will have to decide in the penalty phase in your case. Do you understand that?

A. Yes, sir.

Q. Now, in addition to the statutory intent factors, there are also statutory aggravating factors that the government must prove. Under the law, the government must prove at least one statutory aggravating factor in addition to one statutory intent factor.

Now, these aggravating factors the government will attempt to prove are as follows: First, death during the commission of another crime. The government contends that the death of Alice Donovan, and the injury resulting in her death, occurred during your commission and attempted commission of, and during your immediate flight from, kidnapping as defined in

180

federal law.

The second one they are going to try to prove is pecuniary gain.

THE COURT: Have I ruled on that motion that related to pecuniary gain yet?

MR. GASSER: I don't believe so, Your Honor.

BY THE COURT:

Q. All right. Another issue that might be for the jury is pecuniary gain. The government contends that you committed the killing of Alice Donovan as consideration for the receipt and in the expectation of the receipt of something of pecuniary value.

The third thing they are going to try to prove is participation in additional uncharged murders, attempted murders, or other serious acts of violence.

MR. NETTLES: Those would be non-statutory --

BY THE COURT:

Q. Oh, I'm sorry, these are non-statutory factors.

The first two factors I have read to you, death during the commission of another crime and pecuniary gain are statutory factors. The government has to prove at least one of those two beyond a reasonable doubt.

The other non-statutory factors that the government does not have to prove but will attempt to prove in an effort to convince the jury you should receive the death penalty are,

181

first, participation in additional uncharged murders, attempted murders, or other serious acts of violence.

THE COURT:  Thank you, Mr. Nettles, for correcting me.  Y'all don't hesitate to pop up and correct me if I misstate something.

BY THE COURT:

Q.  The other acts of violence they are going to try to prove against you, Mr. Fulks, are, first, you escaped from a detention facility in Hopkins, Kentucky on November 4th, 2002, where you were awaiting trial on serious charges.

Number two, that you, subsequent to the escape, participated in a car-jacking and kidnapping that resulted in the death of Samantha Burns, a 19 year old woman, in Huntington, West Virginia.

Number three, that you, subsequent to the escape, participated in a burglary and other criminal conduct that resulted in the attempted murder of Carl Jordan, a citizen of Conway, South Carolina.

Next, that subsequent to your escape, you participated in the kidnapping and car-jacking of James Hawkins, a citizen in Hanson, Kentucky.

And, fifth, subsequent to your escape, you participated in a high speed vehicle chase that resulted in endangering the lives and safety of officers of Ohio state police.

GARY N. SMITH, CM
COLUMBIA, SC

182

Now, do you understand those factors I have just read to you?

A. Yes, sir.

Q. The next non-statutory aggravating factor the government will attempt to prove is future dangerousness. The government contends that you are likely to commit in the future criminal acts of violence that would be continuing and a serious threat to the lives and safety of other persons, including but not limited to, inmates and correctional officers in a correctional setting, as evidenced by the offenses charged in the superseding indictment and the statutory and non-statutory aggravating factors.

In addition to the capital offenses charged in counts 1 and 2, the circumstances that demonstrate your future dangerousness include the following, according to the government:

They will attempt to prove that you had previously escaped from a detention facility prior to your escape from the Hopkins County jail, and you will continue to present an escape risk.

The government contends that you have engaged in a continuous pattern of violence throughout your adult life, some have been adjudicated and other conduct has been non-adjudicated, and that you have specifically admitted to numerous acts of violence after your escape from jail on

GARY N. SMITH, CM
COLUMBIA, SC

183

November 4th, 2002.

Next, that you have failed to adapt your behavior to societal norms thereby demonstrating a significantly low rehabilitative potential. Next, that you demonstrated a lack of remorse for your criminal conduct.

Next, that subsequent to your escape, you continuously participated in the use of illegal drugs, to include the smoking of crack cocaine and alcohol during the course of your criminal conduct, including prior to and after the killing of both Samantha Burns and Alice Donovan.

Do you understand those elements the government will attempt to prove?

A. Yes, sir.

Q. Then we come to victim impact evidence. The government contends that you caused injury, harm, and loss to Alice Donovan, to her family, and her friends and co-workers, as demonstrated by her personal characteristics as an individual human being and the impact of the death upon her family.

The government will present information concerning the effect of the offenses on Ms. Donovan and her family, which will include evidence and testimony that describes in detail the extent and scope of the injury and loss suffered by Alice Donovan, her family, and any other relevant information.

