FILED

FEB - 3 2005

LARRY W. PROPES, CLERK
COLUMBIA, S. C.

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

UNITED STATES OF AMERICA

    vs

CHADRICK E. FULKS,

        Defendant

CR NO: 4:02-992
Columbia, SC
December 20, 2004
10:05 a.m.

BEFORE HON. JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT COURT JUDGE
SENTENCING HEARING

APPEARANCES:

FOR THE GOVERNMENT:   J. STROM THURMOND, JR.
                    UNITED STATES ATTORNEY
                    AND: SCOTT N. SCHOOLS
                        JONATHAN S. GASSER
                    Assistant United States Attorneys
                    1441 Main Street, Suite 500
                    Columbia, SC  29201

FOR DEFENDANT:      PARKS N. SMALL
                    FEDERAL PUBLIC DEFENDER
                    BY:  WILLIAM F. NETTLES, IV
                    Assistant Federal Public Defender
                    McMillan Federal Building
                    401 West Evans Street
                    Florence, SC  29503
                    and
                    JOHN H. BLUME, ESQ.
                    BLUME WEYBLE & LOMINACK
                    P.O. Box 11744
                    Columbia, SC  29211

COURT REPORTER:     DANIEL E. MAYO, CSR, RDR
                    Official Court Reporter
                    901 Richland Street
                    Columbia, SC  29201

        STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

USCA4 113

THE COURT:   All right.  This is the case of United States of America versus Chadrick Evan Fulks, criminal number 4:02-992.  As we all know, Mr. Fulks pled guilty to the eight-count indictment in this court.  Following a penalty phase trial the jury voted to impose the death penalty on count one and count two.  Thereafter it was learned that one juror, Miss Sylvia Allison, had failed to disclose on the juror questionnaire that she completed the fact that her husband had been the victim of a murder some 33 years earlier.

Miss Allison was brought in and queried about the episode.  We heard some preliminary argument at that time.  Of course, at that time the matter had not yet been fully briefed. We now have received full briefing on the question of whether a new trial is appropriate based on this development.

And for the defense team benefit, the reason I have delayed scheduling this hearing was I wanted to get the companion case over with first.  The defense lawyers in the case against Mr. Basham argued that the jurors in that trial should not know the fact that Mr. Fulks received the death penalty, and if I had gone ahead with the sentencing hearing any time in late summer or early fall prior to the trial of the Basham case I'd increase the likelihood that the jurors would have read news coverage about the Fulks verdict, and that would make selecting a jury harder in that case.  Or at least it would have made it take longer, in terms of voir dire

questions.   That's why we waited.

I know this is not a pleasant episode to do right around the Christmas holiday season, but we do need to move this case forward.  But with that, Mr. Blume, it is your motion.  I'll be glad to hear you.

MR. BLUME:  Thank you, your Honor.  I don't know that I have a tremendous amount to say other than what has been said.

THE COURT:  Let me ask one thing to start with.  Can we dispel the idea that Miss Allison intentionally omitted answering that question just to get on the jury to pay somebody back in a death penalty case?  In other words, she filled out the questionnaire, as you know, before she knew she was being considered for a death penalty trial.  If you remember, we did the questionnaires in two stages.  The first questionnaire did not reveal that this was a death penalty trial.  So at the time she skipped that question she did not know that a death penalty trial was a potential.

Secondly, it seemed to me from her demeanor and her responses here she was quite shocked to learn that she had not answered that question.  I mean, if her body language told me anything it told me she didn't do this deliberately.  Now, you might disagree.  But let's start with that point.

MR. BLUME:  I don't concede that point one way or the other.  I understand what her testimony is on it, and I don't

USCA4 115

dispute the fact that that's what she said.

THE COURT:  Well, aside from her testimony, put that aside, the question that she skipped was on questionnaire number one which, as you remember, we sent to them through the mail for them to complete.  And that questionnaire number one was compiled after getting y'all's suggestion on what it should include, and I went through and took off some questions.

But I made a conscious decision in questionnaire number one not to reveal that they were under consideration for a death penalty trial because I thought that if they started answering those questions at home with their family members they would get pressured to answer one way or the other, or they might have more time to think about ways to get off of the jury.  Because death penalty cases are long, protracted cases, normally.

And so questionnaire number one asked nothing about death penalty.  It was not until they came to the courthouse and saw the video and then received the followup questionnaire number two that they learned that they were under consideration for selection in a death penalty case.  So she didn't even know at the time she skipped that question.

MR. BLUME:  The only -- I'm not trying to quibble, your Honor, with you, and I will agree there is no evidence at the time she filled out questionnaire one she knew what case or had some idea about which case it was.  And maybe this

didn't -- but, on the other hand, there's no evidence she didn't know or didn't know about this case. It has been in the news, there had been other hearings, the trial date had been reported. I don't have any indication that she had the information, I don't have any indication that she didn't, as well. So that point was not explored.

THE COURT: All right. Well, go ahead with your argument.

MR. BLUME: Well, I think this really comes down to one issue, and that is was there a valid basis for a challenge for cause. There's no question that she did not answer that question. There's no question it's material under Fourth Circuit law. Whether it was intentional or not is irrelevant. So it's really just is there a valid basis for a challenge for cause on the totality of the circumstances.

And it's our position, as we set fourth in our motion, that the answer to that question is yes. And it's a combination, really, of the totality of the circumstances inquiry. Of course, we know her husband was murdered. We know that her husband was murdered at a time when she was pregnant with their child. And I think that in a case of this nature, certainly in a case that involves a homicide, and you have a homicide victim, and in some way she is a victim as much as her late husband was, that that would make it extremely difficult, if not impossible, for a person to be a fair, neutral, detached

USCA4 117

juror in the case, in a capital case.