The government further alleges that the family of Ms. Donovan has suffered injury, harm, and loss as a result of her

GARY N. SMITH, CM
COLUMBIA, SC

184

death, including, but not limited to, one or more of the following things:

Number one, you engaged in a series of lies and deceit during the law enforcement's initial efforts to locate Ms. Donovan's body which resulted in obstructing the search efforts and gave the family a false sense of hope during a period of intense despair.

Number two, you engaged in a premeditated plan to dispose of Alice Donovan's body in such a manner that recovery of the remains has not been achieved.

This action by you has caused significant emotional and psychological pain to Alice Donovan's family beyond the expected grief associated in homicide cases, and has caused a tremendous burden on law enforcement, which has expended a large amount of time and resources in the search efforts.

MR. NETTLES:  Your Honor, before you go any further, I think the government, while not agreeing, has conceded that the last clause of that aggravating factor is not applicable in this case.

THE COURT:  The last clause of number 2?

MR. NETTLES:  Large burden that was on law enforcement.

THE COURT:  All right.  Is that correct, Mr. Gasser, you are going to back off of that one?

MR. GASSER:  Yes, sir.

GARY N. SMITH, CM
COLUMBIA, SC

185

BY THE COURT:

Q. All right, Mr. Fulks, what I told you just a moment ago about the search for the body caused a large amount of time and resources to law enforcement, that's not going to be a part of this case. The government is not going to attempt to prove that. Do you understand?

A. Yes, sir.

Q. Then the final one is that you committed a sexual assault upon Alice Donovan prior to her death. It is alleged that the evidence of this most egregious act of violence against Ms. Donovan not only will be offered to demonstrate the impact on her as a human being, but to also explain the emotionally devastating impact this act has had on her husband, her mother, her daughters, and those that were closest to her.

MR. NETTLES: Judge, a portion of that was struck off of there.

THE COURT: Which one?

MR. NETTLES: Which was the effect that that act had on the family members, Judge.

BY THE COURT:

Q. All right. The government has agreed to drop this one as well, Mr. Fulks, the effect that the sexual assault had upon Ms. Donovan's family will not be an issue in this case as well. Do you understand?

A. Yes, sir.

186

Q.   But the fact that you committed a sexual assault upon her will be something the government will put before the jury, and you have admitted to that.  Do you understand?

A.   Yes, sir.

Q.   All right.  Now, Mr. Fulks, I just want to be sure you understand the procedure from this point forward.

Now, as I said, Mr. Fulks, if we held a trial, it will be a penalty phase trial only.  And I told you that the government must first prove beyond a reasonable doubt that you acted with at least one of four mental states about intent to kill, or intent to commit an act that was contemplating that the life of a person would be taken and so forth.

If the government proves one of those four mental states beyond a reasonable doubt, the government would then have to prove what are called aggravating factors.  I have gone over those aggravating factors with you.

Before the jury may vote to impose the death penalty, the jury must be unanimously persuaded that you acted with the required state of mind, unanimously persuaded that at least one statutory aggravating factor has been proven, and unanimously persuaded that the aggravating factors outweigh any mitigating factors.

Now, you will be offered the opportunity to present any mitigating factors that you or your attorney think need to be presented to the jury.

187

Mitigating factors are factors that any one juror might determine is a reason not to give you the death penalty. Mitigating factors are circumstances about the crime or about your life, background, character, or mental condition that suggest that the death penalty is not the appropriate punishment.

The law defines mitigations as any reason which might lead a juror to choose life imprisonment without the possibility of parole over death. Mitigating factors do not have to be proved beyond a reasonable doubt. The jury does not need to be unanimous in its decision or determination about mitigating factors. Any juror can find a mitigating factor. Unanimity is required only for the jury's determination that aggravating factors outweigh any mitigating factor found by one or more jurors.

Importantly, even if the jury finds no mitigating factors exist at all, the jury must still be unanimously persuaded that the aggravating factors themselves justify a death sentence. Absent such unanimous agreement, a jury cannot impose death.

It is also important to know that even if the jury unanimously finds that the death sentence is justified, no individual juror is ever required to impose a sentence of death upon a defendant. Each and every juror has the absolute right to determine that life imprisonment without parole is the

188

appropriate sentence for any reason, or for no reason at all.

However, if a jury decides to impose a death penalty, the court cannot change the jury's decision.  Finally, if a jury determines, based on the facts and the law given by the court that the death penalty is the appropriate punishment, each juror must sign a verdict of death, return it in the presence of the parties, and if requested affirm his or her individual vote orally in open court.

Do you understand what I have just gone over with you, Mr. Fulks?