That is made especially heightened by the way the capital cases work today. As your Honor knows, for the last ten years since the United States Supreme Court's decision in Payne versus Tennessee, victim impact evidence has been permitted in capital cases. And victim impact evidence -- and there was extensive victim impact evidence presented in this case, some over our objection and some not. But, nevertheless, there was evidence in that regard which was presented.

And it is our position, as we set forth in the pleadings, it would be impossible for Miss Allison not to be affected by this testimony, much more so than any other person, due to the fact that she is a victim. And for all we know, and depending on what the law was at the time, she could have been in circumstances to a witness in a case of this magnitude.

Then the other things that in deciding whether jurors -- that in and of itself would be a valid basis for a challenge for cause. When that is put into context of her other answers during voir dire, other statements she made, she was very pro-death to begin with. She was qualified over our objection, to begin with.

THE COURT: What was the basis for that objection?

MR. BLUME: There were essentially two bases. One is that she initially indicated it would be difficult, if not impossible, for her to consider a life sentence for somebody

who killed two people. And then she hesitated for a very long time when asked if she could consider life under the circumstances. So she was a very strong pro-death juror to begin with, qualified over our objection.

And certainly we think with this additional information there's -- virtually inconceivable that this Court would have qualified her in light of the strength of her answers, as well as the fact that she had been a victim in a homicide. And you would also remember in her testimony here she talked about not only that murder and she was pregnant, but also she didn't feel like the defendants in that case were sentenced to a harsh enough term of years.

THE COURT: Didn't she say "probably not" or something like that? I don't remember her saying she didn't like the sentence he got.

MR. BLUME: She was asked if he got enough time, and I thought she said no. And also I think her statements to -- which were recorded by Mrs. Gilliard in some way, were the strongest of any of the jurors at least that talked. We didn't know what everybody said, but she talked, and she was one described Fulks, I believe, as pure evil.

So we think all of these things taken together, the totality, was a valid basis for a challenge for cause. And we had that information coming out we would have certainly not only -- we did move for challenge for cause anyway, but there

would have been a much stronger basis, and we believe it should have been granted under those circumstances.

THE COURT:  What about the fact that there was someone who was actually seated on the jury who revealed a family member of theirs had been the victim of an assault, I believe, and your side decided to go ahead and put them on there anyway?  I might be a little rusty on that, but I think that's what happened.

MR. BLUME:  I believe that was juror -- one, it wasn't a spouse.  It was a more distant relative in that regard.  It wasn't a homicide and it wasn't a murder.  It was -- I believe it was some type of sexual -- I believe it was a sexual issue, assault of some nature.

MR. GASSER:  For the record, it was -- the juror's name was Tim Curswell.  He and his fiance were robbed at gunpoint, forced to the ground and guns put to the back of their head.  Both he and his fiance were victims.

THE COURT:  That's the one.

MR. GASSER:  Pretty violent armed robbery.

THE COURT:  And they said they could be fair.  He and the girlfriend forced to the ground at gunpoint, armed robbery, they said they could be fair.  And I left them down.  I said that's what peremptory challenges are for.  So if I left that juror down I don't know if I would have struck Miss Allison for cause.

MR. BLUME: I think if somebody is a victim of a robbery is a horse of a different color than the victim of a homicide. And it creates problems, again, not only with this particular juror and how they view the case in a murder case, but especially a sentencing phase of a capital trial where there's impact evidence where the inability I think to not be overly swayed by the testimony I think is to me it's a very different thing.

THE COURT: Well, I'm sure the government's going to stand up in a minute and point out that you actually had her questionnaire in your hand physically when you conducted the voir dire, because you made reference to it and asked her another question about a relative being a law enforcement officer. And you asked for details about her answer to that question. So the fact that she didn't -- not answered the relevant question about family members being a victim of a crime was certainly available to your side, as it was to the government.

MR. BLUME: Yes, and I just -- the record is clear on this, it's my understanding we specifically reserved the right, because I didn't want to waive anything for Mr. Fulks, we reserved the right and he reserved the right to basically challenge the adequacy of our representation for failing to notice that. And we --

THE COURT: So if I were to say well, it's the

defense team's fault by not picking up on that, that takes us full circle to the ineffective assistance counsel which will have to be reached sooner or later.

MR. BLUME:  There's no question we just missed it. But it's my understanding, I want to make clear, that I thought we had an agreement that we would pursue this, we would only go forward on the juror bias point this morning without any prejudice to Mr. Fulks to raise that issue.

THE COURT:  Certainly.  All right.  Anything else that you want to say?

MR. BLUME:  No, sir, your Honor.

THE COURT:  Who's going to speak for the government?

MR. SCHOOLS:  If it please the Court.

THE COURT:  Mr. Schools?

MR. SCHOOLS:  I guess addressing one of the more obvious points first, the distinction between Mr. Curswell and Miss Allison, while certainly a lot of these issues can be spun, and I'll use that word in a derogatory way because that's sort of what we do either way, one of the things about Mr. Curswell is he was the victim of an armed robbery, and we presented evidence, and Mr. Blume and Mr. Nettles were aware that we were going to do this, evidence of Mr. Fulks' participation in two armed robberies.

So in some ways Mr. Curswell's background, if you will, was more in play from our position than Miss Allison's

USCA4 122

was.  Because his victimization had been more recent, and also there would be specific evidence of a crime.  While not necessarily factually similar, armed robbery is what he was a victim of, and we were going to present evidence of that.  And I don't think because Mr. Curswell was able to say to the Court that he could be fair despite the fact that he and his fiance had been victimized, he was qualified as a juror.  And so it's very rare that there are those facts that we would look at or the Court would look at to suggest someone is automatically disqualified if after questioning they can indicate that they can be fair.