A.   Yes, sir.

Q.   Have you discussed these matters with your lawyers?

A.   Yes, sir.

Q.   The matters of how the case will proceed from this point forward if you plead guilty?

A.   Yes, sir.

Q.   And once again, you understand the jury will make the determination as to whether you get life imprisonment without parole or the death penalty.  I have no say so on that question, and if the jury returns a verdict of death, I cannot overturn that verdict, I cannot disagree with the jury and give you life imprisonment instead.  The jury gets to speak the final word on death or life imprisonment without parole.  Do you understand that?

A.   Yes, sir.

GARY N. SMITH, CM
COLUMBIA, SC

THE COURT: All right, Mr. Blume, Mr. Nettles, do you think I have correctly predicted or described the trial that will occur if a guilty plea is accepted by the defendant -- or by the court from the defendant?

MR. BLUME: Yes, Your Honor.

THE COURT: Mr. Nettles?

MR. NETTLES: Yes, Your Honor.

THE COURT: Is the government satisfied I have explained the procedure from this point forward?

MR. GASSER: Yes, sir.

THE COURT: Anything further from the government before I rule on the determination of accepting or rejecting the plea?

MR. GASSER: No, sir.

THE COURT: Mr. Blume, anything further?

MR. BLUME: No, sir.

THE COURT: Mr. Nettles, anything further?

MR. NETTLES: No, sir.

BY THE COURT:

Q. All right, Mr. Fulks, I'm going to give you one last opportunity. When we started Wednesday I made sure you understood the charges against you and the elements of each charge that the government would have to prove, I went over the penalties that could be imposed in each case on all eight counts, I told you about your rights to have a trial and let

the jury determine if the government could prove you guilty.

I explained to you a little bit about the law of sentencing guidelines that will apply to counts 3 through 8. When we came back today we went through the facts of what happened in terms of your statement that you gave to the FBI.

I have explained to you the process we will follow from this point forward if I accept a plea, and I have tried to make sure that you were competent and understood what we were doing at each step of the way.

Having been through all of that, do you still want to plead guilty to all eight counts of the indictment against you?

A.   Yes, sir.

Q.   You understand that as to counts 1 and 2, that means we will go forward with a penalty phase trial in front of a jury, after which the jury might impose a sentence of death upon you?

A.   Yes, sir.

Q.   Have you given very serious thought to the question of whether you should plead guilty?

A.   Yes, sir.

Q.   Do you think that's in your best interest?

A.   Yes, sir.

Q.   Once again, has anyone done anything improper to you to make you plead guilty against your will?

A.   No, sir.

Q.   Has any law enforcement officer that has been assigned to

191

carry you around done anything improper to you to make you plead guilty?

A. No.

Q. Understand, it makes no difference to me what you do. I'm in here trying cases every day anyway, so I don't care whether you plead guilty or not. All I want to know is, is this your free will, is this what you want to do, has anyone threatened you to do it, and do you understand what will happen if you plead guilty? And you seem to be quite comfortable on all of those issues; is that right?

A. Yes, sir.

THE COURT: All right, I am satisfied that pursuant to Rule 11 of the Federal Rules of Criminal Procedure that the defendant, Mr. Fulks, first is competent to plead to these charges.

I was somewhat concerned about that issue before we began, but Dr. Berg has done an excellent job of convincing me that there is absolutely no problem with competency Wednesday or today. Both her report, her explanation of the medication, and my own conversations with the defendant lead me to the conclusion that he is competent.

Mr. Nettles?

MR. NETTLES: I agree, Judge.

THE COURT: All right. Secondly, I find that the defendant understands the nature of the charges against him

192

generally, he understands the maximum penalty that can be imposed on each count.

There is one count with a mandatory minimum penalty, he understands that. He understands the concept of supervised release, which will probably not ever come into play in his case. He understands his right to a jury trial and all the associated procedural rights that go along with that.

I find that he has admitted to an adequate factual basis to support a finding of guilt as to each of the eight counts of the indictment.

As I said, count 1 creates the most difficulty, but I am persuaded that the Pinkerton doctrine can be applied to allow the plea to go forward based on the statements contained in the 302 report of interview provided by the FBI. No party has raised any due process challenge or other challenge to the application of Pinkerton to count 1 of this case.

For all the foregoing reasons, I find that the defendant's plea is freely and voluntarily made and it is accepted by this court, which means we will proceed then to a penalty phase before a jury as to counts 1 and 2.

I will impose a sentence on counts 3 through 8 after the preparation of a presentence report and calculation of the sentencing guidelines.

I will direct the probation office to withhold preparation of that presentence report and the guideline

GARY N. SMITH, CM
COLUMBIA, SC

193

calculation until after we conduct the penalty phase jury trial.

We have some other matters to attend to, not the least of which is the motion to continue.  We have got a motion relating to the method of jury selection.  Before we get into those matters, is there anything else from the government on the guilty plea that has been tendered?