THE COURT:  Well, I think the record will bear me out, I tried to be consistent in terms of accepting a jurors' answer at face value.  If they told me that they would have a problem with the fact two murders occurred here, or even hesitated, I kept them off the jury.  But if they said, no, I have been the victim of violent robbery, gunpoint, push me to the ground but I could put that aside and be fair, I accepted that answer at its face and I said that's what peremptory challenges are for.

And I think I did a couple of times, was it this case or was it the second one, where we had the minister who also was going -- had a law degree and a lot of other things, and I qualified him and went to lunch and had misgivings over lunch and came back and took him off.

MR. SCHOOLS:  That was this case, your Honor.

THE COURT:  That was this case.

MR. SCHOOLS:  The other case was the one where there was a woman whose daughter had been the victim of a kidnapping and sexual assault, and the Court questioned her, and she hesitated about whether she could be fair, and you, based on her equivocation and your observations, her body language, excused her.

THE COURT:  That was based on her equivocation and body language, and that was in the Basham case.  In this case we had the minister who was -- he said he had a law degree and medical degree, too, or something.

MR. SCHOOLS:  Airline pilot, I believe.

THE COURT:  And going to the Benedict School in Atlanta.  And he answered all the questions properly on paper, but it was just his demeanor and his body language, I just had misgivings about it.  And I qualified him at first, went to lunch by myself, thought about it, came back and said I just owe it to the defense team to take him off the jury.  That might be the only episode in this trial where I did not accept an answer at face value.  And that was a call that went to the defense team, actually.

MR. SCHOOLS:  That's right, your Honor.  And the defendant's assessment that Miss Allison was a strong death juror is just an assessment.  I think Mr. Gasser, Mr. Thurmond,

and I also did an evaluation of jurors as they were questioned during voir dire, and certainly jurors who from our perception there were stronger death jurors that ended up on the jury, stronger death jurors than Miss Allison. So I had her rated as 3 out of a scale of 1 to 5 as far as our assessment of her as a juror that the government would want in a death penalty only phase.

THE COURT: She was right at the midpoint?

MR. SCHOOLS: Yes, sir. And so I think the question really comes down to is the answer she gave one for which she would have been struck for cause. And particularly based on her answers at the hearing we had to determine what the facts were, it's clear that she would not have been. She was not equivocal in her assertion to the Court in the hearing that that fact would have played no -- would not have been a factor in her assessing the evidence in this case, did not play a factor. I understand under 606B that's not really evidence we should consider, except for the fact it may be some evidence of what her answers would have been had she been asked those questions originally.

In addition, your Honor the event itself was very remote in time. It was 33 years ago. She testified that she barely remembers what her deceased husband even looked like. That the event arose out of what was basically a barroom fight or a road rage kind of situation where the defendant and the --

USCA4 125

excuse me, the defendant in that case, in Miss Allison's husband's case, and her husband got into some sort of argument at a bar, and then that carried out into a parking lot. And, as I understand it, the perpetrator followed her husband and then shot him and killed him. They had been married six months, it was 33 years ago. She basically had no recollection of what he even looked like.

When you take an incident that remote in time and you take a juror's face value statement that it didn't or wouldn't have any impact on her deliberation, there's really little or no reason to question that unless you get some sort of vibe from the juror that would suggest she's not being truthful with the Court. Well, Miss Allison, to the contrary, I won't say she acted insulted that she was asked the question, but she was not happy about being here, I think felt like, with perhaps some legitimacy, that that was an issue that we should have ferreted out if she had left the question blank. She testified unequivocally she did not want to be on this jury.

There are, I think, other similarities between jurors in this case, or other circumstances, which would probably even more -- a more careful scrutiny of a juror's potential bias. For example, the Court qualified and seated jurors who had spouses who were the same age as Samantha Burns, in some instances both. In some instances the Court took the witnesses' testimony at face value that they could be fair even

though the victims in this very case had similarities of people that the jurors were actually very close with, related to, married to.  Those were the kind of issues that I think the Court is in the perfect position to take an assessment and look at those jurors' credibility and see whether they can or can't be fair.

In this case I think the Court did that with Miss Allison over defense's objection.  There was nothing that the Court observed during the course of her initial voir dire that suggested that she was a biased juror.  She was, I think, both during the original voir dire and the hearing on this issue, extremely nervous.  She is not the kind of juror who would have equivocated on the truth.  She would have told the truth if it impacted her.  And we think the record is just clear that she's not a juror who would have been struck for cause had we all known the facts of that murder at the time we seated this juror.

THE COURT:  All right.  The guiding law in this is the McDonough case out of the Supreme Court, which holds that if a juror falsely answers a question or withholds information that if fully disclosed would have resulted in the Court striking the juror for cause then a new trial is warranted.  All right.  So we got the McDonough issue.  That's what you really all have been debating.  And I think there is a separate issue of actual bias that might be a part separate and apart

from McDonough.  And, of course, we asked her did it have any affect on her verdict and she said no.  But my question is did that questioning violate evidence Rule 606 dealing with competency of a juror as a witness or not?

MR. SCHOOLS:  I think it did, Judge.

THE COURT:  You think it did?

MR. SCHOOLS:  Yes, sir.  To ask a juror whether any particular fact had any impact on her verdict I think is improper.  The difficulty with that particular question is that we have got the cart before the horse.  We have the verdict before the question.  That question obviously would have been a proper question to ask in the speculative form in the time she was questioned originally.  And we have addressed this in our memorandum, but --

THE COURT:  So you think I would disregard the Q and A she gave here when we brought her in about whether it had any affect, however slight, on her verdict.  She said no, but you say that's off limits, I can't even go there, because of this evidence rule?

MR. SCHOOLS:  I read the rule again this morning, your Honor, and it would seem to me to preclude that specific inquiry.  And I think we footnoted that in our memorandum to suggest that's probably not information that the Court can consider.