MR. GASSER:  No, sir.

MR. BLUME:  No, sir.

THE COURT:  Anything further from the defendant?

MR. NETTLES:  No, sir.

THE COURT:  Well, I would like to take just a quick lunch break if you don't mind.  I know you all probably would like to get back to your office and get some work done, but we just need to take an hour for lunch.

And when we come back we have got the continuance, we have got the method of jury selection, we have already taken up the hardship requests, the video that needs to be altered.

We need to decide if the defendant is going to give notice of intent to use mental health evidence today, or at some point.  Are you prepared to state your position on that today?

MR. BLUME:  Well, I think the procedure, Your Honor, is that we contend we get to see the government's report, and then we need to establish a procedure.  I e-mailed Mr. Schools

GARY N. SMITH, CM
COLUMBIA, SC

194

about that, I don't know that we ever came to any resolution of it. Possibly we may chat briefly about it and see if we've got some agreement. But I think we get to see the report and then we get -- have to reaffirm, as I understand it.

THE COURT: Yes. I thought you made the first step and announced your intent to use it, if you are, then you get to see their Butner report, and then you get a second chance to decide whether you are going to persist in it, or reaffirm it.

MR. BLUME: We do intend at this point.

THE COURT: All right. Let's take a one hour lunch break and come back at 2:30 and let me ask --

All right, the clerk may publish the plea.

THE CLERK: May it please the court, United States of America versus Chadrick Evan Fulks, Criminal Number 4:02-992, plea:

The defendant, Chadrick Evan Fulks, having withdrawn his plea of not guilty entered May 20th, 2003, pleads guilty to counts 1 through 8 of the superseding indictment after arraignment in open court, signed by the defendant, Chadrick Evan Fulks, on May 7th, 2004.

THE COURT: All right, just before we break, on Wednesday we sent you a revised script of the video that we intend to play for the jury. Did that kind of hastily, and I looked at it yesterday, and I realized I think that it needs to include reference to the statutory intent factors.

GARY N. SMITH, CM
COLUMBIA, SC

195

It doesn't, we got that off of a standardized charge, and I think -- y'all may have submitted some to us as well, but I think that just not to confuse the jury, I think I'm going to add a sentence or two about the statutory intent factors having to be proved as well.

I'm going to give them much more detailed instructions once we begin the trial, but I would like to include that just for the sake of completeness. And also I think I would like to put in there, just to allay any concern that they have, in the video, that they will not be sequestered during the trial.

Some of them are going to be coming from far away places, I'm going to tell them that they will be free to go home each night, but they also can stay in a local hotel and be reimbursed for their expenditures over and above what they receive for their juror per diem and travel expense. I think those things need to be added to the script.

Any problem with that, Mr. Gasser?

MR. GASSER: No, sir.

THE COURT: Mr. Blume?

MR. BLUME: No, sir, that was one of the suggestions. If it would speed things up, Mr. Gasser gave me several typos or several things he wanted to add, and I put them on a cassette.

THE COURT: All right, we will look at them over

196

lunch.  I would like to try to film it late today or tonight, if I can, and be done with it.

One other thing.  I think I need to tell the jury a little bit more about this case.  I think I need to say the two charges are kidnapping and car-jacking.  The alleged victim is Ms. Alice Donovan who was allegedly abducted from a WalMart parking lot in Conway, South Carolina on November 14th, 2003.

That way, when we bring them in for oral voir dire, I can ask them, "Have you heard anything about this case or read anything about this case?" and I won't have to explain it every time one on one with each juror.  Is there any problem in putting that into the video?

MR. GASSER:  I agree with the court, I think that would be very helpful and --

THE COURT:  Well, I was going to read the counts and elements, but if we start reading the elements, I'm sure not going to try to explain Pinkerton to them on a video.  That put a stop to that.

I need to take a real important phone call.  Y'all think about this over lunch, we will be back at 2:35.  All right.

(Lunch recess)

THE COURT:  All right, let me say, let me correct one thing.  Before lunch I made repeated references to the hearing we held on Wednesday.  My law clerk pointed out that it

GARY N. SMITH, CM
COLUMBIA, SC

was actually Tuesday of this week that we began this proceeding.

All right, we are now down to the motions that have been filed, and at the top of the list is the motion for continuance filed by the defendant. I have read the memorandum, be glad to hear from you.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

I N D E X

Proceedings May 4, 2004 . . . 2

Proceedings May 7, 2004 . . . 74

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_____      _____
Gary N. Smith, CM                  Date

GARY N. SMITH, CM
COLUMBIA, SC