THE COURT:  All right.  But what that means then is

actual bias of a juror is something I really can't go into.

MR. SCHOOLS:  Well, you can go into it, I think, by looking at the nature of the alleged bias.  If, for example --

THE COURT:  That's what I'm coming to next, though. I think there is another doctrine of implied bias or inferred bias where the taint is just so bad that no matter what the juror says it's just not fair.

MR. SCHOOLS:  Well, this would never happen, Judge, but suppose, for example, the case agent's wife got on the jury panel.  And somehow that escapes us all during voir dire.  I think you could from that determine actual bias without inquiry of the actual juror about whether the fact she was a case agent's wife impacted her --

THE COURT:  Well, would that be actual bias or would that be inferred bias?  We would have no showing one way or the other of went on in the juror's mind.  I'm just trying to separate out the legal doctrines.  We got the McDonough decision, and then actual bias, which you say is off limits because of the evidence rule for jurors not testifying about their verdict.  But then I just want to find out if there's a separate thread going through the law or doctrine of implied bias where the connection to the case is so strong that the taint just can't be removed.  Or is that the same thing as the McDonough case?

MR. SCHOOLS:  Well, I don't think it is the same

thing.    I think courts have said even if the juror was not necessarily strikeable for cause that the Court can look at the implied bias.   But the relationships that are present in those implied bias cases are much stronger than here.    The relationships with a lawyer, a witness, some stake in the outcome.   And, obviously, Miss Allison has none of those.   So we don't think that any possibility of finding implied bias would apply in this case because based on the facts that she related to us simply is not inferable from what she testified from her demeanor on the witness stand.

There is a case we cited, and I believe it's the Fitzgerald case, but I'm not sure, in which a juror failed to disclose that a relative had been molested.   And then there was testimony at a hearing post-verdict during which it was revealed that the juror had related to the other jurors that he had no tolerance for sexual assault.   And the argument was that that was evidence of actual bias.

Well, the juror can testify competently about third-party influences or outside influences that got into the jury room.   Whether his communication to the jurors that he had a relative who was a victim of sexual assault and therefore had no patience -- no tolerance for rape, and in that case the defendant had raped the victim, whether that's right along the line of Rule 606B.   And I think we sort of start splitting hairs about whether that's talking about deliberations or not.

But I think that is the kind of evidence that might be considered to prove actual bias. In this case the evidence is not such that we can make that inference. So I think we look at the nature of the alleged bias to determine whether the Court should on those facts conclude this juror couldn't be fair, or despite her own assertion she could be fair there's no way due to the nature of the conflict. The judicial system can't tolerate that kind of issue.

So it's sort of hair splitting, I think, but nonetheless we think the cases that talk about implied bias, the three cases that are cited by the Fourth Circuit in their opinion in I believe it's Fitzgerald, are much stronger cases of inquiry into conflicts which might not amount to necessarily strikes for cause but post-verdict would be deemed to be problematic. Or not deemed to be problematic, would be problematic after.

THE COURT: Thank you. Anything in reply?

MR. BLUME: Just very briefly. The juror was qualified over our objection, as well, on that basis. But I think the other thing is you have to take them all, it's the totality of the answers as a whole. It's, again, not just sort of the murder victim, although we think that is unique here. The fact it's remote in time I don't think that cuts it any way in this case. Primarily because Miss Allison was pregnant with the -- her husband's daughter at the time. So she had a

lifelong reminder of what had happened.  This wasn't somebody who was 18, had married their high school boyfriend, it happened 33 -- she had this child the whole time, which would have been a reminder essentially, you know, a scab on a wound about what had happened to her ex-husband here.

And I do agree with the Mr. Schools that the Court can't consider the testimony of the juror that sort of impeaches their verdict how it impacted --

THE COURT:  So we do have an agreement on that.  The question is -- I was the one that asked her the question did your husband's murder 33 years ago have any impact on your deliberations or your opinion in this case, and she said absolutely not.  You agree that 606 keeps that out?

MR. BLUME:  Yes, I think 606 does preclude that testimony.  And I do agree there are basically doctrines about actual, implied and inferable bias.

THE COURT:  All right.  I'm having trouble fitting that in with the McDonough test.  Is that separate and apart from McDonough or is that part of it?

MR. BLUME:  Your Honor, this is not an area of the law in which the Supreme Court or the courts of appeal, in my opinion, has spoken with precision.

THE COURT:  You handled that very delicately, knowing you are going to be in the Fourth Circuit one way or the other on this case.

MR. BLUME:   And, in fact, I would say the same thing about the difference between actual and implied bias, is also at times the Court's talk about them in a ways that are interchangeable, or at least are not -- I can't tease out the difference.

I do think McDonough implies, and certainly the concurrence by Justice Blackmun applies, in that there is the question of juror failed to answer, the question would that have given the basis for a challenge for cause.  And then in addition I think the case seemed to imply that that doesn't preclude an inquiry of actual juror base or implied juror bias.

Now, those two things I think are relevant to the second inquiry of McDonough, was there a valid basis for cause, but I don't think they are totally -- they totally exclude each other.  So I think in addition to that the Court could grant the new trial motion on the basis of actual or implied bias on behalf of the juror.

THE COURT:   Well, go back.  I tried to be consistent. I mean, if nothing else I felt like I should be consistent and I did try to accept the jurors' testimony at face value.  If they said they could be fair, despite having been a robbery victim, for example, and nothing in their body language indicated they were being deceptive about their response, I said, okay, you're qualified.  And I'm just trying to fit that in now with you all both agreeing that I can't consider her

testimony here post-verdict that it didn't affect her deliberations or her decision. It's almost like a brain teaser now.

If the question had been put to her at jury selection can you put aside your husband's murder and decide this case on its own merits, she would have said yes, probably. Because we know that from what she said after the verdict. But we can't consider what she said after the verdict. So it's just like we don't know what she would have said. That probably made no sense, but I'm just thinking out loud.

MR. BLUME: Well, I think one of the reasons you -- generally you don't want to consider it afterwards is because of the realities of the situation. We now know there has been a trial. We know through this hearing because of something done or not done or something not asked --

THE COURT: Certainly. And it's human nature not to want to disturb the verdict.

MR. BLUME: Or to say okay, sure, that's the reason I did it. I think it's much more likely had the question come up ahead of time the juror might have said, you know, really that may make it hard for me. But nevertheless I think it's the reason you generally don't allow people to impeach.

But in this case, going back to the example that your Honor gave, I mean this juror did hesitate on -- even without this knowledge, the question of whether she could consider life

in a two-murder case.  And you interrupted the questioning to jump in and say, wait a minute, you are hesitating here.  And sort of I've got to know.  And this happened, you know, several times we went back and forth with her.  So I think her strong pro-death views, and I don't think how, truthfully, how they had her rated is any more relevant than what we had her rated. We had her rated seven plus on a one to seven scale.  I don't know if that's any more relevant that they had her three on a scale of one to five.

THE COURT:  She is off the top of the charts on your scale.

MR. BLUME:  We thought she was pro-death and a sure killer all the way.  But we made -- that's nevertheless what it was.  But I think the total combination of those answers is what makes that this juror was -- should have been challenged for cause.

THE COURT:  All right.  Mr. Blume, anything else you want to say on any other subject matter relating to a new trial motion?  I assume you want to renew all your objections and motions made through the whole trial.

MR. BLUME:  I am sure there's no need for us to do it, but I always -- we want to make clear we are not waiving anything and that we renew our prior objections and motions.

THE COURT:  All right.  Let's take a ten-minute recess and I'll come back out and rule on the motion.  We will

be in recess.

(A recess transpired.)

THE COURT:  The reason for the extended delay during the recess, I wanted to look at the transcript of what the juror said.  And I learned the actual transcript was not requested so it's not been prepared.  So I tracked down the court reporter.  And when Miss Allison was asked if she thought the perpetrator of the murder of her husband was -- what was he sentenced to, the answer was, "He was sentenced to a term of years, to ten years imprisonment, I believe."  The question, "Ten?  I thought it was 14."  Question -- I'm sorry.  I've got it backward.

The question was, "He was sentenced to a term of years, to ten years imprisonment, I believe?  Answer, "Ten?  I thought it was 14."  Question, "And did you feel like that was enough time for what he did?"  Answer, "Probably not, but I didn't dwell on it either."  Question, "And you said you were aware that he served some shorter period of time?"  Answer, "Yes, he did."  Of course, back then nobody served full sentences for anything.  So that was her response.  I just wanted to go ahead and tie that down and get it in the record.

All right.  I fully realize that whichever way I go on this motion before me an appeal is going forward so I need to carefully draft a written order.  But for today's purposes I'm going to announce I'm going to deny the motion for a new

trial. I will detail the reasoning in a written order to be filed as soon as possible. That will trigger the defendant's right to appeal the case, and if the case comes back for a reversal we will retry it. But it's my determination at this point that the motion for a new trial must be denied.

All right. The notice that you received indicated that if the motion was denied I would like to proceed with sentencing today because the defendant is still at Just Care, it's my understanding, and that is an awfully expensive proposition to the taxpayers and to the Marshal's budget. And to the extent we can move him along to a federal prison facility, which would probably be better for him, and be better for the taxpayers for sure, everyone is better served.

So, with that, the probation office has prepared a presentence report. And, Mr. Blume, my law clerk just reminded me you indicated to me at some point in the past that the transcript was inaccurate in some respects on the voir dire of Mrs. Allison. The court reporter, who I believe was Gary Smith, came to see me about that, and he said he listened to the tape and he was of the firm opinion that it was an accurate transcript. And I think he later told me you agreed with that eventually. I just thought we all ought so settle that now. Is that correct? I don't want to put words in your mouth. If it's not just tell me.

MR. BLUME: It's more or less right. I don't mean to

quibble.  I went back and listened to the tape and the tape is consistent with the transcript.  So I think it's my advancing age, means I just have the juror confused with another juror. But based on the tape and the transcript they seem to be the same.

THE COURT:  For the record, what did you think was extra that was not included in the transcript?  What subject matter?

MR. BLUME:  I don't know whether I had the juror confused with another juror, which I assume must be the case. But there was a juror who indicated that she was -- that she would give death on the two murders, and -- to me.  And then your Honor attempted to rehabilitate her, and then she told me again and your Honor rehabilitated her.  And so I don't know -- I must have it confused with somebody else.

THE COURT:  Mr. Schools, do you have any recollection about that, of that happening with Miss Allison?

MR. SCHOOLS:  Your Honor, my only input is I think I spoke with Mr. Smith after the hearing, and he advised me he listened to the tape and it matched the transcript.  But I haven't listened to the tape.

THE COURT:  All right.  Well, I'm going to order Mr. Smith to maintain that tape in case the Fourth Circuit needs it.

All right.  A presentence report has been prepared on

counts three through eight.  Has the government had enough time to read the presentence report?

MR. SCHOOLS:  Yes, sir.

THE COURT:  Any objections by the government?

MR. SCHOOLS:  No, sir.

THE COURT:  All right.  Mr. Blume, Mr. Nettles, have you have both had enough time to read over the presentence report on counts three through eight?

MR. NETTLES:  We have, your Honor.

THE COURT:  All right.  Now, I notice in the addendum you raise a Blakely challenge to the guidelines themselves. And, of course, I certainly thought we would have an answer from the Supreme Court by now, but we don't.  And the Fourth Circuit has announced that I am to follow the guidelines unless and until the Supreme Court changes.

Now, they did suggest in this Hammoud decision that I might want to take the opportunity to announce an alternate or fallback sentence.  Most judges I've spoken with have not followed that procedure because it seems to be agreed that if the guidelines are thrown out everybody is going to have to come back before the judge again for the sentence to be imposed, and there will certainly be argument later that the sentence should be modified in some respects.  So what's your position on an alternate sentence?

MR. NETTLES:  Well, I don't think an alternate

USCA4 139

sentence is proper, Judge.  I think it's one sentence under Hammoud which you have to impose at this point.  Although we ultimately think the --

THE COURT:  What is the government's position on the alternative sentence?

MR. SCHOOLS:  Judge, ordinarily I think we leave it at the Court's discretion, but I think this is a case where it might be appropriate given the nature of the crime, and at this point the certain irrelevance of any sentence on count three through eight anyway.  Mr. Fulks, even if there's some flaw in the procedure and the Fourth Circuit reverses the death sentence, he's pled guilty to kidnapping resulting in death with a mandatory life sentence.

THE COURT:  Right.  So it's all academic pretty much.

MR. SCHOOLS:  Pretty much.  And I think Mr. Nettles pointed this out, I believe, in his conversation with the probation officer, but the jury has essentially found all the facts in this case.  Not necessarily specifically, but they found that he -- specifically found that he engaged in the murder of Miss Donovan, which is the resulting cross-reference in the guidelines which kicked him up to a mandatory life on the non -- not all of counts three through eight, but those counts that have a life sentence involved with them.

So I think the reality is all this is very academic, and it would make sense for the Court to impose an alternative

sentence so that Mr. Blume and Mr. Nettles or 2255 counsel at a later date, if that happens, can make a knowledgeable decision about whether to pursue a resentencing on those counts.

THE COURT:  All right.  Well, it's probably all academic, but I think I will -- I know I will follow the guidelines pursuant to the Hammoud decision, and then I'll also announce an alternative sentence assuming the guidelines are thrown out, for what it's worth.  You may have to come back before me for me to actually impose the alternate sentence, but we will see about that later.

Now, according to the probation officer there's one other objection to the presentence report, is that correct, Mr. Nettles?

MR. NETTLES:  Yes.  We will withdraw that objection. I have seen the documentation that probation relied upon to formulate their response to my objection, and we will withdraw that at this time.

THE COURT:  All right.  And, just for the record, that was an objection to paragraphs 91, 94, 95 and 96.  And they all dealt with a conviction for which the defendant did not have counsel, and the question at issue was whether he waived his right to counsel after fully being apprised of his rights.

MR. NETTLES:  That's correct.

THE COURT:  You concede after looking at the

paperwork he did waive counsel.

MR. NETTLES:  Yes.

THE COURT:  All right.  That objection is withdrawn, and with that there's no objections to the presentence report.

MR. NETTLES:  That's correct, your Honor.  I would like to make clear, this goes back to what Mr. Blume said, it's kind of being hypertechnical, I wanted to make sure that the fact that we haven't made wholesale objections to the presentence report does not affect our right to contest any fact or facts as it relates to counts one and two.  It may affect us on counts three through eight in the sentence your Honor imposes, but not as to count one and two.

THE COURT:  Certainly.  You are protected on appeal for that.

MR. NETTLES:  Thank you.

THE COURT:  Now, Mr. Fulks, I need to speak to you. Have you had enough time to read over the presentence report that's been prepared in your case --

DEFENDANT:  Yes, sir --

THE COURT:  -- relating to counts three through eight?

DEFENDANT:  Yes, sir.

THE COURT:  Now, you understand this presentence report is an important document in terms of helping me decide upon the sentence to be imposed upon you in counts three

through eight?

DEFENDANT:   Yes, sir.

THE COURT:   Do you understand that?

DEFENDANT:   Yes, sir.

THE COURT:   Now, Mr. Nettles, one of your attorneys, has told me that although he initially objected to four paragraphs, he now withdraws that objection so that he has no objection to the presentence report as it's drafted, with the understanding that on appeal you will challenge all the factual decisions made by the jury in count one and count two.  But, aside from that, what the probation officer has written in this presentence report you find no basis to object to legally or factually.  That's what he tells me.  Is that correct?

DEFENDANT:   Yes, sir.

THE COURT:   All right.  Very good.  Thank you.  You may be seated.  Then the Court adopts the presentence report as drafted as its findings for purposes of sentencing under counts three through eight.  As Mr. Schools indicated, this may be an academic exercise because counts three through eight all call for a determinate sentences under the guidelines, and the defendant has pled guilty to count one and count two which at a minimum carries a mandatory life sentence.  So although it may be academic, I think I still need to march ahead and sentence on three through eight because the law requires it.

All right.  Having adopted the report, it's my belief

that the following guideline provisions are applicable:  The total offense level, again, this is counts three through eight only, total offense level is 43.  The criminal history category is 6.  The defendant is not eligible for probation.  The term of imprisonment is 660 months for counts three, four, five, seven and eight, plus 84 months on count six, which must be by law run consecutive.  Supervised release is three to five years.  The fine was not calculated because of inability to pay.  There's no restitution applicable here.  The special assessment is $600 or $100 for each of the six counts we are dealing with here.

Have I correctly stated the guideline ranges, Mr. Schools?

MR. SCHOOLS:  Yes, sir.

THE COURT:  Mr. Nettles?

MR. NETTLES:  Yes, your Honor.

THE COURT:  The Court then adopts the previously stated guideline range.  All right.  Is there anything the government wants to present in terms of sentencing matters on counts three through eight?

MR. SCHOOLS:  Your Honor, pursuant to Rule 32(i)(4)(b) the victims of this crime have a right to speak at this hearing, and we would ask the Court to hear from them. But we have nothing else from us.  Mr. Donovan, I believe, would like to address the Court.

THE COURT: All right. If the victims would come around, please. Mr. Donovan? I've looked at you for many, many days in this courtroom, but I have not had a chance to actually hear from you, so I'll be glad to hear you at this time.

MR. DONOVAN: This is addressed to the defendant, Mr. Fulks. During the weeks of your trial I've listened as your life has been detailed by both prosecution and the defense. I've heard about your childhood abuse, your family, your friends, your education, your leadership in driving skills, your manipulative and selfish nature, and even some of your sexual preferences. At no time during the trial have I heard anything about any humanity in your heart and I have seen no remorse in your eyes. I've come to believe that you are the incarnation of all the evil that mankind can inflict upon itself.

Alice was a kind, loving, courageous, and generous person. She had the greatest sense of humor. Through those qualities, her words and her actions, she had a profound effect on those she met in her life. She overcame her life's abuse and chose to adopt those qualities that I just mentioned. She was my wife, my conscience and my life partner. You have taken her from me and all those who love her. And we all still love her.

The support we have received from family, friends,

and even complete strangers has reaffirmed my faith in human nature, and your punishment has reaffirmed my faith in the justice system.  I can not understand the motivation for your acts, nor do I care to.  It suffices that you now understand what Alice and I have always believed, that everyone shall be held accountable for their actions, whether good or bad.

This trial for me has never been about revenge but accountability.  Alice left her first husband after he raped her and threatened to kill her.  You've carried out that sentence and now you will account for it.  Although I don't believe that a peaceful, drug-induced journey into eternity is true punishment for you or true justice for Alice.

Alice's death has had a profound effect on the lives of many, many people who knew her and many, many people who never knew her.  Now her death is about to have a profound effect on your life.  The irony of this is that while your family will know where your remains are, Alice's family and the family of Samantha Burns may never have the comfort of knowing where Alice and Samantha's remains are.

I no longer hold any animosity towards you, nor do I offer forgiveness.  Only pity.  And I hope that you've come to understand and appreciate the precious lives you have taken from us.

THE COURT:  Thank you, Mr. Donovan.  And give us your full name for the record so the court reporter will have it.

MR. DONOVAN:  Barry William Donovan.

THE COURT:  All right.

MS. WARNER:  Everything he said that --

THE COURT:  Give us your name first, if you would.

MS. WARNER:  Jennifer Warner.  Everything that he had wrote in there kind of took the words away from me and my sister.  She couldn't be here today, but she wanted to make sure that he understood that came from all of us.

THE COURT:  Thank you very much.

MS. WARNER:  Thank you.

THE COURT:  Mr. Schools, there's some letters attached to the presentence report from sisters of the victim and others.  I have read all those letters.  Some of them were actually addressed to the Attorney General.  I assume they were used back when the request was made to Washington to seek the death penalty here?

MR. SCHOOLS:  That's correct, your Honor.

THE COURT:  Well, I assure you I read each and every one of those letters before today.  Anything further from the government?

MR. SCHOOLS:  No, sir.

THE COURT:  All right.  Mr. Nettles, Mr. Blume, anything further?

MR. BLUME:  No, sir, your Honor.

THE COURT:  All right.  Then as to counts three

USCA4 147

through eight, which are the non-capital counts, pursuant to the Sentencing Reform Act of 1984 it's the sentence and judgment of the Court that the defendant Chadrick Evan Fulks is hereby committed to the custody of the Bureau of Prisons for a term of 660 months as to counts three, four, five, seven and eight.  This term consists of 120 months for count three, 60 months on count four, 240 months on count five, 120 months on count seven, and 120 months on count eight, all to be served consecutively pursuant to United States Sentencing Guideline 5G1.2(d).

As to count six, which requires a mandatory consecutive sentence, the defendant is sentenced to a term of 84 months, to run consecutive to all the other sentences imposed today.  Therefore, the total term of imprisonment imposed today is 744 months.

It is further ordered that the defendant shall pay to the United States a special assessment fee of $600, which is $100 for each of the six counts, which shall be due immediately.  The Court finds that the defendant does not have the ability to pay a fine in this case.  Therefore, the fine is waived.

Upon release from imprisonment the defendant shall be placed on supervised release for a term of five years.  This term consists of three years as to counts three, four, seven and eight, and five years as to counts five and six, all terms

USCA4 148

to be served concurrently.  Within 72 hours of his release from the custody of the Bureau of Prisons the defendant shall report in person to the probation office in the district to which he is released.

While on supervised release the defendant shall comply with the mandatory and standard conditions of supervision outlined in Title 18 of the United States Code, Section 3583D, and also the following special condition:  The defendant shall participate in a mental health treatment program as directed and approved by the U.S. Probation Office. Voluntary surrender is not an issue since he has been in custody since his arrest, and several detainers have been placed against him by other states.

Under the guidelines I am required to state my reasons for imposing this sentence.  As is obvious, I have sentenced to the maximum sentencing provided by law for each of the counts of conviction and run all counts consecutively.  My reasons are as follows:  These counts all have as derivative facts the kidnapping and murder of Miss Alice Donovan, and the raping of Miss Alice Donovan.  All those facts were cross-referenced into the guidelines, which gave a very high guideline range.  Because this did result in the death of a human being the maximum sentence under the guidelines is appropriate.

Pursuant to the Hammoud decision, it is my

alternative sentence in this case as to counts three through eight, if the guidelines are declared unconstitutional, my alternative sentence is to impose the maximum sentence provided by law for each of counts three through eight, all sentences to run consecutively.

As I said, it's somewhat of an academic exercise to talk about terms of imprisonment and being released on supervised release because it's my firm understanding that regardless of what happens on the penalty phase verdict, the defendant pled guilty to count one and count two, both of which carry at a minimum the life in prison without the probability of release.  So that is my alternative sentence.

Now, I also must impose the sentence on count one and count two.  Obviously, I have never done this before.  I believe it's the probation office has prepared a form, an order for me, an order implementing the judgment.  And just for the sake of completeness I would like to just publish this order into the record.  It provides for the imposition of the death penalty, conditions on who may observe, and so forth.

On May 7, 2004, the defendant Chadrick Evan Fulks pleaded guilty to, among other things, count one and two of the superseding indictment.  Pursuant to the plea the defendant is adjudged guilty of carjacking resulting in the death of Alice Donovan on or about November 14th, 2002, a violation of Title 18, Section 2119, and also kidnapping resulting in the death of

Alice Donovan on or about November 14, 2002, a violation of Title 18 of the United States Code, Section 1201.

Pursuant to the Death Penalty Act of 1994, which appears at 18 USC 3591 through 3594, and the special findings of the jury returned in this case on June 30, 2004, and the jury's unanimous vote recommending that the defendant be sentenced to death, it's the judgment of the Court that the defendant Chadrick Evan Fulks is sentenced to death on counts one and two of the superseding indictment. It is ordered that the defendant pay a special assessment to the United States in the amount of $100 for count one and $100 for count two which shall be paid immediately. I decline to impose a fine due to the defendant's inability to pay.

It is further ordered that the defendant's sentence shall be executed by a United States Marshal designated by the Director of the Marshal's Service. The defendant's sentence shall be executed by intravenous injection of lethal substance or substances in a quantity sufficient to cause death. The defendant's sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons, which date shall be no sooner than 60 days from the entry of this judgment of death.

The sentence shall be executed at a federal penal or correctional institution designated by the Director of the Federal Bureau of Prisons by a United States Marshal designated

USCA4 151

by the Director of the Marshal's Service, assisted by additional personnel selected by the Marshal and the warden of the designated institution, and acting at the direction of the Marshal, and by intravenous injection of a lethal substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the warden and acting at the direction of the Marshal.

If the date designated for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted.   Unless the President of the United States intervenes the United States Marshal shall not stay execution of the sentence on the basis that the defendant has filed a petition for executive clemency.

Except to the extent the Court orders otherwise, A, the warden of the designated institution shall notify the defendant of the date designated for the execution at least 20 days in advance, except when the date follows a postponement of fewer than 20 days of a previously scheduled and noticed date of execution, in which case the warden shall notify the defendant as soon as possible.

B, beginning seven days before the designated date of execution, the defendant shall have access only to his spiritual advisers, not to exceed two, his defense attorneys,

and, under supervision, members of his family, and the officers and employees of the institution.  Upon approval of the Director of the Federal Bureau of Prisons the warden may grant access to such other proper persons as the defendant may request.

In addition to the Marshal and the warden, the following persons shall be present to witness the defendant's execution.  Number one, necessary personnel selected by the Marshal and warden.  Number two, those attorneys of the Department of Justice who the Deputy Attorney General determines are necessary.  Number three, not more than the following number of persons selected by the defendant:  One spiritual advisor, two defense attorneys, and three adult friends or relatives.

And, number four, not more than the following number of persons selected by the warden:  First, eight citizens and, second, ten representatives of the news media.  No other persons shall be present at the defendant's execution unless leave for such persons' presence is granted by the Director of the Federal Bureau of Prisons or by this Court.  No person younger than 18 years of age shall witness the execution.  The warden should notify those individuals described above as soon as practical before the designated time of execution.

No photographic or other visual or audio recording of the execution shall be permitted.  After the execution has been

USCA4 153

carried out qualified personnel selected by the warden shall conduct an examination of the defendant's body to determine that death has occurred, and shall inform the Marshal and the warden of his determination.  Upon notification of defendant's death the Marshal shall complete and sign the return attached hereto as Exhibit A, or any similar document, and shall file such document with this Court.  The defendant's remains shall be disposed of according to procedures established by the Director of the Federal Bureau of Prisons.

No officer or employee of the Department of Justice shall be required to be in attendance or to participate in the execution if such attendance or participation is contrary to moral or religious convictions of the officer or employee, or if the employee is a medical professional who considers such participation or attendance contrary to medical ethics.  For purposes of this section the term participation includes personal preparation of the condemned individual and the apparatus used for execution, and supervision of the activities of other personnel in carrying out such activities.

Pursuant to the provisions of Title 18 of the United States Code Section 3596, it is ordered that the defendant committed to the custody of the Attorney General of the United States or his authorized representative for appropriate detention until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence.  When

USCA4 154

the sentence is to be implemented the Attorney General shall release the defendant to the custody of the United States Marshal who shall supervise implementation of the sentence in the manner prescribed by law.  The defendant is hereby remanded to the custody of the United States Marshal to await placement at the appropriate facility.

Those are the terms of the order that I will sign today, along with the judgment order in counts three through eight.

Now, Mr. Fulks, you have ten days from today to appeal the jury determination that you should receive the death penalty.  You also have ten days from today to appeal the sentence the Court has imposed on counts three through eight. And I guess I should say for thoroughness if there's anything regarding your guilty plea to counts one and two you think is appealable you also have ten days from today to make that appeal, as well.  If you wish to appeal any of these things and can not afford an attorney the Court will appoint one for you.

I think that does it.  Anything from the government?

MR. SCHOOLS:  No, sir.

THE COURT:  Anything further from the defendant?

MR. BLUME:  No, sir.

THE COURT:  All right.  Well, it's certainly not a happy occasion for anyone.  I will say this, it was a well tried case on both sides, and I have enjoyed working with all

of you, if that can be said about a death penalty case.   Thank you very much.   We will be in recess.

                    (The proceedings concluded.)

            I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____   2-2-05
            Daniel E. Mayo          Date

USCA4 156